IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | |
|---|---|
| UNITED STATES of AMERICA | ) |
| | ) |
| v. | ) No. 2:09-cr-96 |
| | ) |
| ROBERT RAY SAYNE, Jr. | ) District Judge GREER |

UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through James R. Dedrick, United States Attorney for the Eastern District of Tennessee, submits that the presentence report for ROBERT RAY SAYNE, Jr. includes all of the pertinent sentencing factors of 18 U.S.C. § 3553(a) and correctly states the criminal history level calculation of VI. However, as noted in its objection to the pre-sentence report, the United States respectfully submits that the Court should apply the enhancement for sophisticated means in accordance with U.S.S.G. § 2B1.1(9)(C). As provided below, the United States respectfully submits that the defendant's criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood of recidivism and the Court should consider an upward departure, pursuant to U.S.S.G. § 4A1.3(a)(1). The following subdivisions of 18 U.S.C. § 3553(a) are relevant to sentencing.

**1a.** **The nature and circumstances of the offenses.**

After he was released from federal custody on the prior bank fraud count on January 5, 2008, SAYNE reported to United States Probation Officer Dan Thornton to begin his five-year term of supervised release. He acknowledged his understanding of his reporting obligations when he met with United States Probation Officer Dan Thornton. SAYNE was subject to

1

several standard conditions and four special conditions of supervision. One specific condition was the requirement that SAYNE locate and retain gainful employment.

Shortly before he was released from federal custody on January 5, 2008, SAYNE contacted David Waters regarding employment. Mr. Waters advised SAYNE that he did not have a permanent salaried or wage position, but that he had a straight commission position, which involved the distribution of promotional literature for Mr. Waters' business. Mr. Waters did not pay SAYNE a salary or a wage, but provided him with a cellular telephone and service and an internet access modem. SAYNE accepted the part-time straight commission position shortly after he was released from prison. On or about March 1, 2008, SAYNE advised Mr. Waters that he had obtained a full-time position at an auto detail shop and they decided to terminate the straight commission position. At the request of SAYNE, Mr. Waters allowed him to keep the cellular telephone and service and the internet access modem and SAYNE agreed to pay the monthly charges associated with the telephone and internet modem. Mr. Waters never paid SAYNE any commission, salary, or wage.

SAYNE submitted monthly supervision reports to Probation Officer Dan Thornton under penalties of perjury. Each report required detailed information about SAYNE, including his residence, employment, vehicles, checking accounts, credit accounts, and expenditures. Each report contained a written warning that "Any False statements may result in revocation of probation, supervised release, or parole, in addition to 5 years imprisonment, a $250,000 fine, or both, 18 U.S.C. § 1001" and contained SAYNE's certification that all information he furnished is complete and correct. On March 3, 2008; April 1, 2008; May 2, 2008; June 2, 2008; July 22, 2008; August 1, 2008; September 12, 2008; October 1, 2008; November 4, 2008; December 3,

2008; and January 2, 2009, SAYNE submitted monthly supervision reports to Officer Thornton. In those eleven monthly supervision reports, SAYNE affirmatively claimed that he was employed by David Waters and Associates and reported gross wages in amounts varying from $1,100 to $2,330. In those monthly supervision reports, SAYNE attached earnings statements which he fabricated and represented were issued by David Waters and Associates. At the time SAYNE submitted the monthly supervision reports and the earnings statements, he knew that the reports were false, that he had received no earnings from David Waters and Associates, and that the earnings statements were materially false. SAYNE submitted the false monthly supervision reports and the fabricated earnings statements to avoid detection of his conduct which violated standard and special conditions of release.

After he was released from federal prison, SAYNE began to live with Mrs. Mary Almeda Ellis, an elderly individual who lives in Newport, Tennessee. Mrs. Ellis considers the defendant a grandson and because of this special relationship, the defendant had access to Mrs. Ellis' personal information, including Social Security Number, date of birth, bank, and credit information.

