**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No.: 2:09-CR-96** |
| | ) | **Judge Greer** |
| **ROBERT RAY SAYNE** | ) | |


**SENTENCING MEMORANDUM
ON BEHALF OF ROBERT RAY SAYNE**


**I.    Introduction.**

On November 17, 2003, Robert Ray Sayne was sentenced in this Court (2:03-CR-26) to 51 months in custody followed by 5 years supervised release. The case involved the creation and use of counterfeit checks by the Defendant at banks in East Tennessee. The loss was $107,509 and resulted in a total offense level 16 and criminal history V. The Defendant did not receive an adjustment for acceptance of responsibility and received a two-level enhancement for obstruction of justice (3C1.1). He had 12 criminal history points based on misdemeanor theft, bad/worthless checks, and a felony theft conviction. His resulting guideline range was 41-51 months.

On January 5, 2008, the Defendant was released from custody and began his term of supervised release. On January 13, 2009, the Probation Office in this Division submitted a Petition to revoke the Defendant's release, alleging he committed a new offense and had failed to comply with conditions of his supervised release. The Defendant was arrested on January 20, 2009, and has remained in custody at various jails in the District and in Ocilla, Georgia. The undersigned was appointed (CJA) to represent

him on the supervised release revocation petition and potential new charges.

There were meetings in early 2009 between the Defendant, the undersigned, and the FBI to explain the background of the new charges and cooperate with the ongoing investigation. During 2008, the Defendant had discovered a security weakness in the victim's [First Data Merchant Services (First Data)] operations and wanted to explain it so it could be addressed and corrected. There were extended discussions of a Plea Agreement, while the Government put together and disclosed the Rule 16 discovery materials. No Plea Agreement was reached and on October 14, 2009, the Grand Jury charged the Defendant in a Two Count Indictment (R. 1) with violations of 18 U.S.C. § 1001 (providing false information to the Probation Office) and 18 U.S.C. § 1343 (a wire fraud scheme involving First Data). The scheme was described in language the parties had agreed as part of the plea negotiation process.

On November 2, 2009, the Defendant pled guilty to both counts. The Government filed a detailed factual basis to support the plea that included a total loss of $40,650 [Presentence Report (PSR), Paragraphs 5-16]. The Defendant agreed with those facts, except a portion of Paragraph 9 of the PSR, and submitted his own background on his relationship with David Waters, as set out in Paragraph 18 of the PSR. The Defendant faces a maximum jail sentence on Count One of 5 years, Count Two of 20 years, and a consecutive sentence on the supervised release revocation. The Court granted the Defendant's Motion for Pre-Sentence Study and Report (R. 22), 18 U.S.C. § 3552(b)(c), and the Defendant was examined by Pamela McNish, Ph.D., a licensed psychologist in Knoxville, Tennessee. A report dated March 12, 2010 has been provided to the Probation Office and the Government.

The PSR currently reflects 26 criminal history points, a resulting criminal history VI, and a base offense level 7. As noted, the total loss was $40,650, resulting in a six-level increase. There were no other specific offense characteristics or enhancements, and the Defendant received a two-level adjustment for acceptance of responsibility [(3E1.1(a)]. There was a 14 level increase in criminal history points from the 2003 PSR. This was caused by 3 points from the 2003 conviction (2:03-CR-26) in this Court (PSR, Paragraph 48), by 2 points [4A1.1(d)] because the Defendant was on supervised release (PSR, Paragraph 53), and 1 point [(4A1.1(e)] because the current offense was committed less than 2 years from the Defendant's release from custody on the 2003 conviction (PSR, Paragraph 54). The Defendant also received points from state convictions which were run concurrently with the 2003 federal conviction: Knox County (forgery), 1 point (PSR, Paragraph 49); Sullivan County (felony theft), 3 points (PSR, Paragraph 50); and Sullivan County (failure to appear), 3 points (PSR, Paragraph 51). The Defendant's current offense level 11 and criminal history VI establishes an advisory guideline range of 27 to 33 months. The sentence on the current case would be consecutive to the supervised release revocation, a Grade B violation [7B1.1(a)(2)]. The Defendant's criminal history V at the time of the 2003 sentence (7B1.4) would result in a range of 18-24 months on the revocation.

## II.     Recent Sentencing Law.

Section 3553(a) of Title 18 of the United States Code instructs district courts to impose a sentence "*sufficient, but not greater than necessary*," to comply with the four purposes of sentencing set forth in Section 3553(a)(2). The four purposes of 3553(a)(2) are:

(A)    the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;

(B)    the need to afford adequate deterrence to criminal conduct;

(C)    the need to protect the public from further crimes of the defendant; and

(D)    the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The mandate to impose a sentence "sufficient, but not greater than necessary" is often referred to as the parsimony provision. The parsimony provision is not just another "factor" to be considered along with the others set forth in § 3553(a). It sets an independent limit on the sentence a court may impose.

In determining the sentence minimally sufficient to comply with the § 3553(a)(2) purposes of sentencing, the court must consider several factors listed in § 3553(a). These factors include (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentence available;" (3) the Guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) Guidelines range; (4) the need to avoid unwarranted sentencing disparity; and (5) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7). Neither the statute nor *United States v. Booker*, 543 U.S. 220, 245-46 (2005) suggests that any one of these factors is to be given greater weight than any other factor. What is clear is that all factors are subservient to § 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four policy purposes of sentencing.