Using the front of Perfection Auto Detailing, SAYNE contracted with First Data Merchant Services to process credit and debit card transactions. First Data is a clearing house for credit card and debit card issuers, including banks and merchants. First Data maintains its operations center in Coral Springs, Florida. Pursuant to its contract with SAYNE, First Data provided him a card terminal to conduct financial transactions using interstate telephone transmissions and a unique Terminal Identification Number.

Consumers use credit cards to make purchases on credit granted by the card

issuer, usually a bank. There are five parties to the typical credit card transaction: a cardholder, a card-issuing bank, a credit card company or processor, a merchant, and the merchants bank. In typical legitimate transactions, the cardholder selects goods or services from the merchant and presents a credit card as payment. The merchant swipes the card through an electronic point-of-sale terminal and keys in the amount of the transaction. An authorization request is transmitted electronically through the credit card company/processor to the issuer of the credit card. The card-issuer then approves or declines the transaction based on the cardholder's account status, and the approval or disapproval is transmitted electronically back to the merchant through the credit card company/processor. At the end of each day, the merchant submits all of its credit card drafts to its bank, which in turn credits the merchant's account for the transactions. The merchant's bank is then responsible for getting paid for the transaction and sends transaction data electronically to the credit card company/processor, which in turn sends the transaction data to each card-issuing bank. The credit card company/processor collects the funds from each card-issuing bank and transfers them to the account of the merchant's bank. The card-issuing bank is responsible for collecting the funds from the cardholder.

Debit cards are connected to a cardholder's bank account and can be used to purchase merchandise and services from merchants and to withdraw cash from automatic teller machines (ATMs). A check card is a debit card. Debit transactions must receive on-line authorization from a central database before a payment can be made and rely on the internet, a means of interstate communication and commerce. Debit-based systems generally process transactions through traditional bank payment systems, such as the automated clearing house (ACH) or ATM networks. Unlike a credit card transaction, the debit card transaction is immediately complete

and funds are transferred from the cardholder/purchaser's bank account to the merchant or when the cash is withdrawn from the ATM. Debit cards have a machine-readable magnetic strip indicating cardholder information that usually includes the account number, bank number, expiration date, name and address, and type of account. The purchaser swipes his card and enters a Personal Identification Number; that information is encrypted by the register and sent to the transaction processor (such as First Data). The processor takes the account number and encryped PIN, decrypts the PIN using a decryption key, and verifies with the purchaser's bank that the cardholder has sufficient funds to cover the purchase. If that occurs, the processor sends an approval code to the merchant and funds are immediately transferred from the cardholder's bank account to the merchant.

Consumers also use Stored Value Cards to conduct transactions. An example of an SVC is a gift card or a prepaid card, which has been "loaded" with a pre-determined value. The card is issued by a card-issuer, which encodes the card to identify the unique location of the cardholder's value stored in a centralized data processing facility. The value store is maintained in an electronic memory register. The card-accepting terminal and the data processing center are connected by means of a data communications channel, usually a telephone or internet line, both of which are means of interstate communications and commerce. As value is used to make purchases, or when additional value is added to the store, the memory register at the primary electronic data source is adjusted accordingly. Such cards are similar to debit cards except that the cardholder specifically designates the amount of money that may be accessed through the card. The identity of the particular cardholder is not required and stored value cards may be used as anonymously as cash.

SAYNE gained an understanding of these complexities and then he gained control and use of five debit and credit cards issued by Bank of America in the names of Almeda Ellis; Sayne Automotive; and Robbie Sayne, and one debit card issued by GE Money Bank in the name of Robbie Sayne. He obtained another debit card in his name from Bank of America, Wal-Mart Stored Value Cards, check cards issued by Branch Banking and Trust to Mrs. Ellis, and other forms of electronic payment. As part of this scheme to defraud, beginning on or about December 3, 2008, he altered the Terminal Identification Number which First Data issued to Perfection Auto Detailing, thus emulating the Terminal Identification Numbers which were issued to other merchants who contracted with First Data for credit/debit card processing services. In sixty days, SAYNE emulated 45 other vendors or merchants. In these transactions, he submitted a credit card which had been issued by Bank of America to Almeda Ellis in support of a purchase from an emulated vendor. First Data approved the transaction, resulting in a credit being given to the emulated vendor and a debit being entered against the Bank of America credit card. Within a twenty-four period of time, SAYNE caused the same emulated vendor to refund the same transaction amount to one of the debit cards, stored value cards, or check cards he controlled. First Data approved the refund transaction, which issued a debit to the emulated vendor and a credit to the debit/stored value/check cards which SAYNE controlled. The defendant then diverted the credit/value to his benefit and use, most in the form of cash ATM withdrawals.