In the recent case of *Gall v. United States*, 128 S.Ct. 586 (2007), the Supreme

Court outlined four steps a district court should follow during sentencing:

> [1]   As we explained in *Rita*, a district court should begin all sentencing
> proceedings by correctly calculating the applicable Guidelines range . . . .
> As a matter of administration and to secure nationwide consistency, the
> Guidelines should be the starting point and the initial benchmark.  The
> Guidelines are not the only consideration, however.

> [2]   [A]fter giving both parties an opportunity to argue for whatever
> sentence they deem appropriate, the district judge should then consider all
> of the § 3553(a) factors to determine whether they support the sentence
> requested by a party.  In so doing, he may not presume that the Guidelines
> range is reasonable . . . He must make an individualized assessment based
> on the facts presented.

> [3]   If [the district court] decides that an outside-Guidelines sentence is
> warranted, he must consider the extent of the deviation and ensure that the
> justification is sufficiently compelling to support the degree of the
> variance.  We find it uncontroversial that a major departure should be
> supported by a more significant justification than a minor one.

> [4]   After settling on the appropriate sentence, [the district court] must
> adequately explain the chosen sentence to allow for meaningful appellate
> review and to promote the perception of fair sentencing.

*Gall* at 596-97.

The *Gall* case involved a conspiracy to distribute the illegal drug, ecstasy.

Although the Guidelines recommended a sentence of 30-37 months of imprisonment, the

district court sentenced Gall to 36 months of probation.  The district court cited several

mitigating factors to support its sentence.

> The Court determined that considering all the factors under 18 U.S.C.
> 3553(a), the Defendant's explicit withdrawal from the conspiracy almost
> four years before the filing of the Indictment, the Defendant's post-offense
> conduct, especially obtaining a college degree and the start of his own
> successful business, the support of family and friends, lack of criminal
> history, and his age at the time of the offense conduct, all warrant the
> sentence imposed.  *Gall* at 593.

At sentencing, the district court explained that a probationary sentence was

sufficient, but not greater than necessary, to meet the goals of sentencing because Gall had in essence rehabilitated himself some four years before he was indicted. The government appealed and the Eighth Circuit reversed, holding that the district court's "100%" variance from the Guidelines range was not supported by sufficiently extraordinary reasons. The Supreme Court reversed the Court of Appeals. The Supreme Court explicitly rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall* at 595. The Supreme Court also rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* The Supreme Court noted that these approaches come perilously close to establishing a presumption that sentences outside the Guidelines range are "unreasonable" – a presumption the Court previously rejected in *Rita v. United States*, 127 S.Ct. 2456 (2007).

*Gall* affirmed that while sentencing courts must consider the Guidelines range as a "starting point," the "Guidelines are not the only consideration." *Gall* at 596. District courts must also consider all of the other factors listed in 18 U.S.C. § 3553(a). Once a Court of Appeals is satisfied that a district court has properly considered all of the factors listed in 18 U.S.C. § 3553(a), its review of a sentence is under the deferential abuse of discretion standard. *Gall* at 597. While a Court of Appeals "may consider the extent of the deviation, [it] must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall* at 597.

**III.**    **Nature and Circumstances of the Offense**.

A factual basis for the two counts is set out in the PSR (Paragraphs 5-16 and 18). The Defendant supplements those facts as follows. On January 5, 2008, the Defendant was released from federal custody and began a 5-year term of supervised release in this Division. His great grandmother, Mary Almeda Ellis, gave/loaned him $55,000 in July 2008 to begin a business, Perfection Auto Detailing (Perfection) in Oak Ridge, Tennessee. The Defendant and his business partner, Angela Allen, started the business in August 2008 and depended on the local Ford dealership to supply the bulk of the business. The dealership decided to keep their vehicle detailing work in house and in November 2008, Perfection failed. The Defendant became depressed after another personal and business failure, particularly after losing his great grandmother's money.[1]

The business acquired a "terminal" from First Data, by lease, to process credit card charges from prospective customers. As the problems with the business escalated, the Defendant continued to increase his use of illegal drugs (PSR, Paragraph 69). Late in 2008, the Defendant began experimenting with the terminal. He incorrectly believed this was his last chance for personal and business success. He began with the terminal ID number for Perfection and changed the last number to one number lower. For example, if Perfection's number was 1607925, then he changed it to 1607924, and downloaded the parameters for that number. If the parameters came back valid, then the Defendant used that merchant to process a transaction. If it did not, then he entered 1607923. The

---

[1] Perfection was opened in Angela Allen's name. This included the lease, utilities, and repairs to the building. The plan was for the Defendant to work for Allen and disclose the employment to the Probation Office once the business became viable.

Defendant did this continuously and in sequence until he came to a gap in the numbers. He would then go down until he came to valid numbers again. Every business associated with First Data had their own merchant ID number. The Defendant used certain debit, check, and stored value cards to store and use the $40,650 illegally obtained from First Data.

The undersigned was appointed (CJA) and initially met with the Defendant on March 6, 2009 at the Washington County Jail. Initially, the Defendant completely admitted his complicity in the scheme to provide false information to the Probation Office and the First Data activity. He was ready to cooperate and wanted to meet immediately with the FBI and First Data representatives to explain his actions and disclose what he believed to be security vulnerabilities in the First Data systems. The initial meeting was eventually held with the FBI on March 31, 2009. It lasted several hours and the Defendant painstakingly went through the circumstances surrounding supervised release, particularly the beginning of the business, and the detail of the operation of the First Data scheme. The Defendant answered all the agent's questions and expressed a willingness and desire to meet again, to include First Data to answer any questions or concerns which could come about from the proffer or additional investigation.