Because SAYNE entered matching pairs of purchases and refunds to First Data within a twenty-four-hour period of time, the legitimate/emulated vendors did not notice the transactions, since their accounts were not out of balance. Because the accounts "zeroed" out at the end of

6

each day and because transactions were submitted in batches, the scheme is known as a Zero Sum Batch Scheme. In every transaction, SAYNE realized value because he received credit on the cards he controlled. The cards were used to withdraw cash from ATMs and to purchase goods and services from legitimate merchants.

First Data Merchant Services identified $321,314 in more than 100 fraudulent transactions and forty-five different emulated merchants in SAYNE's scheme; these transactions were conducted via telephone calls placed from Newport, Tennessee to Coral Springs, Florida and via the internet. Both are means of interstate commerce and interstate communication. The amount of loss to FDMS was $40,650 for purposes of U.S.S.G. § 2B1.1(b)(1).

After FDMS, the FBI, and the probation officer shared information, SAYNE was arrested at the federal courthouse on January 20, 2009. His fraud scheme continued until his arrest: FBI Special Agent O'Hare found card readers and a laptop computer with transaction information on it, in the cab of his vehicle parked in front of the federal courthouse. SAYNE never voluntarily disclosed or terminated his illegal behavior: law enforcement officers terminated them.

SAYNE used the proceeds of his wire fraud scheme to purchase high-end vehicles and resold them, sometimes at a loss. The Federal Bureau of Investigation has identified and administratively forfeited three vehicles and SAYNE identified the location of a fourth vehicle at his debriefing on June 29, 2009. The purchase of vehicles with wire fraud proceeds is money laundering.

### 1b. **The history and characteristics of the defendant.**

The presentence report correctly presents the history and characteristics of the defendant. The present convictions represent the defendant's second and third federal felony convictions:

7

bank fraud in violation of 18 United States Code § 1344 in 2003; wire fraud in violation of 18 United States Code § 1343 in 2010; and false documents presented to a federal probation officer in violation of 18 United States Code § 1001 in 2010. SAYNE is a full-time criminal whose major life activities are fraud and deceit.

**2A. <u>The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.</u>**

The defendant committed offenses against the Judicial Branch when he submitted eleven false monthly reports beginning in March 2008 and continuing through the date of his arrest on January 20, 2009. He committed wire fraud while he was under the supervision of the United States Probation Office for a prior federal bank fraud conviction. All three of his federal offenses are serious offenses and the defendant's two most recent offenses prove beyond question that he has no respect for the rule of law or the authority of this Court. The defendant's repeated offenses and his decision to commit new offenses <u>while still on supervision for a prior offense</u> warrants just punishment.

The United States respectfully submits that the Court should accord serious weight to the defendant's corruption of the probation office process and integrity. Often considered the Court's "eyes and ears", probation officers are charged by statute with responsibility for the supervision of federal prisoners ordered to be supervised to complete their sentences. Among other things, federal probation officers are required to "keep informed, to the degree required by the conditions specified by the sentencing court, as to the conduct and condition of a probationer or a person on supervised release, who is under his supervision, and report his conduct and condition to the sentencing court...". 18 United States Code § 3603(2). Federal probation officers have extraordinary powers and the Court expects a very high level of professionalism

from probation officers. The federal probation system and process inherently relies upon the Court's authority, the probationer's candor and cooperation, and the officer's training and experience to meet the Office's mission, which is to assist the federal courts in the administration of justice, protect the community, and bring about long-term positive change in individuals under supervision.

The defendant corrupted the entire probation process, the integrity of the Court, and his chances for long-term positive change when he submitted multiple false monthly reports and fabricated earnings statements to Officer Thornton for nearly a year. There is no question but that the defendant would have continued his corruption until he was interrupted by the Federal Bureau of Investigation. Each time SAYNE lied to Officer Thornton, he was, in effect lying to the Court.