The case agent left on a detail and it was not until June 29, 2009 that the debriefing concluded at the Defendant's request. That meeting occurred at the U.S. Attorney's Office and included the FBI agent and Assistant U.S. Attorney. The Defendant again answered all their concerns and detailed what he believed was a serious deficiency he had discovered in the First Data systems. In addition to the terminal ID

discovery, above, the Defendant found personal credit card information could be obtained from the use of a First Data terminal and a password. The passwords could be identified through a relatively simple internet search. This put virtually all of First Data's private customer credit information at risk for discovery and possible exploitation. The Government agreed this information was valuable and said they would pass it on to First Data. They also credited all of the Defendant's disclosures through the proffer process as being complete and creditable.

**IV.**     <u>Impact of this Offense and Impact on the Defendant.</u>

On March 24, 2010, the undersigned met with the Defendant at the Claiborne County Detention Center to review the PSR, talk about the Sentencing Memorandum and discuss the sentencing process. The Defendant handed the undersigned the letter, Exhibit 1, he had written and is attached and set out verbatim below. It was written 14 months after he came into custody on the supervised release violation.

**Exhibit 1, Letter from Robert Sayne**

> Judge Greer: I hope that this letter will better express my thoughts and feelings to the Court, as I'm afraid I'll be unable to do so adequately in front of a large number of people.
>
> I want to apologize to the victim, my family, friends, Mrs. Smith, Mr. Thornton and the Court, although saying I'm sorry feels so inadequate for all the stress and trouble I've caused everyone. I'm sure words mean very little coming from me. Hopefully, one day everyone will know I'm sincere by my present and future actions.
>
> It seems like I've screwed up every opportunity I've been given and hurt most everyone I come in contact with. The saying, "The road to Hell is paved with good intentions," seems like it was made for me. I've wanted to do the right thing, but always seem to make a mess out of things, then manage to dig the hole deeper by doing something immoral and illegal.
>
> I often wonder how I got to this point, where I first started to go wrong. The sad truth is, I'm not sure. After my grandmother gave me another opportunity, I blew it. Once I realized that I had failed her yet again, I'm not sure whether I went into denial or simply didn't care what

happened. Any rational person would know they will get caught sending ill-gotten money straight into their bank account, yet that's exactly what I did. Likewise, I knew it was wrong (not to mention illegal), but I still went through with it.

I know I don't have the right to ask the Court for anything, especially leniency, but I do hope that you will ensure that I get the therapy I need to help me change my behavior, while incarcerated and more importantly beyond. I do not want anyone else to be hurt by my actions and am committed to changing those actions so no one else will be.

Thank you for taking the time to read my letter. Robert Sayne

The Defendant has had no contact with his mother, Carlene Sayne, in the past eight years. The whereabouts of his father, Kevin Wright, are unknown, although the Defendant believes he is still alive. His closest relatives are his half-sister, Amber Belcher Brown, and his great grandmother, Mary Almeda Ellis. They are both willing to give him another chance. Their letters and one from his brother-in-law, Poncho Brown, are attached as Exhibits 2, 3, and 4, and are set out verbatim below.

## Exhibit 2, Letter from Amber Brown, Robert Sayne's Sister

To Whom It May Concern: Hello, my name is Amber Brown. I am Robert Sayne's little sister. Robert is one of the best brothers I could have ever ask for he is caring and loving and has always took care of me. He has always took care of our great grandmother Almeda Ellis and made sure she had everything she needed and took her wherever she needed To go dr appointments, hair appointments, eye appointments and etc... I am not asking that you excuse Robert from anything I am very aware that if he has committed a crime that he has to pay for his actions. This is why the legal system is in place. The only thing I ask is not to just throw someone away that is as smart and has as much potential that Robert does he is one of the smartest people I have ever met in my life. He is so full of life, and I really feel this time that Robert wants To change his life I myself have never gotten involved with his criminal life because I never felt that he wanted to do the right thing. This time he does he wants therapy and he wants help. I feel that if he does have help that there wouldn't be any more criminal history for Robert. He would do anything in the world for anybody To help them and is a very hard worker, and has never had any kind of violent charge or violent nature he is a very easy going person. Thank you. Amber Brown

## Exhibit 3, Letter (Email) from Mary Almeda Ellis,
## Robert Sayne's Great Grandmother

I, Almeda Ellis great grandmother of Robert Sayne am writing to you on behalf of my great grandson. He has always been a big help to me taking me to church, and to social events and anywhere else I needed to go. He did work on things I needed around the house and anything else I needed.

Robert decided he wanted to start a business for income so I gave him the money to get started in a detail shop business. He worked very hard in the business but the location was not good and car dealerships could not afford to hire outside workers so Robert's business didn't make it which I feel was the reason for his actions.

Robert has always been there for anyone that he could be a help to and I have been blessed with him as far as him not having any use for drugs or alcohol. I feel that he could turn his life around if given another chance. Thank you. Almeda Ellis.