**2B.** **The need for the sentence imposed to afford adequate deterrence to criminal conduct.**

The defendant is an incorrigible fraudster who cannot and who will not be deterred from criminal conduct. As the pre-sentence report documented, the defendant embarked on his full-time criminal career while still a very young man. His custodial interludes have provided the only respite from his criminal swath of destruction. The Court can discern definite patterns in Robbie Sayne's behavior: lying, fabricating documents, facts, and events, stealing, and manipulating. His convictions include multiple theft convictions, multiple bad check convictions, multiple identity theft convictions, forgery, and failure to appear convictions in state courts. His practice of fabricating court documents began at age 25, when he caused someone else to fabricate a court order with the judge's signature to unsuccessfully facilitate SAYNE's release from the Grainger County Jail. His methods have become more sophisticated and more

9

fruitful for him, but the defendant remains today what he was at age 21: a con artist with no moral compass. The defendant cannot be deterred and cannot be rehabilitated.

**2C.    The need for the sentence imposed to protect the public from further crimes of the defendant.**

The Court should accord a high level of importance to this factor. As demonstrated in the pre-sentence report, the public in general and financial institutions in particular need to be protected from the defendant.

**2D.    The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The United States concurs with the probation officer that this factor is not relevant.

**3.    The kinds of sentences available.**
The presentence report correctly describes the kinds of sentences available.

**4.    The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.**

It is the position of the United States that the pre-sentence report correctly determined that the defendant has a criminal history category of VI with 26 total criminal history points. The United States asserts that the Court should impose the two-point enhancement for sophisticated means relating to the wire fraud count, and that this will yield a total offense level of 13, which yields a guideline advisory range of thirty-three to forty-one months under the Sentencing Table. As set forth more fully below, the United States respectfully requests that the Court depart upwardly four levels, to a total offense level of 17, which yields a guideline advisory range of fifty-one to sixty-three months under the Sentencing Table.

**5.    Pertinent policy statement.**

U.S.S.G. § 4A1.3 provides a policy statement regarding upward departures based on the inadequacy of the criminal history category and the probation officer has cited the policy statement. The explanation provided in the guideline commentary is instructive.

*U.S.S.G. § 4A1.3. Application Note 2(B):*

*<u>Upward Departures from Criminal History Category VI:</u> – In the case of an egregious, serious criminal record in which even the guideline range for Criminal History Category VI is not adequate to reflect the seriousness of the defendant's criminal history, a departure above the guideline range for a defendant with Criminal History Category VI may be warranted. In determining whether an upward departure from Criminal History Category VI is warranted, the Court should consider that the nature of the prior offenses rather than simply their number is often more indicative of the seriousness of the defendant's criminal record. For example, a defendant with five prior sentences for very large-scale fraud offenses may have 15 criminal history points, within the range of points typical for Criminal History Category VI, yet have a substantially more serious criminal history overall because of the nature of the prior offenses.*

**6.     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

This factor is not relevant.

**7.     The need to provide restitution and order a monetary fine.**

The presentence report correctly sets forth the appropriateness of a fine. Restitution in the amount of $40,650 should be ordered to be paid to First Data Merchant Services.

**8.     The Court should vary upwardly because the defendant's criminal history category does not adequately reflect the seriousness of his past criminal conduct or the likelihood of recidivism.**

The defendant has accrued a criminal history category point total of twenty-six, which exceeds the thirteen-point ceiling under the Sentencing Guidelines. In addition, the defendant has established a consistent history of non-acceptance of responsibility for his behavior and delusion with his abilities and accountability.

SAYNE has devoted his short lifetime to victimizing others through deception, swindles,

11

and outright lies.  He continues to attribute his illegal behavior to a poor family background, addiction to drugs and other substances, and victimhood.  Despite his terrible record of deceit and fraud, Sayne has managed to convince a stream of innocent individuals that he will reform and become a productive member of society.  The list of his victims includes his great-grandmother, his friends, and every law enforcement officer and probation officer assigned to deal with him.  SAYNE had the temerity to bring a new victim into federal court in his attempt to obtain pre-sentence release, a woman his attorney described as a "mother figure".  SAYNE is 33 years old, well past the age of minority or emotional need for a "mother figure".  SAYNE needs no more enablers, excusers, or victims: he needs to be controlled in a prison environment.