## Exhibit 4, Letter from Poncho Brown,
## Robert Sayne's Brother-in-law

Hello. My name is Poncho Brown, and I am Robert Sayne's brother n law. I have known Robby for about 22 years. I have always known Robby 2 be a very loyal and caring person he is always doing everything he can to help someone. He has always had one of the biggest hearts I have ever seen. He loves his family and friends very much. I am aware that Robert has a bad criminal history. I feel that if he could get the help he needs I feel he would change his life, and his ways. Robby has never had a violent nature he has always been very respectful and caring. Thank You. Poncho Brown

Several other friends and associates sent emails or letters to the undersigned for submission to the Court. They generally describe the Defendant as a person with two personalities and have difficulty understanding how his personal and public persona could have engaged in the criminal activity. Their letters, Exhibits 5-11, are attached and set out verbatim below.

## Exhibit 5, Letter from Jennifer Cash

To Whom It May Concern: I met Robert Sayne 1 time through his sister Amber Brown. I believed him to be a nice well rounded person and didn't know that he had a criminal past until I was told about it. He seemed

to be a very caring person toward people he was around that day and not at all criminal like. From what I know, he is in need of some kind of therapy and I think he needs it.  It would be more beneficial for him to have therapy than to be just sitting in a cell waiting around.  Sincerely, Jennifer Cash

### Exhibit 6, Letter from Bryan Kent McPeters

To Whom It May Concern:  I met Robert Sayne online around March 2008. We chatted off an on for about four months. It was not until July 2008 that I met Rob in person. He seemed to be a regular and normal person. He was working at the detail shop in Oak Ridge. Rob seemed to have normal friends and had the same hobbies and interests as any other 30-something year old man. We both had our interests of cars as our biggest common subject. I begin hanging out with Rob and his friends at the detail shop when I was off work and on weekends. Nothing about any way that he conducted his business or acted towards his friends or family made me think anything out of the ordinary about him. From the nine months that I knew of Rob before he was detained, he was a very personable and normal acting person. He conducted his personal relationships and business relationships the same way as any other person would have. Again, he did not act in any way that would have made me think anything out of the ordinary about him or his character. Thank you, Bryan Kent McPeters

### Exhibit 7, Letter from Tammy Clark

To Whom It May Concern, I met Rob Sayne through my brother, Bryan Kent McPeters. We met at a family cookout and we were around each other a few more times, including Christmas 2008. From what I knew of Rob, he seemed to be a normal, down to earth person. He got along great with all of our other family members and did nothing that made him stand out. He was able to talk and carry on normal conversations and was very courteous to everyone. My honest opinion is that he seemed like any other person you would meet. Nothing he said or did, or any of his actions would have made me think anything bad about him. I thought he was funny and a nice person. He got along great with my brother Kent, so I really didn't see any problems. Sincerely, Tammy Clark

### Exhibit 8, Letter from Carol Heatley

To Whom It May Concern:  I met Rob around 2002 at a car dealership I worked at. He brought a friend to look at a car.  He was very friendly and we agree to get together sometime which we did go out to dinner and we have been friends since. I had no idea that Rob had done

anything wrong because he seemed so straight forward to me. But he went to prison after that and we lost touch. But continued to be friends after he got out. We grew very close so I was around him a lot and I never saw or heard anything that would lead me to think he had done anything wrong. So I didn't know anything until they arrested him and that was a real shock to me. I just couldn't believe it. We had talked about his past and he said he would never go back we have continued to be friends for the time he has been in jail and I wish the best for him. (Signed) Carol Heatley

### Exhibit 9, Letter from Anna Vierengal

To Whom It May Concern: I Anna Vierengal have knowned Robbie Sayne for a while. I have never knowned him to do any drugs or alcohol. He was always a very nice person. Anna Viergenal

### Exhibit 10, Letter from Orville J. Burly, Jr.

To Whom It May Concern: I had the pleasure of knowing Robbie Sayne for about a year. For a young man he was always very mannered and polite and impressed me of being a wonderful human being. Orville J. Burly, Jr., 298 Black Oak Rd., Harriman, TN 37748 (C 865-293-8990) (H 865-882-9603

### Exhibit 11, Letter from Elizabeth Burly

Dear Sir: I am writing regarding Robert Sayne whom I have known for over one year. He is a very mannerable young man and would go out of his way to help anyone and I would wish for good things to happen to him. Thank you. Elizabeth Burly, 298 Black Oak Rd., Harriman, TN 37748 (865-882-9603)

## V.   History and Characteristics of Robert Ray Sayne.

In *Rita v. United States*, 127 S.Ct. 2456 (2007), the United States Supreme Court noted that Congress intended for the Sentencing Commission and sentencing courts to carry out the same 3553(a) objectives in determining appropriate sentences:

In instructing both the *sentencing judge* and the *Commission* what to do, Congress referred to the basic sentencing objectives that the statute sets forth in 18 U.S.C. § 3553(a) (2000 ed. and Supp. IV). That provision tells the *sentencing judge* to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to

avoid unwarranted disparities; and (7) the need for restitution. The provision also tells the sentencing judge to "impose a sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing as set out above.

Congressional statutes then tell the *Commission* to write Guidelines that will carry out these same § 3553(a) objectives. Thus, 28 U.S.C. § 991(b) indicates that one of the Commission's basic objectives is to 'assure the meeting of the purposes of sentencing as set forth in [§ 3553(a)(2)].' The provision adds that the Commission must seek to 'provide certainty and fairness' in sentencing, to 'avoid unwarranted sentencing disparities,' to 'maintain sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices,' and to 'reflect, to the extent practicable [sentencing-relevant] advancement in [the] knowledge of human behavior.' Later provisions specifically instruct the Commission to write the Guidelines with reference to this statement of purposes, the statement that itself refers to § 3553(a). See 28 U.S.C. §§ 994(f), and 994(m).