SAYNE has blamed others for his "problem": his family, his criminal accomplices, his victims, and law enforcement officers.  His behavior has worsened with each conviction, emboldening him to commit more serious crimes on increasingly vulnerable victims.  SAYNE demonstrated his contempt for the rule of law each time he walked into the federal courthouse and gave Probation Officer Thornton false monthly reports with <u>completely fabricated earnings statements</u> attached to the reports.  SAYNE's "problem" is not his poor family background, his addiction to drugs, any mental health condition, or that he does not understand the rule of law; his problem is that he totally rejects any rule of any sort on his behavior.  Every person and every business is merely a new victim, waiting to be fleeced.

For these reasons, and to deter recidivism by SAYNE, the United States respectfully urges the Court to impose a sentence of 70 months.  In support of its request, the United States cites *United States v. Zaky*, 2007 WL 1482105 (6th Cir. 2007)(affirming four-level upward variance in a mail and wire fraud case based on the defendant's multiple fraudulent acts in the

12

charged offenses, the patent insufficiency of the guideline range; the inadequate deterrence provided by the guideline range; the defendant's similar uncharged fraudulent conduct with other victims; and the defendant's medical and mental health needs). The two-point enhancement for use of a sophisticated means to commit wire fraud is appropriate and is supported by the facts admitted by the defendant: SAYNE gained an understanding of the complex world of electronic debit, credit, and stored-value cards and used that information to manipulate more than $300,000 in more than 100 financial transactions over a sixty-day period of time. He emulated the terminal identification numbers of forty-five legitimate vendors to steal more than $40,000. Then, to conceal his illegal credit card scheme, he provided false and fabricated information to his probation officer under penalties of perjury. These are sophisticated means to commit wire fraud and he should receive the two-level enhancement pursuant to U.S.S.G. § 2B1.1(9)(C). See *United States v. Masters*, 216 Fed. Appx. 524, 2007 WL 438085 (6th Cir. 2007)(affirming application of sophisticated means enhancement against a defendant convicted of wire fraud who engaged in a credit card fraud scheme)(holding that "A series of criminal actions may constitute sophisticated means even if none of the offenses, standing alone, is 'especially complex' or 'especially intricate'"); *United States v. Erwin*, 67 Fed. Appx. 876, 2003 WL 21376108 (6th Cir. 2003)(affirming sophisticated means enhancement against a wire and mail fraud defendant); and *United States v. Cox*, 2009 WL 4885266 (6th Cir. 2009)(affirming sophisticated means enhancement in a conviction for fraudulent transfer of funds in interstate commerce).

## SUMMARY

The advisory guideline range for the defendant is either twenty-seven to thirty-three months imprisonment (as per the Pre-Sentence Report) or thirty-three to forty-one months (as

per the United States' request for an enhancement for the defendant's use of a sophisticated means for the wire fraud). The United States respectfully submits that the Court should sentence the defendant to serve seventy months incarceration. This sentence is sufficient but not more than necessary to reflect the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offenses, to afford adequate deterrence, and to protect the public from further crimes perpetrated by the defendant. The defendant is an extremely poor candidate for federal supervision and is not likely to successfully complete any term of supervised release. The pre-sentence report correctly explained the Court's sentencing options.

RESPECTFULLY SUBMITTED,

JAMES R. DEDRICK
United States Attorney

By: *s/ Helen C.T. Smith*
Helen C.T. Smith
Assistant United States Attorney

Certificate of Electronic Filing and Service

I certify that I electronically filed the foregoing sentencing memorandum on March 29, 2010. Guy W. Blackwell, the defendant's attorney will receive a copy of the pleading via the court's electronic notice system. In accordance with the Court's order, I have provided a copy of the memorandum to the probation officer who prepared the presentence report.

*s/ Helen C.T. Smith*