<u>The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale.</u>

*Rita* at 2463 (emphasis added).

Despite Congress' intent that sentencing courts and the Sentencing Commission apply the same 3553(a) factors to determining appropriate sentences, the Guidelines have for years effectively ignored the "history and characteristics of the defendant." The Guidelines specifically provide that age, education, vocational skills, mental and emotional conditions, physical condition, drug and alcohol dependence, employment record, family ties and responsibilities, military service, civic, charitable, or public service, record of prior good works, lack of guidance as a youth are to be given little or no consideration in determining whether a departure from the Guidelines is warranted. <u>See</u> U.S.S.G. § 5H1.1-5H1.12.

The *Rita* court noted this problem with the Guidelines in the last paragraph of its

opinion but refused to address the issue because Petitioner Rita failed to raise the issue in the Court of Appeals. The Supreme Court said:

> Finally, Rita and supporting *amici* here claim that the Guidelines sentence is not reasonable under § 3553(a) because it expressly declines to consider various personal characteristics of the defendant, such as physical condition, employment record, and military service, under the view that these factors are "not ordinarily relevant." USSG §§ 5H1.4, 5H1.5, 5H1.11. Rita did not make this argument below, and we shall not consider it.

*Rita* at 2470.

In the formulation of its Guidelines, the Sentencing Commission no doubt failed to take into account the history and characteristics of defendants because all defendants are different, and it would be extremely difficult to draft Guidelines to fit all of the different personalities, histories, and walks of life that come before the courts. The unfortunate truth is that rather than relinquish the job of evaluating those aspects of defendants to the sentencing courts, the commission adopted the approach that all defendants are essentially the same and that their histories and characteristics are irrelevant unless something "extraordinary" about them exists. Counsel respectfully suggests that the Commission's approach has been flawed for many years and that, accordingly, the following information concerning the defendant's history and character is extremely relevant to this Court's determination of what is a reasonable sentence.

## Family History

Robert Ray Sayne (age 33) was born on January 14, 1977 in Memphis, Tennessee. He has a younger half-sister, Amber Belcher Brown (age 28) in Newport, Tennessee, who has been very supportive over the years. The Defendant's upbringing was complicated. On one hand, his mother abused him and his father was never part of

his life.  On the other, he had relatives and grandparents who raised and taught him their unique values and ways of life.

The Defendant was born to Carlene Sayne.  During his early years, his mother abandoned him and he was raised by his grandfather, Bob Sayne, and two sets of great grandparents in Newport, Tennessee.  His grandfather was openly involved in various illegal activities, including "chop shops," drug trafficking, moonshine, dog/chicken fighting, and insurance fraud.  The Defendant's grandfather and great grandparents, Burnett and Mary Almeda Ellis, gave him everything he wanted with little discipline or rules about conduct and behavior.  When he was eight, the Defendant began living again with his mother, his step-father, Wayne Belcher, and his younger sister, Amber Belcher Brown.  He observed Wayne Belcher physically abuse his mother.  His mother and step-father regularly abused drugs and alcohol.  After several years, Defendant's mother again left the home and began living with Brady Wood.  The Defendant again stayed with his relatives until Wood was convicted on drug charges and went to prison.  His mother then married Joe Seay, who at the time was financially stable.  She took over the family finances and began several elaborate schemes to take money from him and others to support her lifestyle and apparent substance abuse problem.  Since then, the Defendant has only had limited contact with his mother.

When he was 19, the Defendant was first told by his mother that his father was Kevin Wright.  His mother wanted the Defendant's help in suing the putative father for back child support.  He refused and thought about trying to find his father as the years went on.  He never followed through on what his mother told him, because he was afraid she may not have told him the truth.

The Defendant's grandfather, Bob Sayne, his great grandfather, and his mother at various times attempted suicide. There is a family history of mental illness and psychiatric intervention. The Defendant himself began abusing alcohol and drugs when he was 19. (2:03-CR-26, PSR, Paragraph 57). This has continued periodically until the January 2009 arrest. He wants treatment for his substance abuse and will request at sentencing the Bureau of Prisons 500-hour comprehensive drug treatment program.[2]

## Criminal History

It is difficult to understand or rationalize Defendant's criminal history. There were no juvenile adjudications (PSR, Paragraph 36) and Defendant's extensive and varied drug abuse began and escalated with the beginnings of his adult criminal history in 1998 (PSR, Paragraphs 39 and 69). Until 2001, there was a series of theft and bad/worthless check charges in this area (PSR, Paragraphs 39-45). They all appear to be misdemeanor offenses and generally involved little, if any, jail time and payment of restitution. There is only one instance where the Defendant violated his probation (PSR, Paragraph 39), but he accumulated 7 criminal history points (category IV) during this time. The undersigned may file objections to the calculations associated with these convictions. They all could count, but may overstate his criminal activity. They do not involve drugs, guns, or violent conduct, and in most cases were simply remedied with restitution.

The criminal conduct escalated in 2002 and resulted in the Defendant's first felony conviction. The Defendant was indicted in this Court (2:03-CR-26) and charged

_____

[2] The Defendant was told by his first partner, Jonathan Hill, that he had given the Defendant HIV. Over a month went by before the Defendant was tested and learned he was not infected. Hill then admitted he had lied to get even for a perceived transgression by the Defendant.

with a violation of 18 U.S.C. § 1344, bank fraud, based on facts in May/June 2002. The case revolved around several cashier's checks and other checks which totaled $107,509.85 for guideline and restitution purposes. The Defendant admittedly involved his great grandmother, Mary Almeda Ellis, in his scheme but did not disclose any of the details to her. On April 28, 2003, the Defendant pled guilty with a Plea Agreement to the Indictment. He was initially released on a non-surety bond, but was arrested on August 20, 2003 on a pretrial release violation relating to a failure to appear charge in state court. On September 29, 2003, at a hearing to withdraw his guilty plea in this Court, the Defendant testified his plea had not been voluntary and he had not committed the alleged crime. As a direct result of this irrational behavior, the Court denied the motion to withdraw, assessed a 2 level increase for obstruction (3C1.1), and took away what should have been a 3 level reduction of acceptance of responsibility (3E1.1). The Court then sentenced the Defendant to 51 months, the top of the then mandatory guideline range. This type of conduct did not recur in the case at hand.

The second felony conviction was a theft/worthless check case in Blount County, Tennessee (PSR, Paragraph 46). Although the crime occurred in 2001, the Defendant was sentenced in 2003 to serve 5 years in state custody, concurrent to the then active federal sentence (2:03-CR-26). There were other pending state charges that were resolved in the same manner. A theft and tampering charge based on facts in March 2002 resulted in a felony conviction in Grainger County and a consecutive term to the 2003 federal sentence (PSR, Paragraph 47). He was apparently paroled by the state in January 2008, at the time he was released from federal custody.

The remaining three convictions involved conduct in May 2003. Although two

convictions (PSR, Paragraphs 49 and 50) occurred a day apart, the first (PSR, Paragraph 49) was sentenced on July 16, 2003, while the Defendant was on release from the 2003 federal sentence. The second (PSR, Paragraph 50) was not sentenced until April 4, 2005, while the Defendant was serving his 2003 federal sentence, apparently when he was returned to Sullivan County on a writ of habeas corpus ad prosequendum. There is no factual recitation on either conviction in the PSR. Both sentences expired before the Defendant was released from federal custody. Finally, the failure to appear conviction (PSR, Paragraph 51), #S48023 comes from the felony theft conviction (PSR, Paragraph 50). Although the guilty plea and sentencings occurred the same day and involved consecutive jail terms, the Defendant received 6 criminal history points. In effect, the Defendant received 13 criminal history points on the state convictions based on plea agreements directly related to his 2003 federal conviction.[3]

In the end, whether the Court subtracts some of these points, makes no difference, the Defendant will still be a criminal history VI. The objections to some of these convictions, above, if offered, are primarily for consideration under 3553(a) and to address the departure language (PSR, Paragraph 91 and 92) included in the PSR (4A1.3).

## Custody

Since his arrest on January 20, 2009, the Defendant has been housed in a variety of jails in Tennessee and Georgia. He was moved around locally between Washington County, Greene County, and Ocilla, Georgia, and forced to sleep and exist in overcrowded jails under difficult conditions of confinement, often with violent offenders. He had no disciplinary write-ups and has accepted confinement and his loss of freedom

---

[3] PSR, Paragraphs 46 (3 points), 47 (3 points), 49 (1 point), 50 (3 points), and 51 (3 points).

as a natural consequence of his criminal activity. In fact, he has risked his own personal safety by assisting law enforcement and corrections officials.

Early in custody, the Defendant shared a cell with a Hispanic at the Washington County Jail. Both the Hispanic and his brother, an inmate, had violent criminal histories and were in custody for violent crimes. As a diabetic, the Hispanic was on a special diet and required a tray each meal with his name on it. Someone in the jail working in the kitchen would tape pills and contraband on the bottom of a bowl on the tray. The Hispanic would then accumulate the contraband for use or sale to other inmates. The Defendant disclosed the scheme to jail officials and a shake-down inspection resulted in the recovery of contraband from the cell. The Defendant was then transferred to another cell block for his safety and was eventually moved to another facility. He was returned several months later to Washington County and the undersigned intervened and he requested he be moved away from the Hispanic. He was again transferred to another facility.

During a recent stay at the Claiborne County Jail, the Defendant overheard another inmate talking about several robberies and burglaries he had committed in the area while using a stolen motorcycle. The inmate said the local sheriff's department had located witnesses who could place the motorcycle at several of the crime scenes. They also had a video from a sheriff's cruiser of the subject fleeing from the deputy on the stolen motorcycle, but had not been able to identify the inmate who was wearing a helmet. The inmate told the Defendant he was going to have his girlfriend dispose of the helmet because it would link him to the stolen motorcycle and ultimately the crimes. The Defendant was able to relay this information to the sheriff who in turn reviewed the

visitation video/phone conversations between the inmate and the girlfriend. Ultimately, the girlfriend turned over a quantity of stolen guns and gave a statement implicating the inmate, who has been charged.

Recently at the Claiborne County Jail, the Defendant witnessed an altercation between guards and an inmate. The inmate had resisted the guards and fought with them until he was maced and subdued. The corrections officials interviewed the Defendant and he gave a full, complete statement that the inmate had continually resisted the guards' attempts to control him.[4]

## **Psychological Evaluation**

On October 29, 2009, the undersigned filed a Motion for Pre-Sentence Study and Report (R. 22) and Affidavit under 18 U.S.C. § 3552(b) and (c). It was based on several concerns. On March 6, 2009, the Defendant told the undersigned, "I am not normal. There must be something wrong with me." He later said during the PSR interview, "I've never been a success at anything." Although he had a lengthy criminal history, no one on the federal or state level, or anyone else for that matter, had ever thought to have him undergo a psychological evaluation. The correctional focus in the past had primarily been punishment with some attention to the Defendant's drug abuse problem. The Court granted the Motion to identify psychological issues relating to the Defendant's past and available treatment he could receive while in custody and afterward on supervised release to avoid a repeat of criminal activity.

The evaluation was conducted by Pamela McNish, Ph.D., a licensed psychologist

---

[4] The names of the subject inmates were not included because of the potential public nature of this pleading and the real possibility of retribution against the Defendant within the correctional system.

in Knoxville, Tennessee. The undersigned sent her a number of documents, including the Motion and Affidavit, above, family background, the Indictment, and the factual bases. Five specific questions were asked (Exhibit 12) and an appropriate written report was requested. The evaluation took place at the Claiborne County Detention Center. On March 12, 2010, the report was received by the undersigned and has been provided to the Probation Office and the Government.

Dr. McNish conducted clinical interviews and mental status examinations with the Defendant, reviewed all the submitted documentation and conducted other collateral interviews. The report outlines the "unorthodox quality of his upbringing" which included abuse by his mother and a grandfather and life without a father. The examinations were somewhat revealing and often inconsistent, and in part, provide verbatim:

> • Mr. Sayne's scores reflect achievement at post high school level in spelling; the post high school grade level in reading; and the high school level in arithmetic. (Wide Range Achievement Test)
>
> • He tends to rely on defenses of denial and repression in the face of conflict. He feels somewhat self-alienated and expresses some personal misgivings or a vague sense of remorse about past acts. He feels that life is unrewarding and dull, and he finds it hard to settle down. He views the world as a threatening place, sees himself as having been unjustly blamed for others' problems, and feels he is getting a raw deal out of life. His scores suggest a low capacity for change. His tendency to repress or deny problems makes him particularly resistant to the idea that psychological factors can influence his symptoms. He may be receiving secondary gain from his symptoms that helps to maintain them (Minnesota Multiphasic).
>
> • The clinical scales suggest the presence of tension, anger, unhappiness and instability. The profile reflects his distress at his current situation, both legally and interpersonally. He is uncertain about major life issues and has little sense of direction or purpose in his life as it currently stands. He is quite impulsive and prone to behaviors to be self-harmful or self-destructive. . . His self perceptions will tend to vary as a function of the current status of close relationships; apart from a sense of identity

established from relationships, he likely feels incomplete, unfulfilled and inadequate (Personality Assessment Inventory).

• Anger results from the belief or realization that some person or situation has imposed an injustice on the individual. Typically, some form of goal attainment is perceived to have been unfairly blocked. Mr. Sayne appears to have a strong tendency to express anger overtly, directly, and without inhibition (FIRO).

• [Contrary to assertions made by the Government when the Defendant pled guilty] Mr. Sayne endorsed symptoms and psychological problems in a manner which is consistent with individuals honestly reporting their difficulties. No evidence of exaggeration or feigning was found (Structured Interview).

Dr. McNish determined the Defendant was not suffering from an Axis I mental illness. She did determine he displayed sufficient symptoms to warrant an Axis II diagnosis of two separate personality disorders: Borderline Personality Disorder and Anti-Social Personality Disorder. As she notes, "The essential feature of Borderline Personality Disorder is a persuasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that begins by early adulthood." The perception of impending rejection can lead to profound changes in self-image, cognition, and behavior. Dr. McNish believed the Defendant's intense abandonment fears could lead to impulsive actions. Dr. McNish determined the second diagnosis, Anti-Social Personality Disorder, "is justified for Mr. Sayne due to his history as well as his current behavioral patterns." This has manifested in disobeying laws, repeated lying to others for personal gain, being impulsive and irresponsible and a sense of being indifferent to the consequences and results of his actions.

In the Summary, Dr. McNish recognizes the Defendant's "criminal behaviors as having been committed for the benefit of others," but adds he then justifies his behaviors "by doing things for others in order to keep from being abandoned." She then states his

"desire for an evaluation is admirable" but says "his request seems self-serving." She concludes the "requesting and participating in the evaluation is a benefit only to Mr. Sayne." Here is where the undersigned's opinion is different. The Defendant believed he had a problem, admitted the problem, and asked for help. The Defendant believes he has let everyone around him down, including his great grandmother, his half-sister, Brian McPeters, Dan Thornton, the Court, the FBI, U.S. Attorney's Office, and First Data. As he said, he has never been a success at anything and wants treatment to better control his actions and decision-making processes in the future. Toward that end, Dr. McNish stated:

> If an individual is highly motivated, treatment can be marginally successful for individuals with Borderline Personality Disorder and/or Anti-Social Personality Disorder. A cognitive-behavioral approach would be recommended. Typically, treatment for a personality disorder is a long, slow process.

Dr. McNish does not explain the focus and course of cognitive-behavioral therapy (CBT). The therapy is based on the idea that our thoughts cause our feelings and behaviors, not external things like people, situations, and events. The benefit of this fact is that people can change the way they think to feel or act better even if the situation does not change. This particular therapy can be among the most rapid in terms of the results obtained. The average number of sessions patients receive is usually 16. Other forms of therapy, like psychoanalysis, can take years. What enables CBT to be briefer is the highly instructive nature and the use it makes of projects and work to supplement the therapy. CBT is time limited to help patients understand at the beginning of the therapy process that there will be a point when the formal therapy will end. Although it is not an open ended, never ending process, CBT can be reinforced as the need dictates.

CBT therapists believe it is critical to have a good, trusting relationship with the patient. They believe that patients change because they learn how to think differently and they act on that learning. Therapists focus on teaching rational self-counseling skills. They try to learn what their patients want out of life (goals) and then help them achieve those goals. The therapist's role is to listen, teach, and encourage while the patient's role is to express concerns, learn, and implement that learning. CBT therapists have a distinct agenda, and specific techniques and concepts are taught during each session. Patients are not told what their goals should be or what they should tolerate. The therapists show the patients how to think and behave in ways to obtain what they, the patients, want. In the end, CBT therapists do not tell their clients "what" to do rather they teach their clients "how" to do.

CBT is based on the scientifically reported assumption that most emotional and behavioral reactions are learned. Thus, the goal of therapy is to help patients "unlearn" their unwanted reactions and to learn a new way of reacting. Goal achievement, if obtained can take a very long time if all a person was to think about were the techniques and topics taught during the individual sessions. Therapists encourage their patients to practice the techniques learned, but in the end it is the change in behavior and attitude that determines whether the therapy has been successful.[5]

**VI.    Types of Sentences Available and Conclusion.**

According to 18 U.S.C. § 3551(b), an individual found guilty of an offense shall be sentenced to one of the following:

(1)  a term of probation;

---

[5] The CBT and information is taken from materials provided by the National Association of Cognitive-Behavioral Therapists.

(2) a fine; or

(3) a term of imprisonment.

Robert Ray Sayne faces a statutory maximum penalty of 5 years on Count One and 20 years on Count Two followed by 3 years supervised release. His advisory range on the Indictment is 27-33 months, with a separate and consecutive range of 18-24 months with a term of supervised release. At the top end, the Defendant is subject to a cumulative penalty of 57 months, and on the low end, 45 months. In *Rita, supra*, the Supreme Court said a federal sentence within the federal guidelines is presumptively reasonable even though the guidelines are now advisory. The District Court, here, in previous sentencings has consistently stated the guidelines are the single most important factor in determining whether a sentence is reasonable and sufficient, but not greater than necessary to achieve the sentencing goals of 3553(a).

The PSR (Paragraphs 91 and 92) has identified the one factor (4A1.3) the Court may consider in determining whether to depart upward from the applicable range.[6] The 26 criminal history points for a person who is 33 years is old is an immediate temptation to write him off and impose a much longer sentence. As developed in this Memorandum, there are a number of factors that argue against this simple conclusion. Until the first felony conviction in 2003 (PSR, Paragraph 48, 2:03-CR-26), the Defendant accumulated criminal history points (10) through a series of petty theft and worthless check misdemeanor charges.

The PSR for the 2003 federal conviction in this Court did not develop any family background, primarily because at the time the guidelines were mandatory and this type of

---

[6] The Probation Office stated the inclusion in the PSR did "not necessarily constitute a recommendation . . . for a departure." (PSR, Paragraph 91).

information could not be considered.  The bulk of the other criminal history points overlap the 2003 conviction and came from guilty pleas to state charges based on crimes committed during the same general time frame.  The 2003 federal case included clear, obstructive conduct and no acceptance of responsibility by the Defendant.  There was no request for a psychological evaluation and the Court found sufficient cause to sentence the Defendant at the top of the mandatory range.

Although the Defendant's conduct in lying to the Probation Office and defrauding First Data aggravated an already serious criminal history, his conduct and his actions since being in custody suggest he may have reached the bottom of his downward spiral. The Defendant's developmental years were full of obvious contradictions:  a mother who used and abandoned him and later committed economic crimes; a non-existent father; a grandfather who openly violated the law; and other grandparents who gave the Defendant everything.  This was against a family history of mental illness and his long-term drug abuse.  All these factors contributed to the Axis II diagnoses, Personality Disorders, and the resulting need for cognitive-behavioral therapy, and the 500-hour residential drug treatment program.

The Defendant has known he has always been a failure.  He wanted to understand why and hoped he could find help.  As noted, in March 2009, he admitted his conduct to the undersigned and showed genuine remorse.  He initiated meetings with the FBI and U.S. Attorney's Office to explain what he had done to help the victim, First Data, correct defective security procedures.  He helped law enforcement and correctional officials at various jails, in spite of the real possibility of violent retribution from the involved inmates.  He requested the psychological evaluation and honestly participated in that

process.  The obstructive conduct and attitude associated with the 2003 federal conviction is gone, replaced with a much more humble hope for help and treatment to give him the best chance in the future for success.  The Defendant wants to be a positive example for his family and be proud of himself for the first time in his life.  Robert Ray Sayne now simply asks for the Court's help and mercy at sentencing.

*s*/Guy W. Blackwell
Guy W. Blackwell, BPR #008225
Attorney for Defendant
Law Office of Guy W. Blackwell, P.C.
138 Saylor Road
Gray, TN 37615
423-557-3924
Fax:  423-753-5846
gwblawoffice@comcast.net

ATTACHMENTS:  Exhibits 1-12

Certificate of Service

I hereby certify that on March 29, 2010, a copy of the foregoing Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or fax.  Parties may access this filing through the Court's electronic filing system.

*s*/Guy W. Blackwell
