1                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF TENNESSEE
2                        GREENEVILLE

3

UNITED STATES OF AMERICA,  .  DOCKET NO. CR-2-09-96
4                          .          CR-2-03-26
       GOVERNMENT,         .
5                         .
         VS.            .  GREENEVILLE, TN
6                         .  APRIL 12, 2010
ROBERT RAY SAYNE,        .  1:57 P.M.
7                         .
       DEFENDANT.          .
8                         .
.  .  .  .  .  .  .  .  .  .
9

10

11                 TRANSCRIPT OF SENTENCING
        BEFORE THE HONORABLE J. RONNIE GREER
12             UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  FOR THE GOVERNMENT:     U.S. DEPARTMENT OF JUSTICE
                         HELEN C.T. SMITH, AUSA
16                     U.S. COURTHOUSE.
                     220 WEST DEPOT STREET
17                     GREENEVILLE, TN 37743

18

FOR THE DEFENDANT:      GUY W. BLACKWELL, ESQ.
19                     138 SAYLOR ROAD
                     GRAY, TN 37615
20

21

22  COURT REPORTER:        KAREN J. BRADLEY
                     RPR-RMR
23                     U.S. COURTHOUSE
                     220 WEST DEPOT STREET
24                     GREENEVILLE, TN 37743

25  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY COMPUTER.

1          (CALL TO ORDER OF THE COURT AT 1:57 P.M.)

2               THE COURT:  ALL RIGHT.  MS. HOPSON WILL YOU

3     CALL THE NEXT CASE PLEASE.

4               THE CLERK:  UNITED STATES OF AMERICA VERSUS

5     ROBERT R. SAYNE, CASE NUMBER CR-2-09-96 AND CASE NUMBER

6     CR-2-03-26.

7               MR. BLACKWELL:  YOUR HONOR, IF I COULD HAVE THE

8     COURT'S INDULGENCE, I WAS HANDED AN AGREED PRELIMINARY

9     ORDER OF FORFEITURE RIGHT BEFORE COURT STARTED, AND MR.

10    SAYNE HAS BEEN IN CUSTODY IN CLAIBORNE COUNTY, I NEED JUST

11    A COUPLE OF MINUTES TO TALK TO HIM AND GET THAT SIGNED.

12              THE COURT:  ALL RIGHT.  I'LL GIVE YOU THAT.

13         (DISCUSSION BETWEEN MR. BLACKWELL AND THE DEFENDANT)

14              MR. BLACKWELL:  YOUR HONOR, WE'RE READY.

15              THE COURT:  ALL RIGHT.  THANK YOU,

16    MR. BLACKWELL.

17              ALL RIGHT.  IN CASE NUMBER 09-CR-96, MR. SAYNE

18    IS BEFORE THE COURT THIS AFTERNOON FOR SENTENCING AFTER

19    HIS CONVICTION IN THE CASE OF COUNTS 1 AND 2.  COUNT 1

20    CHARGED THE MAKING OF A FALSE STATEMENT TO THE UNITED

21    STATES AND COUNT 2 CHARGED WIRE FRAUD.  ALSO PENDING IS A

22    PETITION SEEKING REVOCATION OF MR. SAYNE'S TERM OF

23    SUPERVISED RELEASE IN CASE NUMBER 03-CR-96.

24              LET'S TAKE UP HIS SENTENCING IN CASE -- I SAID

25    96, 03-CR-26.

1        LET'S TAKE UP SENTENCING IN CASE NUMBER

2   09-CR-96 FIRST.  IN THAT CASE A PRESENTENCE REPORT HAS

3   BEEN PREPARED AND DISCLOSED TO ALL PARTIES.  THE

4   PRESENTENCE REPORT ESTABLISHES AN ADVISORY GUIDELINE

5   SENTENCING RANGE OF 27 TO 33 MONTHS IN THE CASE.

6        THERE IS ONE OBJECTION BY THE GOVERNMENT.  THE

7   GOVERNMENT CONTENDS THAT UNDER SECTION 2B1.19C THERE

8   SHOULD BE A TWO LEVEL ENHANCEMENT BECAUSE THE OFFENSE OF

9   WIRE FRAUD INVOLVED SOPHISTICATED MEANS.  BY STATUTE MR.

10  SAYNE FACES A TERM OF IMPRISONMENT NOT TO EXCEED 5 YEARS

11  WITH RESPECT TO COUNT 5 AND NOT TO EXCEED 20 YEARS WITH

12  RESPECT TO COUNT 2.

13       LET'S TAKE UP THE, THE OBJECTION OF THE

14  GOVERNMENT FIRST.  MS. SMITH, DOES THE GOVERNMENT HAVE

15  WITNESSES ON THAT OBJECTION?

16       MS. SMITH:  I DO, YOUR HONOR.  IN FACT,

17  MR. BLACKWELL AND I DISCUSSED THIS BEFORE WE GOT STARTED.

18  I HAVE TWO WITNESSES.  AGENT SCOWN WILL ADDRESS THE

19  SOPHISTICATED MEANS AND THEN OFFICER THORNTON WILL DISCUSS

20  THE OTHER MATTERS, AND IT MIGHT SAVE TIME JUST TO PUT ALL

21  THE PROOF IN AND THEN TO HEAR ARGUMENT ON THE

22  SENTENCING.

23       THE COURT:  I WILL DO THAT IF MR. BLACKWELL --

24       MS. SMITH:  IS THAT OKAY WITH YOU?

25       MR. BLACKWELL:  THAT'S FINE WITH ME, YOUR

1    HONOR.

2              THE COURT:  ALL RIGHT.  LET'S JUST HEAR ALL THE

3    WITNESSES THEN AND THEN I'LL TAKE THE MATTER UP.

4              CALL YOUR FIRST WITNESS.

5              MS. SMITH:  THE UNITED STATES CALLS DREW SCOWN,

6    YOUR HONOR.  AND I HAVE A SMALL POWER POINT, I DON'T KNOW

7    WHAT I NEED TO DO TO MAKE SURE IT'S ON THE SCREEN.

8              DREW SCOWN, GOVERNMENT'S WITNESS, SWORN

9              MS. SMITH:  I'VE GOT COPIES OF THE POWER POINT

10   TOO.

11             THE CLERK:  IS THIS FOR THE WITNESS?

12             MS. SMITH:  NO, MA'AM -- WELL, YES, MA'AM, I'M

13   SORRY.

14             OKAY.

15             MR. BLACKWELL:  YOUR HONOR, IF IT WOULD HELP

16   EXPEDITE MATTERS, WE'RE WILLING TO STIPULATE TO WHAT'S ON

17   PAGES 2 AND 3 OF THE POWER POINT.  IT'S BASICALLY

18   HISTORICAL INFORMATION THAT'S CONTAINED IN THE PRESENTENCE

19   REPORT.

20             THE COURT:  ALL RIGHT.  THAT'S FINE, TO THE

21   EXTENT THAT WILL SPEED IT UP.  MS. SMITH, THAT'S -- I

22   DON'T HAVE A COPY OF IT, YOU'LL HAVE TO SHOW IT TO ME ON

23   THE SCREEN.

24             MS. SMITH:  I HAVE A TECHNICAL DIFFICULTY, IF I

25   COULD ASK AGENT SCOWN TO COME TOGGLE ME ON NOW THAT THE

1    SYSTEM IS ON; AND IF I MAY STAND HERE, YOUR HONOR, BECAUSE

2    I DON'T THINK MY LAPTOP WILL GO THAT FAR.

3                  THE COURT:  YOU MAY.

4                  MS. SMITH:  THANK YOU.

5                  WELL, LET'S JUST USE THE PAPER ONE.

6                  MR. BLACKWELL:  YOUR HONOR, AGAIN, I'VE HAD AN

7    OPPORTUNITY, I'VE HAD AN OPPORTUNITY TO SHOW THIS TO MY

8    CLIENT AND BRIEFLY DISCUSS IT WITH HIM, AND THERE'S

9    NOTHING IN HERE THAT WE'RE GOING TO CONTEST.

10                 THE COURT:  WELL, TO THE EXTENT THE AGENT NEEDS

11   TO EXPLAIN IT, I'LL LET HIM DO THAT.  LET'S TRY TO MOVE

12   THROUGH IT AS QUICKLY AS WE CAN.

13                 MS. SMITH:  I WILL, YOUR HONOR, THANK YOU.

14                      DIRECT EXAMINATION

15                       BY MS. SMITH:

16   Q.   COULD YOU PLEASE STATE YOUR NAME AND OCCUPATION AND

17   THE EXTENT OF YOUR FORMAL EDUCATION, AGENT SCOWN?

18   A.    MY NAME IS PAUL DREW SCOWN, II.  I'M A SPECIAL AGENT

19   WITH THE FBI IN JOHNSON CITY.  I HAVE A BACHELOR'S AND

20   MASTER'S DEGREE IN ACCOUNTING AND I'M ALSO A CERTIFIED

21   PUBLIC ACCOUNTANT.

22   Q.   AND DO YOU WORK ON ECONOMIC CRIMES AND CONDUCT

23   FINANCIAL ANALYSIS AS PART OF YOUR JOB DUTIES?

24   A.    I DO.

25   Q.   COULD YOU EXPLAIN TO JUDGE GREER THE SCHEME FOR THE,

1  THAT MR. SAYNE ENGAGED IN REGARDING FIRST DATA MERCHANT

2  SERVICES?

3  A.    YES, MA'AM.  AS IS STATED ON THE SCREEN AND AS HAS

4  BEEN STIPULATED, HE WAS CONVICTED ON NOVEMBER 17 OF 2003

5  FOR BANK FRAUD AND SENTENCED TO 5 YEARS, OR 51 MONTHS AND

6  5 YEARS ON SUPERVISED RELEASE.  ON JANUARY 5 OF 2008 HE

7  WAS RELEASED, AND THEN ON DECEMBER 3 OF 2008 IS WHEN THE

8  SCHEME BEGAN, WHICH IT CONTINUED UNTIL, UP UNTIL JANUARY

9  20, 2009 WHEN HE WAS ARRESTED.

10           THE COURT:  THE SCHEME BEGAN, YOU MEAN THE WIRE

11  FRAUD?

12           THE WITNESS:  YES, SIR.

13  Q.    OKAY.  WE'LL JUST GO FORWARD A LITTLE BIT MORE.  CAN

14  YOU EXPLAIN THE WIRE FRAUD SCHEME?

15  A.    WELL, IT INVOLVED MR. SAYNE AND FDMS, WHICH IS FIRST

16  DATA MERCHANT SERVICES, WHICH IS A CREDIT CARD CLEARING

17  HOUSE FOR, BETWEEN MERCHANTS AND BANKS BASICALLY.  MR.

18  SAYNE HAD AN ACCOUNT WITH FDMS TO RUN HIS, HIS BUSINESS;

19  AND AS SUCH, HE HAD A, WHAT I WOULD TERM A CREDIT CARD

20  MACHINE FOR THAT BUSINESS WHICH HE USED TO HELP WITH THE

21  WIRE FRAUD SCHEME.  HE ALSO HAD SEVERAL DIFFERENT DEBIT

22  CARDS WHICH HE USED AS WELL IN, TO HELP WITH THE SCHEME.

23  Q.    AND DID YOU FIND THE INSTRUMENTS OF THIS CRIME IN

24  HIS TRUCK ON JANUARY 20, YOU OR BRIAN O'HARE FIND THE

25  INSTRUMENT OF THIS CRIME IN HIS TRUCK PARKED IN FRONT OF

THE JAMES H. QUILLEN COURTHOUSE ON JANUARY 20, 2009?

A.    WE FOUND THE INSTRUMENTS THAT HE USED FOR THIS CRIME

BOTH, SOME THINGS, SOME EVIDENCE OF IT IN HIS TRUCK AND

ALSO AT HIS RESIDENCE IN NEWPORT, TENNESSEE.

Q.    EXPLAIN TO THE JUDGE HOW THIS SCHEME WORKED, IF YOU

MAY.

A.    ALL RIGHT.  WELL, IF YOU'LL GO TO THE NEXT SLIDE.

THIS JUST GOES ON THE TELEPHONE NUMBER THAT WAS USED.

Q.    ALL RIGHT.

A.    FIRST OF ALL, HE WAS RUNNING AND OPERATING A

BUSINESS CALLED PERFECTION AUTO DETAILING; AND AS SUCH, I

MENTIONED BEFORE, HE HAD AN ACCOUNT WITH FDMS FOR THAT.

WHAT HE WOULD DO IS -- IF YOU'D CLICK THROUGH -- HE WOULD

TAKE THAT ACCOUNT AND WOULD CHANGE THE VENDOR IN HIS

TERMINAL TO LEAD THE COMPUTER AT FDMS TO BELIEVE THAT HE

WAS A DIFFERENT BUSINESS, WHICH IS REPRESENTED ON THIS

SLIDE AS AN EMULATED VENDOR.  HE WOULD THEN TAKE A DEBIT

CARD UNDER HIS CONTROL AND EXECUTE A TRANSACTION FOR, YOU

KNOW, VARYING AMOUNTS OF MONEY IN THE NAME OF THAT

EMULATED VENDOR USING THAT DEBIT CARD.  AFTER THAT, THAT

WOULD CAUSE THE TRANSACTION TO BE SENT TO FDMS WHICH WOULD

GIVE THAT VENDOR CREDIT FOR A SALE IN THE AMOUNT THAT MR.

SAYNE WAS MAKING THE SALE FOR.  AFTER WHICH, AS IT SAYS

THERE, A CREDIT IS GIVEN TO THE EMULATED VENDOR THAT MR.

SAYNE WAS PRETENDING TO BE; AND LATER ON, LATER IN THE

DAY, MR. SAYNE WOULD AGAIN EMULATE A SPECIFIC VENDOR, A
DIFFERENT COMPANY, AND A CREDIT WOULD BE GIVEN, USING THE
SAME MACHINE, WOULD BE GIVEN TO A SEPARATE DEBIT CARD
WHICH WAS CONTROLLED BY MR. SAYNE, A DEBIT CARD OR A STORE
VALUE CARD.  THAT WOULD ALL BE SENT TO FDMS -- IF YOU
COULD CLICK IT THROUGH, PLEASE -- AND THEN IT WOULD, IT
WOULD BE FOR THE SAME AMOUNT AS THE PREVIOUS TRANSACTION,
WHICH WOULD CREATE A ZERO BALANCE BETWEEN THE TWO
TRANSACTIONS.  SO THERE WOULD BE ONE AMOUNT FOR THE
PURCHASE AND THERE WOULD BE A CREDIT TO A DIFFERENT DEBIT
ACCOUNT FOR THE EXACT SAME AMOUNT OF MONEY.
Q.    AND HOW DID THAT, HOW DID THAT LEAD TO BENEFIT TO
MR. SAYNE?
A.    WELL, HE WOULD PUT IT ONTO CARDS THAT HE COULD THEN
RECEIVE THE CASH FROM ATM WITHDRAWALS AND THINGS OF THAT
NATURE.
Q.    THANK YOU.  HOW MUCH, HOW MANY TRANSACTIONS DID HE
MANIPULATE IN THE PERIOD OF TIME THAT THAT WAS UNDER
INVESTIGATION?
A.    WELL, IT WAS WELL OVER 100 TRANSACTIONS IN VARYING
AMOUNTS.  ON THE FIRST DAY THAT FDMS FIRST NOTICED THAT
THERE WERE SOME SUSPECT TRANSACTIONS, THOSE WERE FOR VERY
SMALL AMOUNTS.  AS TIME PROGRESSED, THERE WERE LARGER
AMOUNTS FOUND AFTER THE SCHEME WAS FOUND TO BE WORKING.
Q.    AND HOW -- WHAT WAS THE TOTAL AMOUNT OF FUNDS THAT

1  WAS MANIPULATED BY THIS SCHEME?

2  A.   WELL, IT'S LISTED HERE ON THE SLIDE, IT'S

3  $321,313.73.  NOW THAT NUMBER IS VERY LARGE AND IT

4  REPRESENTS BOTH THE PURCHASES AND THE REFUND AMOUNTS, SO

5  BOTH SIDES OF THE TRANSACTION.

6  Q.   AND HOW MUCH LOSS DID FDMS ACTUALLY INCUR?

7  A.   THEY INCURRED A LOSS OF $40,661.05 FROM THE

8  SCHEME.

9  Q.   WAS THAT THE TOTAL AMOUNT OF LOSS THAT WAS SUFFERED

10  BY THE MERCHANTS AS WELL IN THIS SCHEME?

11  A.   IT WASN'T.  THERE WERE LOSSES THAT WERE SUFFERED BY

12  THE INDIVIDUAL MERCHANTS THAT WERE, ENDED UP BEING PASSED

13  ON BY FDMS AND BY BANK OF AMERICA.

14  Q.   AND HOW MANY MERCHANTS WERE AFFECTED BY THIS

15  SCHEME?

16  A.   THERE WERE ABOUT 45 MERCHANTS THAT MR. SAYNE

17  EMULATED.

18  Q.   AND DOES THE LOSS INCLUDE ANY OF THE COSTS WHICH

19  FDMS OR THE MERCHANTS INCURRED IN RESEARCH OR REMEDIATION

20  OF THEIR SYSTEMS?

21  A.   NO, THE NUMBER DOESN'T TAKE THAT INTO ACCOUNT.

22  Q.   THANK YOU.  NOW, WAS THIS A SIMPLE SCHEME?

23  A.   I WOULDN'T SAY SO.

24        MR. BLACKWELL:  YOUR HONOR, I'M GOING TO OBJECT

25  TO THE WITNESS REACHING A CONCLUSION ONLY THE COURT CAN

1   REACH.

2           THE COURT:  SUSTAINED AS TO THAT QUESTION.

3   Q.    DID THIS SCHEME REQUIRE THE INTENTIONAL MANIPULATION

4   OF DATA AND COMPUTER SYSTEMS?

5   A.    YES, IT DID.

6   Q.    AND DID IT OCCUR BY HAPPENSTANCE OR JUST PLAIN

7   LUCK?

8   A.    I DON'T BELIEVE IT DID, NO.

9   Q.    DID MR. SAYNE ALSO AT THE SAME TIME OF THIS, THE

10  WIRE FRAUD, DID HE ALSO TAKE MONEY FROM HIS GRANDMOTHER?

11  A.    HE DID.

12  Q.    AND WHAT WAS THAT SCHEME?

13  A.    MR. SAYNE HELPED A LADY NAMED ALMEDA ELLIS --

14          MR. BLACKWELL:  YOUR HONOR, I'M GOING TO OBJECT

15  TO THIS.  I THINK THIS IS GOING TO BE BASED ON HEARSAY.  I

16  KNOW IT'S RELEVANT CONDUCT IN THE PRESENTENCE REPORT.

17  IT'S NOT CONSIDERED AS PART OF THE LOSS THAT'S CALCULATED

18  IN THE ADVISORY GUIDELINE RANGE.

19          THE COURT:  AND THE OBJECTION IS THAT IT'S

20  HEARSAY OR --

21          MR. BLACKWELL:  YES, SIR.

22          THE COURT:  WELL, HEARSAY IS ADMISSIBLE IF IT'S

23  RELIABLE HEARSAY.

24          WHAT'S THE SOURCE OF YOUR INFORMATION AGENT

25  SCOWN?

1    THE WITNESS:  WELL, I HAVE REVIEWED INTERVIEWS

2  THAT WERE DONE WITH MR. SAYNE AND ALSO WITH MS. ELLIS'S,

3  HIS GRANDMOTHER.

4    THE COURT:  INTERVIEWS CONDUCTED BY FBI AGENTS?

5    THE WITNESS:  YES, SIR.

6    THE COURT:  ALL RIGHT.  OVERRULED.

7    MR. BLACKWELL:  YOUR HONOR, THE ONLY THING

8  POINTED OUT IS OBVIOUSLY HAD THE GOVERNMENT, IF THEY

9  WANTED TO HAVE HAD MS. ELLIS HERE TODAY, WE COULD HAVE

10  TOO, AND I JUST WANT THE COURT TO TAKE THAT INTO

11  CONSIDERATION.

12    THE COURT:  I UNDERSTAND.

13  Q.    COULD YOU CONTINUE, AGENT SCOWN.

14  A.    MR. SAYNE HELPED MS. ELLIS SET UP A, WHAT IS TERMED

15  BY BOTH OF THEM, A REVERSE MORTGAGE ON HER RESIDENCE IN

16  NEWPORT, TENNESSEE.  IF I RECALL CORRECTLY, IT WAS FOR AN

17  AMOUNT OF APPROXIMATELY $122,000, WHICH MS. ELLIS USED TO

18  PAY OFF BILLS AND THINGS LIKE THAT.  SHE ALSO ALLOWED MR.

19  SAYNE TO USE ABOUT $30,000 TO BEGIN HIS BUSINESS; BUT

20  SUBSEQUENTLY ALL OF THOSE FUNDS ARE, ARE GONE NOW, AND SHE

21  DOESN'T HAVE ANY EQUITY IN HER HOME NOW.

22    THE COURT:  EXCUSE ME, MS. SMITH, WHAT WAS

23  INVOLVED IN SETTING UP THIS BUSINESS?  I READ IN HERE THAT

24  IT FAILED BECAUSE AN AUTO DEALER CHOSE NOT TO USE THE

25  SERVICE, BUT WHY WOULD THAT AMOUNT OF MONEY BE NEEDED TO

1  SET UP A DETAILING BUSINESS?

2              THE WITNESS:  I'M NOT SURE, SIR.

3              THE COURT:  WERE YOU ABLE TO CONFIRM THAT THE

4  BUSINESS EVEN EXISTED?

5              THE WITNESS:  I CAN'T TESTIFY EITHER WAY.

6              THE COURT:  ALL RIGHT.

7              GO AHEAD, MS. SMITH.

8  Q.    HAS THE FBI SEIZED SOME OF THE ASSETS THAT MR. SAYNE

9  PURCHASED WITH THE WIRE FRAUD?

10 A.    YES.  WE SEIZED TWO VEHICLES.

11 Q.    OKAY.  WHICH VEHICLES ARE THOSE?

12 A.    THE ONES LISTED HERE ON THE SCREEN, THERE'S A 2003

13 FORD EXPEDITION AND ALSO A 2000 BMW.  IT'S MISPRINTED.

14 Q.    AND THEN WE HAVE AN AGREED PRELIMINARY ORDER OF

15 FORFEITURE FOR A THIRD VEHICLE AS WELL?

16 A.    THAT'S CORRECT.

17 Q.    AND WHICH VEHICLE IS THAT?

18 A.    I BELIEVE IT'S A 2004 FORD ESCAPE.

19             MS. SMITH:  NOW, YOUR HONOR, I'M NOT GOING TO

20 HAVE HIM PULL EVERYTHING OUT HERE, BUT I DO WANT THE COURT

21 TO UNDERSTAND THE NATURE OF MR. SAYNE'S SCHEME, AND I'M

22 GOING TO PULL THIS CART UP HERE AND ASK HIM JUST TO

23 IDENTIFY A FEW OF THE THINGS THAT WERE FOUND IN HIS TRUCK

24 ON JANUARY 20, 2009, AND HOW THEY RELATED TO THE SCHEME.

25             THE COURT:  ALL RIGHT.

1   Q.    DID YOU FIND A LAPTOP COMPUTER IN THE FRONT SEAT OF

2   HIS TRUCK THAT DAY?

3   A.    YES, WE DID.

4   Q.    AND DID THAT COMPUTER UNDERGO A CART EXAMINATION?

5   A.    YES, MA'AM.  THE COMPUTER WAS FORENSICALLY EXAMINED,

6   A CART EXAMINATION, BY AN FBI COMPUTER FORENSIC

7   EXAMINER.

8   Q.    AND DID YOU FIND EVIDENCE ON THAT COMPUTER WHICH

9   CORROBORATED THE FABRICATED EARNING STATEMENTS WHICH MR.

10  SAYNE SUBMITTED TO OFFICER THORNTON?

11  A.    YEAH.  YES, WE DID.  WE FOUND, OR THE FORENSIC

12  EXAMINER FOUND EXCEL SPREADSHEETS THAT REPRESENTED, THAT

13  WERE USED FOR THOSE EARNINGS REPORTS.

14  Q.    AND DID YOU FIND OTHER PIECES OF EQUIPMENT AND

15  EVIDENCE WHICH LINKED MR. SAYNE TO HIS CARD READING ZERO

16  SUM BATCH SCHEME AT THE SAME TIME?

17  A.    YES, WE DID.  WE FOUND --

18  Q.    COULD YOU PULL ONE OF THOSE OUT AND JUST SHOW IT TO

19  THE JUDGE.

20  A.    THESE REPRESENT JUST DIFFERENT CREDIT CARD MACHINES

21  FROM FDMS.

22  Q.    AND IF YOU WOULD -- HOW WOULD IT WORK THERE?

23  A.    I'M SORRY?

24  Q.    HOW WOULD THE SCHEME WORK THERE, WHAT WOULD HE HAVE

25  TO DO WITH THAT PIECE OF EQUIPMENT?

1  A.   MY UNDERSTANDING IS THAT YOU HAVE TO MAKE A PHONE

2  CALL TO FDMS AND, AND LOG IN AS A SPECIFIC VENDOR, AND

3  THEN, YOU KNOW, THROUGH A SERIES OF NORMAL TRANSACTIONS AS

4  YOU WOULD, AS YOU WOULD FIND AT A STORE.

5  Q.   NOW, I KNOW YOU'VE READ ALL THE PLEADINGS IN THIS

6  CASE, BUT THE DEFENDANT HAS ALLEGED THAT THE BUSINESS WENT

7  OUT OF BUSINESS IN JULY OF 2008, JULY OR AUGUST OF 2008,

8  AND THE JUDGE JUST ASKED YOU ABOUT THAT AS WELL.  WERE --

9  WAS THAT EQUIPMENT FOUND AND WAS IT BEING USED IN JANUARY

10 OF 2009 WHEN HE WAS ARRESTED?

11 A.   YES, IT WAS.

12 Q.   OKAY, AND DID THE SCHEME CONTINUE UNTIL HE WAS

13 ARRESTED ON JANUARY 20, 2009?

14 A.   YES.

15 Q.   OKAY.  THANK YOU.

16       NOW, DID YOU ATTEND MR. SAYNE'S DEBRIEFING AT

17 MY OFFICE ON JANUARY 29, 2009?  I BELIEVE THAT WAS THE

18 DATE, I MAY BE WRONG.  JUNE, I'M SORRY, I MEANT TO SAY

19 JUNE.

20 A.   YES, I WAS THERE IN JUNE.

21 Q.   AND DID HE SHOW ANY WEAKNESS IN THE FDMS SYSTEM

22 PRIOR TO HIS ARREST ON JANUARY 20 OF 2009?

23 A.   NO, HE DIDN'T TELL ANYONE ABOUT THE WEAKNESS.

24 Q.   AND DID HE IMPLICATE, EVEN AT THE DEBRIEFING, DID HE

25 IMPLICATE ANY OTHERS IN HIS SCHEME?

1   A.    NO, HE DIDN'T.

2   Q.    DID HE SHOW ANY SIGNS OF REMORSE FOR HIS SCHEME?

3   A.    I DON'T BELIEVE HE DID, NO.

4            MS. SMITH:  THANK YOU.  I HAVE NO FURTHER

5   QUESTIONS OF THE WITNESS, YOUR HONOR.

6            I WOULD LIKE TO HAVE THE POWER POINT ENTERED AS

7   AN EXHIBIT, THE PAPER COPY, IF I MAY.

8            THE COURT:  ALL RIGHT.  LET IT BE FILED.

9            MR. BLACKWELL, YOU MAY CROSS EXAMINE.

10           MR. BLACKWELL:  WELL, THANK YOU, YOUR HONOR.

11                    CROSS EXAMINATION

12                    BY MR. BLACKWELL:

13  Q.    LET ME START FIRST WITH ONE OF THOSE TERMINALS.  YOU

14  WOULD AGREE WITH ME THAT BASED ON YOUR INVESTIGATION THAT

15  MR. SAYNE AND MS. ALLEN, HIS PARTNER AT PERFECTION,

16  LEGITIMATELY OBTAINED THAT TERMINAL FROM FIRST DATA;

17  WOULDN'T YOU?

18  A.    THEY DID SET UP A CONTRACT WITH FDMS.

19  Q.    AND AS PART OF THAT CONTRACT WITH FIRST DATA,

20  PERFECTION DESIGN DETAILING RECEIVED A I.D. NUMBER?

21  A.    YES.

22  Q.    AND IN FACT IT WAS THAT I.D. NUMBER THAT THEY WOULD

23  ENTER INTO THAT TERMINAL TO EFFECT A PARTICULAR

24  TRANSACTION; ISN'T THAT CORRECT?

25  A.    THAT'S MY UNDERSTANDING OF HOW IT WOULD HAPPEN.

1  Q.    AND IF FACT WHAT MR. SAYNE DID VERY SIMPLY WAS AFTER

2  THE BUSINESS WENT OUT, HE WOULD ENTER A NUMBER, EITHER ONE

3  NUMBER ABOVE OR ONE NUMBER BELOW, TO SEE IF THAT WAS A

4  VALID NUMBER FOR ANOTHER MERCHANT; WOULDN'T HE?

5  A.    THAT'S WHAT HE REPORTED TO US IN JUNE, YES, SIR.

6  Q.    AND BASED ON YOUR INVESTIGATION, DID YOU CHECK TO

7  DETERMINE WHETHER HE WAS BEING ACCURATE WHEN HE TOLD YOU

8  THAT?

9  A.    I DID SPEAK WITH FDMS, AND THEY BELIEVED THAT TO BE

10  A PLAUSIBLE EXPLANATION.

11  Q.    AND THEN REALLY THE REST OF THE SCHEME WAS A TWO-

12  STEP PROCESS LIKE YOU JUST TESTIFIED INVOLVING A DEBIT AND

13  A CREDIT THAT ULTIMATELY WENT TO MR. SAYNE'S BENEFIT?

14  A.    THERE WOULD BE A DEBIT OFF OF ONE CARD AND THEN --

15  BY DEBIT I MEAN PAYING FOR SOMETHING WITH ONE CARD, AND

16  THEN RECEIVING A REFUND ON A SEPARATE CARD, YES, SIR.

17  Q.    AND THERE WOULD BE THAT DEBIT CREDIT FOR EACH

18  TRANSACTION INVOLVING EACH INDIVIDUAL MERCHANT?

19  A.    YES, WITH EQUAL AMOUNTS OF MONEY.

20  Q.    NOW, YOU SAID THAT WHAT MR. SAYNE DID, AND I BELIEVE

21  THIS IS CONTAINED ON THE DIAGRAM, IS THAT A STORAGE DEVICE

22  OR THE MONEY THAT HE GOT, THE FORTY SOME THOUSAND DOLLARS

23  WENT INTO A DEBIT CARD OR A VALUE ADDED CARD?

24  A.    THAT'S CORRECT.

25  Q.    NOW, WHAT I DIDN'T SEE ON HERE, OR I DON'T BELIEVE

1  YOU TESTIFIED ABOUT, THOSE CARDS WERE IN MR. SAYNE'S NAME;
2  WEREN'T THEY?
3  A.    WHICH ONES, THE ONES THAT HE WOULD RECEIVE THE FUNDS
4  ONTO?
5  Q.    YES.
6  A.    YES.
7  Q.    AND THEY WERE EITHER IN HIS NAME OR THEY WERE IN THE
8  NAME OF THE BUSINESS; WEREN'T THEY?
9  A.    THAT'S CORRECT.
10 Q.    SO YOU WOULD AGREE WITH ME THAT THERE WAS NO ATTEMPT
11 ON HIS PART TO CONCEAL HIS IDENTITY BY ACCUMULATING THAT
12 MONEY IN THOSE CARDS?
13 A.    WELL, I WOULD CERTAINLY SAY THAT THERE COULD HAVE
14 BEEN MORE THINGS HE COULD HAVE DONE TO CONCEAL HIS
15 IDENTITY, YES, SIR.
16 Q.    BUT IF YOU PUT SOMETHING IN YOUR OWN NAME, IF YOU
17 GET CAUGHT, THAT'S PRETTY GOOD EVIDENCE THAT YOU DID WHAT
18 YOU DID; ISN'T IT?
19 A.    IT IS GOOD EVIDENCE, YES, SIR.
20 Q.    NOW, YOU SAID YOU HAD AN OPPORTUNITY TO READ THE
21 PLEADINGS IN THE CASE.  DID YOU ALSO HAVE A CHANCE TO READ
22 THE PRESENTENCE REPORT?
23 A.    I CAN'T SAY I READ EVERY SINGLE WORD, BUT, YES, I'VE
24 SEEN A COPY OF IT.
25 Q.    LET ME BACK UP FROM THAT.  YOU HAD AN OPPORTUNITY TO

1  PARTICIPATE WITH MS. SMITH IN DRAFTING THE AGREED FACTUAL

2  BASIS OR THE FACTUAL BASIS THAT THE GOVERNMENT USED TO

3  SUPPORT MR. SAYNE'S GUILTY PLEA?

4  A.    YES, SIR.

5  Q.    AND YOU WOULD AGREE THAT IN THAT FACTUAL BASIS THE

6  SCHEME WAS DESCRIBED SOMEWHAT LIKE YOU'VE DESCRIBED IT IN

7  COURT TODAY?

8  A.    YES, SOMEWHAT.

9  Q.    OKAY, AND YOU'RE AWARE IN READING THE PRESENTENCE

10  REPORT THAT THE PROBATION OFFICE, HAVING READ THAT, MADE A

11  DECISION NOT TO APPLY THE SOPHISTICATED MEANS TWO LEVEL

12  ENHANCEMENT?

13        MS. SMITH:  I OBJECT, YOUR HONOR.  I DON'T KNOW

14  THAT THIS, THIS WITNESS IS QUALIFIED TO TESTIFY ON THAT.

15        THE COURT:  WELL, IT GOES WITHOUT SAYING THAT

16  THE PROBATION OFFICER DID NOT APPLY THE ENHANCEMENT.

17  THAT'S CLEARLY ESTABLISHED.

18        MR. BLACKWELL:  THANK YOU, YOUR HONOR.  THAT'S

19  MY POINT.

20  Q.    LET ME ASK YOU A COUPLE OF MORE QUESTIONS.  YOU WERE

21  ASKED ABOUT THE MEETINGS THAT LED UP TO OUR MEETING ON

22  JUNE 29, YOU ENTERED THIS CASE AT WHAT POINT?

23  A.    I'M GOING TO SAY PROBABLY AROUND THE MIDDLE OF MAY

24  2009.

25  Q.    OKAY, AND BY THEN THE CASE HAD BEEN ACTIVE, HAD IT,

1 FOR A PERIOD OF TIME?

2 A.    YES, SIR.

3 Q.    AND, IN FACT, THE CASE AGENT BEFORE YOU WAS BRIAN

4 O'HARE; IS THAT RIGHT?

5 A.    THAT'S RIGHT.

6 Q.    AND MR. O'HARE HAD BEEN INVOLVED UP TO AN EXTENT

7 BEFORE HE LEFT ON A DETAIL?

8 A.    THAT'S CORRECT.

9 Q.    WERE YOU AWARE IN YOUR REVIEW OF THE FILE THAT THERE

10 WAS A MEETING BETWEEN MR. O'HARE AND ME AND MR. SAYNE ON

11 MARCH 31 OF 2009?

12 A.    I WAS.  I BELIEVE IT WAS AT THE WASHINGTON COUNTY

13 DETENTION FACILITY.

14 Q.    RIGHT.  AND WERE YOU AWARE THAT THAT MEETING LASTED

15 OVER TWO HOURS?

16 A.    I WASN'T AWARE OF THE LENGTH OF THE MEETING, SIR.

17 Q.    AND THAT DURING THAT MEETING MR. SAYNE ON SEVERAL

18 OCCASIONS EXPRESSED REMORSE FOR WHAT HE HAD DONE AND TOLD

19 AGENT O'HARE THAT HE WANTED HELP?

20 A.    I'D HAVE TO REVIEW AGENT O'HARE'S REPORT TO BE SURE;

21 THAT VERY WELL COULD HAVE HAPPENED.

22 Q.    WELL, AND THAT WAS GOING TO BE MY NEXT QUESTION,

23 HAVE YOU HAD AN OPPORTUNITY TO REVIEW THAT REPORT?

24 A.    I HAVE.

25 Q.    DID THE REPORT CONTAIN A LOT OF DETAIL ABOUT WHAT

1    MR. SAYNE TALKED ABOUT?

2    A.    IT DID HAVE DETAIL, YES, SIR.

3    Q.    AND, IN FACT, DID IT REFLECT THAT MR. SAYNE WAS THE

4    ONE THAT REQUESTED AND ASKED FOR THAT MEETING WITH AGENT

5    O'HARE TO EXPLAIN TO HIM THE WHOLE BACKGROUND OF WHAT

6    HAPPENED AND THE CRIMES HE COMMITTED?

7    A.    I DO RECALL THAT IN JUNE, IF I RECALL -- SPECIAL

8    AGENT O'HARE WAS STILL THE CASE AGENT IN JUNE WHEN I WAS A

9    PART OF THE DEBRIEFING AT THE UNITED STATES ATTORNEY'S

10   OFFICE, AND I DO RECALL HIM SAYING THAT MR. SAYNE WANTED

11   TO MEET WITH US THEN.  I DON'T RECALL ABOUT THE MARCH

12   MEETING, BUT I WOULD ASSUME THAT MR. SAYNE WANTED TO MEET

13   WITH THE FBI AT THAT TIME AS WELL.

14   Q.    YOU'VE BEEN AN FBI AGENT HOW LONG?

15   A.    SINCE DECEMBER OF 2008.

16   Q.    WOULD YOU AGREE WITH ME THAT IT'S EXTRAORDINARY FOR

17   A DEFENDANT TO INSIST ON MEETING WITH THE FBI IN ORDER TO

18   EXPLAIN THE DETAILS OF WHAT THAT DEFENDANT DID TO GIVE THE

19   VICTIM A BETTER UNDERSTANDING OF SECURITY PROBLEMS THAT

20   VICTIM MIGHT HAVE?

21   A.    I WOULD SAY THAT'S NOT EXTRAORDINARY, SIR.

22   Q.    I KNOW YOU'VE ONLY BEEN AN AGENT A COUPLE OF YEARS,

23   BUT HOW OFTEN HAS THAT HAPPENED IN THE TWO YEARS?

24   A.    IN MY CASES THAT'S THE ONLY TIME IT HAS HAPPENED;

25   BUT SPEAKING WITH AGENTS IN OUR OFFICE, PEOPLE OFTEN DO

1    WANT TO DEBRIEF WITH THE FBI TO HELP THEIR CAUSE, IF YOU

2    WILL.

3    Q.    WELL, BUT MR. SAYNE HAD ALREADY AGREED TO PLEAD

4    GUILTY AND WAS ADMITTING HIS INVOLVEMENT AND DETAILED HIS

5    PARTICIPATION IN THE CRIMES; DIDN'T HE?

6    A.    HE DID ADMIT THAT HE WAS INVOLVED IN THOSE CRIMES,

7    YES, SIR.

8    Q.    AND WOULD YOU AGREE WITH ME AFTER READING THE 302,

9    OR THE NOTES THAT AGENT O'HARE HAD, ON MARCH 31 THAT HE

10   DIDN'T FIND ANYTHING THAT MR. SAYNE SAID TO HAVE BEEN

11   UNTRUTHFUL?

12   A.    IF I RECALL CORRECTLY, THE ONLY THING THAT AGENT

13   O'HARE CALLED INTO QUESTION WAS MR. SAYNE'S, MR. SAYNE

14   BEING THE ONLY PERSON INVOLVED IN THIS SCHEME, BUT THERE

15   CERTAINLY WAS A LOT OF TRUTHFUL INFORMATION THAT MR. SAYNE

16   PROVIDED.

17   Q.    AND NOBODY ELSE HAS BEEN CHARGED IN THIS SCHEME;

18   HAVE THEY?

19   A.    NO, SIR.

20   Q.    DID AGENT O'HARE EVER INDICATE TO YOU WHO HE THOUGHT

21   MIGHT BE INVOLVED IN THE SCHEME BESIDES MR. SAYNE?

22   A.    HI INDICATED TO ME THAT HE THOUGHT IT MAY HAVE BEEN

23   SOMEONE THAT HAD INSIDE INFORMATION INTO FDMS, BUT HE

24   DIDN'T SPECIFICALLY GIVE ME A NAME, NO, SIR.

25   Q.    NOW, DID AGENT O'HARE INDICATE TO YOU THAT MR. SAYNE

1   HAD BEEN VERY HELPFUL IN THAT INTERVIEW ON MARCH 31?

2   A.    I DON'T RECALL AGENT O'HARE SAYING WHETHER THE

3   INTERVIEW WAS HELPFUL OR NOT.

4   Q.    NOW, YOU WERE PRESENT --

5   A.    THERE WAS HELPFUL INFORMATION IN THE 302 THOUGH,

6   YES, SIR.

7   Q.    ALL RIGHT, AND ON JUNE 29 OF 2009, YOU WERE PRESENT

8   DURING THAT MEETING?

9   A.    YES, I WAS.

10  Q.    AND THAT WAS A MEETING IN THE U.S. ATTORNEY'S OFFICE

11  HERE IN GREENEVILLE?

12  A.    YES, SIR.

13  Q.    AND IT INVOLVED YOU AND MYSELF AND MR. SAYNE,

14  MS. SMITH, WAS AGENT O'HARE THERE THEN?

15  A.    YES, HE WAS.

16  Q.    AND THAT MEETING INVOLVED THE AGENTS AND MS. SMITH

17  ASKING MR. SAYNE A LOT OF QUESTIONS; ISN'T THAT CORRECT?

18  A.    YES, SIR.

19  Q.    AND IN YOUR OPINION WAS MR. SAYNE TRUTHFUL IN THE

20  INFORMATION HE PROVIDED DURING THAT MEETING?

21  A.    I CAN'T BE SURE ABOUT ALL THE INFORMATION HE

22  PROVIDED, BUT I BELIEVE THAT THE BULK OF THE INFORMATION,

23  IF NOT ALL THE INFORMATION, HE PROVIDED WAS TRUTHFUL.

24  Q.    WELL, DO YOU RECALL ANYTHING IN PARTICULAR THAT YOU

25  BELIEVED THEN OR NOW WAS NOT TRUTHFUL?

1   A.    AS I MENTIONED BEFORE, SPECIAL AGENT O'HARE AND

2   MYSELF HAD QUESTIONS AS TO IF SOMEONE ELSE WAS INVOLVED IN

3   THE SCHEME.

4   Q.    AND, IN FACT, MR. SAYNE EXPLAINED TO YOU HOW THE

5   SCHEME WORKED AND ASKED, AS I DID, THAT YOU ALL NOTIFY

6   FIRST DATA OF THE INFORMATION HE HAD PROVIDED; ISN'T THAT

7   CORRECT?

8   A.    THAT'S CORRECT.

9   Q.    AND WOULD YOU AGREE WITH ME THAT DURING THE COURSE

10  OF THAT MEETING THAT MR. SAYNE IN SOME DETAIL TALKED ABOUT

11  INFORMATION HE HAD FOUND THAT HE THOUGHT FIRST DATA SHOULD

12  KNOW ABOUT BECAUSE IT CREATED A SECURITY ISSUE FOR HIM?

13  A.    ARE YOU TALKING ABOUT THE INFORMATION HE FOUND ON

14  THE INTERNET?

15  Q.    YES, SIR.

16  A.    THAT WAS ACTUALLY IN THE MARCH MEETING; BUT, YES,

17  THAT WAS RECORDED INTO AGENT O'HARE'S REPORT.

18  Q.    AND IN JUNE WE WENT OVER THAT AGAIN IN MORE DETAIL;

19  DIDN'T WE?

20  A.    WE DID GO OVER AGAIN THE METHODOLOGY MR. SAYNE WOULD

21  USE TO PERFORM THE TRANSACTIONS, YES, SIR.

22  Q.    WELL, WHAT I WANT YOU TO DO IS EXPLAIN TO THE COURT

23  WHAT INFORMATION MR. SAYNE REPORTED TO YOU AND TO AGENT

24  O'HARE THAT HE HAD DISCOVERED ON THE INTERNET THAT HE

25  WANTED TRANSMITTED TO FIRST DATA?

1    A.    I RECALL FROM THE REPORT, I WASN'T THERE IN MARCH

2    WHEN WE TALKED, WHEN MR. SAYNE TALKED ABOUT FINDING THE

3    INFORMATION ON THE INTERNET, HOWEVER, FROM THE REPORT IT

4    MENTIONED THAT IT WAS INFORMATION THAT HE HAD GOOGLED, HAD

5    FOUND USING GOOGLE.COM THAT HE BELIEVED TO BE PROPRIETARY

6    TO FDMS THAT SHOWED HOW TO SET UP A TERMINAL AND I

7    BELIEVE, IF I REMEMBER CORRECTLY FROM THE REPORT,

8    CONTAINED A PASSWORD TO HELP WITH SETTING UP THE TERMINAL.

9    Q.    OKAY.  WELL, LET ME ASK YOU THIS, WOULD YOU AGREE

10   WITH ME THAT WHAT MR. SAYNE SAID WAS THAT HE HAD FOUND

11   THROUGH, HAD FOUND PERSONAL CREDIT CARD INFORMATION COULD

12   BE OBTAINED FROM THE USE OF A FIRST DATA TERMINAL AND A

13   PASSWORD BASED ON INFORMATION HE HAD DISCOVERED DURING

14   INTERNET SEARCHES?

15   A.    I'M SORRY, COULD YOU REPEAT THE QUESTION.

16   Q.    ALL RIGHT.  DID MR. SAYNE INDICATE THAT HE FOUND

17   PERSONAL CREDIT CARD INFORMATION ON PEOPLE COULD BE

18   OBTAINED USING A FIRST DATA TERMINAL AND A PASSWORD BASED

19   ON SEARCHES HE MADE ON THE INTERNET?

20   A.    IF I RECALL CORRECTLY, THE INFORMATION HE COULD FIND

21   WAS INFORMATION ON PARTICULAR VENDORS.  I DON'T RECALL

22   ABOUT INDIVIDUAL PEOPLE'S CREDIT CARD INFORMATION; BUT I

23   DO REMEMBER, AND THAT'S THE CRUX OF WHAT HAPPENED AS WELL,

24   IS DIFFERENT VENDORS THAT WERE EMULATED.

25   Q.    WELL, OBVIOUSLY IF SOMEONE CAN GET ACCESS TO VENDOR

INFORMATION, YOU CAN ACCESS CUSTOMER INFORMATION AS IT

RELATES TO THOSE VENDORS; CAN'T YOU?

A.    THAT'S CERTAINLY A POSSIBILITY, I'M NOT SURE.

Q.    AND MR. SAYNE BOTH IN MARCH AND IN JUNE EXPRESSED

HIS DESIRE THAT THIS INFORMATION BE PROVIDED TO FIRST DATA

SO THEY COULD TAKE STEPS TO MAKE SURE THAT THAT

INFORMATION WAS NOT STOLEN AND USED; DIDN'T HE?

A.    I BELIEVE THAT'S TRUE.

Q.    AND YOU WOULD AGREE THAT THE FBI AND THE U.S.

ATTORNEY'S OFFICE AGREED AT THE TIME THAT THAT WAS

VALUABLE INFORMATION AND THAT YOU WOULD PASS IT ON TO

FIRST DATA?

A.    WELL, WE DID AGREE TO PASS IT ON TO FDMS BECAUSE IT

WAS, I AGREE IT WAS IMPORTANT INFORMATION TO MAKE SURE

THAT THIS KIND OF SCHEME DIDN'T HAPPEN AGAIN.  FDMS

CONTACTED ME SEVERAL TIMES.  THEY WERE VERY INTERESTED IN

UNDERSTANDING HOW THIS SCHEME WORKED.  THEY HADN'T, THEY

HAD NOT SEEN THIS SCHEME BEFORE.  THIS WAS SOMETHING

COMPLETELY NEW TO THEM; AND SO, YES, SIR, THEY WERE VERY

INTERESTED TO KNOW EXACTLY HOW THE TRANSACTIONS WOULD TAKE

PLACE BECAUSE THEY WANTED TO BE ABLE TO PUT CONTROLS IN

PLACE TO MAKE SURE IT DIDN'T HAPPEN AGAIN BECAUSE, LIKE I

SAID, THEY HAD NEVER SEEN THIS KIND OF A SCHEME BEFORE.

Q.    AND BASED ON INFORMATION THAT MR. SAYNE PROVIDED,

DID FIRST DATA TAKE STEPS TO CHANGE THEIR SECURITY

1   PROCEDURES?

2   A.    I'M NOT SURE WHAT THEIR INTERNAL CONTROLS WERE OR

3   ARE AT THIS TIME.  I DID PASS THE INFORMATION ON TO THEM,

4   AND I WOULD ASSUME THAT THEY HAVE TAKEN STEPS TO PROTECT

5   THEMSELVES.

6   Q.    NOW, YOU SAID EARLIER THAT ON MARCH 31 AND JUNE 29

7   OF LAST YEAR THAT SOMEONE, EITHER YOU OR AGENT O'HARE,

8   PREPARED A 302 OF THE INTERVIEWS WITH MR. SAYNE?

9   A.    YES.

10  Q.    DO YOU HAVE THOSE INTERVIEWS WITH YOU TODAY HERE?

11  A.    I DO.

12          MR. BLACKWELL:  YOUR HONOR, I'D SIMPLY LIKE

13  THOSE TO BE ADMITTED AS EXHIBITS FOR THE COURT'S

14  CONSIDERATION.

15          MS. SMITH:  YOUR HONOR, THAT WAS PROVIDED AS

16  DISCOVERY.  I DON'T KNOW THAT HE -- I MEAN, I CERTAINLY

17  DIDN'T INTEND TO PUT THOSE IN TODAY.

18          THE COURT:  WELL, I UNDERSTAND THE POINT

19  MR. BLACKWELL IS MAKING.  THEY CAN BE FILED, BUT SOMEBODY

20  WILL HAVE TO PROVIDE THEM TO THE CLERK.

21          MR. BLACKWELL:  THAT'S FINE.  THAT'S ALL I

22  HAVE, YOUR HONOR.  THANK YOU.

23          THE COURT:  ANYTHING ELSE, MS. SMITH?

24          MS. SMITH:  I DO, YOUR HONOR.

25                  REDIRECT EXAMINATION

1    BY MS. SMITH:

2    Q.    DID MR. SAYNE GIVE ANY INFORMATION TO FDMS PRIOR TO

3    HIS BEING ARRESTED IN FRONT OF THE BUILDING ON JANUARY 20,

4    2009?

5    A.    NO, HE DIDN'T.

6    Q.    AND DID HE EVER GIVE ANY TIPS OR HOT LINE CALLS OR

7    ANYTHING TO CONTROL THE LOSSES THAT FDMS INCURRED?

8    A.    NO, HE DIDN'T.

9    Q.    AND IN FACT AT THE TIME HE GAVE THIS VALUABLE

10   INFORMATION, HE HAD BEEN ADVISED HE WAS GOING TO BE

11   CHARGED WITH WIRE FRAUD AT THE VERY LEAST; WASN'T HE?

12   A.    THAT'S CORRECT.

13   Q.    AND I THINK SOME OF THE QUESTIONS THAT MR. BLACKWELL

14   ASKED YOU, THE INTENT WAS THAT MR. SAYNE SIMPLY TOOK

15   ADVANTAGE OF A GLITCH IN THE FDMS SYSTEM.  WERE THESE

16   LOSSES CAUSED BY A GLITCH IN THE SYSTEM OR WERE THEY

17   CAUSED BY MR. SAYNE'S INTENTIONAL MANIPULATION OF THE FDMS

18   SYSTEM?

19   A.    HE CERTAINLY DID INTENTIONALLY MANIPULATE THE

20   SYSTEM, AS WAS EVIDENCED BY THE COMPLEXITY OF THE

21   TRANSACTIONS AND THE MULTIPLE TRANSACTIONS, AS WELL AS HIS

22   OWN STATEMENTS TO THE FBI ON BOTH OF THE OCCASIONS THAT

23   MR. BLACKWELL NOTED.

24           MS. SMITH:  THANK YOU.  I HAVE NO FURTHER

25   QUESTIONS, YOUR HONOR.

1    THE COURT:  ANYTHING ELSE, MR. BLACKWELL?

2    MR. BLACKWELL:  NO, SIR.

3    EXAMINATION

4    BY THE COURT:

5    Q.    AGENT SCOWN, LET ME ASK YOU A QUESTION.  I BELIEVE I

6    UNDERSTOOD YOU TO SAY THAT FDMS HAD NEVER SEEN THIS SCHEME

7    BEFORE; IS THAT CORRECT?

8    A.    THAT'S WHAT THEY REPORTED TO ME, YES, SIR.

9    Q.    GIVEN THE NAME THAT'S ATTACHED TO IT IN THE

10   PRESENTENCE REPORT, ZERO SUM BATCH FRAUD SCHEME,

11   APPARENTLY SOMEBODY HAS SEEN IT BEFORE.  THIS DIDN'T

12   ORIGINATE WITH MR. SAYNE, I TAKE IT?

13   A.    MY UNDERSTANDING IS THAT IS A TERM THAT WAS COME UP

14   WITH FDMS TO EXPLAIN HOW THE FRAUD SCHEME WORKED; AND THE

15   REASON THAT THEY TERMED IT AS ZERO SUM BATCH SCHEME IS

16   THAT WHEN MR. SAYNE WOULD MAKE A PURCHASE ON ONE CARD IN

17   THE NAME OF AN EMULATED VENDOR, THEN WITHIN A 24 HOUR

18   PERIOD, SO BEFORE THE BATCH WAS CLOSED OUT, MR. SAYNE

19   WOULD MAKE THE REFUND TO THE SEPARATE CARD FOR THE EXACT

20   SAME AMOUNT SO THAT IT WOULD EQUAL ZERO.

21   Q.    AND THAT, OF COURSE, IS THE KEY TO BEING, TO NOT

22   BEING DETECTED BECAUSE THERE HAD TO BE A CORRESPONDING

23   CREDIT FOR THAT DEBIT WITHIN THE 24 HOUR PERIOD, OTHERWISE

24   SOMEBODY WOULD DISCOVER WHAT WAS GOING ON?

25   A.    THAT'S RIGHT.  THAT'S THE WHOLE IDEA BEHIND IT IS TO

1  MAKE THINGS ZERO OUT IN THE ATTEMPT TO STAY UNDER THE

2  RADAR.

3  Q.    OKAY.  THE -- WHERE IS FDMS LOCATED?

4  A.    I BELIEVE THE HEADQUARTERS IS IN CORAL SPRINGS,

5  FLORIDA.

6  Q.    AND ACCORDING TO THE PRESENTENCE REPORT, THESE

7  TRANSACTIONS OCCURRED OVER ABOUT A SIX WEEK OR SO PERIOD;

8  IS THAT RIGHT?

9  A.    THAT'S RIGHT.  THEY BEGAN IN DECEMBER OF 2008 AND

10  ENDED IN JANUARY OF 2009.

11  Q.    AND THERE WERE ABOUT 45 VENDORS OR MERCHANTS WHO

12  WERE EMULATED DURING THAT PERIOD OF TIME?

13  A.    THAT'S CORRECT.

14           THE COURT:  ALL RIGHT.  ANYTHING ELSE FROM THE

15  AGENT?

16           OKAY.  THANK YOU VERY MUCH.  YOU MAY STEP DOWN.

17           ALL RIGHT, MS. SMITH, CALL YOUR NEXT WITNESS.

18           MS. SMITH:  PROBATION OFFICER DAN THORNTON.

19      DAN THORNTON, GOVERNMENT'S WITNESS, SWORN

20                 DIRECT EXAMINATION

21                   BY MS. SMITH:

22  Q.    WOULD YOU PLEASE STATE YOUR NAME AND OCCUPATION.

23  A.    DAN THORNTON, UNITED STATES PROBATION OFFICER

24  ASSIGNED HERE IN THE GREENEVILLE DIVISION.

25  Q.    WELL, I'M SURE IT'S REDUNDANT.  WOULD YOU GIVE THE

1    COURT AN ABBREVIATED DESCRIPTION OF YOUR JOB DUTIES,

2    MR. THORNTON.

3            MR. BLACKWELL:  YOUR HONOR, I WILL AGREE AND

4    STIPULATE THAT MR. THORNTON IS MORE THAN QUALIFIED TO

5    TESTIFY AS A PROBATION OFFICER.

6            THE COURT:  AND I CERTAINLY KNOW HIS BACKGROUND

7    AND KNOW THAT IT'S IMPORTANT TO PUT THAT IN THE RECORD.

8            MS. SMITH:  THANK YOU.

9    Q.    MR. -- ARE YOU FAMILIAR WITH MR. ROBERT SAYNE?

10   A.    YES, MA'AM.

11   Q.    AND HOW ARE YOU FAMILIAR WITH HIM AND HOW LONG HAVE

12   YOU KNOWN HIM?

13   A.    I WAS ASSIGNED TO SUPERVISE MR. SAYNE ON HIS TERM OF

14   SUPERVISION UPON HIS RELEASE FROM THE BUREAU OF PRISONS.

15   HIS SUPERVISION COMMENCED ON JANUARY 5 OF 2008.

16           MS. SMITH:  ALL RIGHT, AND I'M GOING TO ASK THE

17   COURT TO ADMIT THIS EXHIBIT, I ACTUALLY HAVE TWO COPIES,

18   ONE FOR THE WITNESS AND ONE FOR THE COURT.

19   Q.    IF YOU COULD IDENTIFY THESE, MR. THORNTON.  IT MIGHT

20   SAVE A LITTLE TIME AS WELL.  CAN YOU RECOGNIZE THOSE,

21   MR. THORNTON?

22   A.    YES, MA'AM.  THE MAJORITY OF THE PACKET CONTAINS

23   MONTHLY SUPERVISION REPORTS, AS WELL AS PROOF OF EARNINGS,

24   AND IT APPEARS ALSO, I SAW ONE AND HERE'S ANOTHER PERSONAL

25   FINANCIAL STATEMENT SUBMITTED BY MR. SAYNE.

1    Q.   NOW, WHAT IS THE PROCESS WITH MR. SAYNE WHEN HE CAME

2    UNDER YOUR SUPERVISION UPON HIS RELEASE FROM FEDERAL

3    PRISON?

4    A.   BEAR WITH ME JUST A MOMENT.

5    Q.   YES, SIR.

6    A.   ON JANUARY 8, 2008, WHICH WAS THREE DAYS AFTER HIS

7    RELEASE, MR. SAYNE REPORTED TO OUR OFFICE HERE IN

8    GREENEVILLE, AND HIS CONDITIONS OF SUPERVISION WERE READ

9    TO HIM AND EXPLAINED.  THE REQUIREMENT OF THE MONTHLY

10   REPORTING FORMS WERE STRESSED, AS WELL AS THE SIGNIFICANCE

11   OF THE PROOF OF EARNINGS, AND JUST GENERAL QUESTIONS THAT

12   HE MAY HAVE HAD AT THAT TIME.

13   Q.   DID YOU EXPLAIN TO HIM ABOUT THE MONTHLY REPORTS HE

14   WAS REQUIRED TO SUBMIT TO YOU?

15   A.   YES, MA'AM.  THAT IS A STANDARD CONDITION OF

16   SUPERVISION FOR EVERY OFFENDER, WHETHER IT'S PROBATION OR

17   A SUPERVISED RELEASE CASE, THAT THEY ARE REQUIRED TO

18   SUBMIT A MONTHLY SUPERVISION REPORTING FORM EVERY MONTH.

19   Q.   AND DID YOU EXPLAIN TO HIM WHAT IT MEANT TO SUBMIT

20   THINGS UNDER PENALTIES OF PERJURY TO YOU?

21   A.   YES, MA'AM.  IF YOU HAPPEN TO LOOK ON THE SECOND

22   PAGE OF EACH FORM OF THE MONTHLY REPORTING FORM, ON THE

23   LEFT COLUMN TOWARDS THE BOTTOM THERE'S A WARNING THAT ANY

24   FALSE STATEMENT MAY RESULT IN REVOCATION OF PROBATION,

25   SUPERVISED RELEASE OR PAROLE AND AN ADDITIONAL 5 YEARS IN

1  PRISON OR A $25,000 FINE OR BOTH UNDER THAT 18 U.S.C. 1001

2  SECTION.

3       MS. SMITH:  THIS MIGHT BE A GOOD TIME, YOUR

4  HONOR, TO ASK THE CLERK TO PUT THE EXHIBIT ON THE

5  PRESENTER, AND I WAS GOING TO GO THROUGH THIS EXHIBIT,

6  JUST A FEW PAGES IF I COULD.  THANK YOU.

7  Q.   SO YOU'RE TALKING ABOUT THAT PART RIGHT HERE, THE

8  WARNING PART RIGHT THERE?

9  A.   YES, MA'AM.  THERE ON THE LEFT SIDE.

10 Q.   THANK YOU.  AND WHAT IS THE PURPOSE OF THIS MONTHLY

11 REPORT, OR WHAT ARE THE PURPOSES, I GUESS, THAT I SHOULD

12 SAY THERE?

13 A.   WELL, THERE'S SEVERAL.  THERE'S FOUR OR FIVE PARTS

14 TO THE MONTHLY REPORTING FORMS.  SPECIFICALLY OFFENDERS

15 ARE REQUIRED TO PROVIDE THEIR CURRENT ADDRESS EACH MONTH,

16 WHO IS LIVING WITH THEM, WHETHER THEY HAVE MOVED DURING

17 THE PREVIOUS MONTH OF THEIR SUPERVISION.  THE NEXT SECTION

18 ADDRESSES EMPLOYMENT, EARNINGS, WHO THEIR SUPERVISORS ARE,

19 HOURS OF WORK THAT THEY HAVE, THEIR TYPICAL WORK HOURS.

20 PART D, EXCUSE ME, C IS THEY'RE REQUIRED TO PROVIDE

21 VEHICLE INFORMATION.  PART D IS A BRIEF MONTHLY FINANCIAL

22 STATEMENT.  IT JUST INDICATES HOW THE OFFENDERS UNDER

23 SUPERVISION ARE SPENDING THEIR MONEY, ASKS IF THEY HAVE

24 ANY BANK ACCOUNTS, SAVINGS OR CHECKING; AND THEN PART E ON

25 PAGE 2 ASKS ABOUT ANY CONTACT WITH LAW ENFORCEMENT, DO

1  THEY HAVE ANY CONTACT WITH ANYONE HAVING A CRIMINAL

2  RECORD, DID THEY POSSESS A FIREARM DURING THE PREVIOUS

3  MONTH ON SUPERVISION, DID THEY USE ANY ILLEGAL DRUGS,

4  TRAVEL OUT OF THE DISTRICT.

5  Q.    DOES ALL OF THIS TIE IN ONE WAY OR ANOTHER INTO THE

6  JUDGMENT AND COMMITMENT ORDER?

7  A.    YES, MA'AM.

8  Q.    OR TO THE, TO THE DEFENDANT'S REHABILITATION?

9  A.    WELL, IT PROVIDES THE PROBATION OFFICE -- IT'S A

10 TOOL THAT WE USE TO MONITOR INDIVIDUALS ON SUPERVISION, IN

11 PARTICULAR WITH MR. SAYNE HAVING A FINANCIAL OBLIGATION

12 PAYABLE TO THE COURT.

13 Q.    SO YOU USE THIS INFORMATION TO DETERMINE IF HE'S

14 PAYING ENOUGH TOWARDS HIS RESTITUTION DEBT AS HE SHOULD

15 BE?

16 A.    THIS IS A BRIEF INDICATOR.  THE ACTUAL PERSONAL

17 FINANCIAL STATEMENT, WHICH I'M SURE YOU'LL GET TO IN A

18 WHILE, GOES INTO MORE DETAIL PROMPTING OFFENDERS TO

19 PROVIDE BASICALLY A SNAPSHOT OF HOW MUCH MONEY THEY HAVE

20 AVAILABLE TO PAY TOWARDS THEIR FINANCIAL OBLIGATION.

21 Q.    NOW, DID YOU ASK MR. SAYNE, OR REQUIRE MR. SAYNE

22 RATHER, TO SUBMIT TO DRUG SCREENS WHILE HE WAS UNDER YOUR

23 SUPERVISION?

24 A.    YES, MA'AM.

25 Q.    HOW LONG DID THAT LAST AND WHAT WAS THE RESULT OF

1  THAT?

2  A.    MR. SAYNE WAS PLACED ON OFFICE CODE-A-PHONE ON

3  JANUARY 8, AND COINCIDENTALLY HE SUBMITTED A URINE DRUG

4  SCREEN ON JANUARY 8, 2008 WITH NEGATIVE RESULTS; AND HE

5  WAS ON THE CODE-A-PHONE FOR A LITTLE OVER SIX MONTHS.  ALL

6  OF HIS SCREENS SUBMITTED RESULTED WITH NEGATIVE RESULTS.

7  Q.    SO THROUGH JULY 8, 2008, YOU HAD NO INDICATION OF

8  ANY SUBSTANCE ABUSE OR USE BY MR. SAYNE?

9  A.    JULY, I'M SORRY, JULY 17, 2008 WAS HIS LAST OBTAINED

10 DRUG SCREEN.

11 Q.    AND DID YOU TERMINATE THE DRUG SCREENS AT THAT

12 TIME?

13 A.    I DID.

14 Q.    DID HE EVER REPORT TO YOU THAT HE WAS USING OR

15 ABUSING ILLEGAL SUBSTANCES?

16 A.    NO, MA'AM.

17 Q.    IF HE HAD, WHAT WOULD HAVE BEEN YOUR RESPONSE?

18 A.    HAD HE DONE THAT, I WOULD HAVE REFERRED HIM FOR A

19 SUBSTANCE ABUSE ASSESSMENT, LET THOSE INDIVIDUALS AT THE

20 TREATMENT FACILITY MAKE THAT DETERMINATION WHETHER

21 TREATMENT WAS NECESSARY, AND AT THAT TIME CALL HIM BACK IN

22 AND WE WOULD DISCUSS THE ASSESSMENT AND REFER HIM FOR

23 TREATMENT IF WARRANTED.

24 Q.    AND THIS EXHIBIT HERE, I THINK IT'S GOING TO BE

25 EXHIBIT 2, I'M NOT SURE, I THINK THAT'S CORRECT --

1    THE COURT:  IT WILL BE NUMBER 2.

2    MS. SMITH:  NUMBER 2.

3  Q.    HOW MANY MONTHLY REPORTS DID MR. SAYNE PROVIDE YOU

4  FROM JANUARY 8, 2008 UNTIL JANUARY 20, 2009?

5  A.    IT WOULD HAVE BEEN 11.

6  Q.    ELEVEN MONTHLY REPORTS.  AND HOW MANY EARNINGS

7  STATEMENTS WERE ATTACHED TO THOSE 11 MONTHLY REPORTS?

8  A.    WELL, I WAS GOING TO SAY 11, BUT -- DO YOU WANT ME

9  TO COUNT THEM?

10  Q.    WELL, DID HE SUBMIT TWO PER MONTH APPROXIMATELY?

11  THAT'S WHAT IT LOOKS LIKE.

12  A.    APPROXIMATELY TWO PAY STUBS DURING EACH MONTH WHEN

13  HE'S SUBMITTING THE MONTHLY REPORTING FORM WERE PROVIDED

14  TO THE PROBATION OFFICE.

15  Q.    AND HOW MANY NET WORTH OR CASH FLOW STATEMENTS DID

16  HE SUBMIT TO YOU DURING YOUR SUPERVISION?

17  A.    TWO, ONCE APPROXIMATELY EVERY SIX MONTHS.

18  Q.    DID MR. SAYNE EVER DISCLOSE TO YOU THAT HE HAD

19  BORROWED OR TAKEN $55,000 FROM MRS. ELLIS TO BEGIN A

20  BUSINESS KNOWN AS PERFECTION AUTO DETAILING?

21  A.    HE DID NOT.

22  Q.    DID HE EVER DISCLOSE TO YOU THAT HE HAD ENTERED INTO

23  A BUSINESS WITH SOMEONE NAMED ANGELA ALLEN AND THAT THE

24  NAME OF THAT BUSINESS WAS PERFECTION AUTO DETAILING?

25  A.    HE DID NOT.

1  Q.    DID HE EVER DISCLOSE TO YOU THAT HE HAD BORROWED ANY

2  SUMS OF MONEY FROM ANYONE?

3  A.    HE DID NOT.

4  Q.    DID HE EVER DISCLOSE TO YOU THAT HE HAD BEEN GIFTED

5  LARGE SUMS OF MONEY FROM ANYONE?

6  A.    HE DID NOT.

7  Q.    DID HE EVER DISCLOSE TO YOU THAT HE HAD STARTED ANY

8  TYPE OF BUSINESS?

9  A.    NO, MA'AM.

10  Q.    IF HE HAD EXPOSED ANY OF THESE THINGS, WHAT WOULD

11  HAVE BEEN YOUR CONCERN AS HIS SUPERVISING PROBATION

12  OFFICER, THAT WOULD BE BORROWING MONEY OR TAKING MONEY OR

13  STARTING A BUSINESS?

14  A.    WELL, IF -- COULD WE TAKE YOUR QUESTIONS IN ORDER?

15  Q.    YES, SIR.

16  A.    THAT MIGHT BE A LITTLE BIT EASIER FOR ME TO

17  ANSWER.

18  Q.    SURE.

19  A.    DO YOU MIND TO --

20  Q.    HOW ABOUT JUST BORROWING MONEY, $55,000 FROM HIS

21  GRANDMOTHER?

22  A.    WELL, OBVIOUSLY THE PROBATION OFFICER WOULD WANT TO

23  KNOW FOR WHAT PURPOSE GIVEN THE FACT THAT MR. SAYNE OWED

24  APPROXIMATELY 105 OR $107,000 ON THE OLD CASE, THE 2003

25  CASE.  HAD HE APPROACHED ME FOR THAT MUCH MONEY TO OPEN A

1  BUSINESS, I WOULD HAVE DENIED THAT.  I WOULD HAVE SAID, IF

2  YOU'RE GOING TO BORROW MONEY, THE BEST PLACE TO SPEND THAT

3  MONEY IS PAY YOUR RESTITUTION.  I WOULD HAVE INVESTIGATED

4  FURTHER TO SEE WHAT TYPE OF PAYMENT PLAN HE WOULD HAVE HAD

5  TO HAVE ARRANGED; BUT BASED ON A PAYMENT OF HALF, MORE

6  THAN LIKELY I WOULD NOT HAVE APPROVED HIM BORROWING THAT

7  MUCH MONEY.

8  Q.    HOW ABOUT IF HE HAD BEEN GIFTED $55,000?

9  A.    I WOULD HAVE REQUIRED MR. SAYNE TO PAY THE ENTIRE

10 SUM TO THE COURT.

11 Q.    AND HOW ABOUT IF HE STARTED A BUSINESS, IF YOU HAD

12 KNOWN, HAD KNOWN THAT INFORMATION?

13 A.    ASSUMING THAT HE HAD TO BORROW THE MONEY, I WOULD

14 NOT HAVE PERMITTED THAT TO OCCUR.

15 Q.    BUT JUST STARTING A BUSINESS WITH SOMEONE ELSE WHICH

16 INVOLVES A CREDIT CARD PROCESSOR, AS THIS ONE DID

17 APPARENTLY?

18 A.    WELL, I WOULD HAVE BEEN CURIOUS ON, OF HOW HE WAS

19 GOING TO CONTINUE WORKING FOR MR. DAVID WALTERS, AS HE

20 REPORTED TO ME, AS WELL AS CONTINUE OR START THIS BUSINESS

21 OF PERFECTION AUTO DETAIL.  TO SAY WHETHER I WOULD HAVE

22 APPROVED OR DENIED, I MEAN, THAT'S A WHAT-IF, I'M SORRY, I

23 JUST CAN'T GIVE YOU A DIRECT ANSWER.

24 Q.    BUT IT WOULD HAVE CAUSED YOU TO INQUIRE FURTHER; IS

25 THAT CORRECT?

1   A.    YES, MA'AM.

2   Q.    WAS IT PLAUSIBLE FOR MR. SAYNE TO BELIEVE THAT HE

3   COULD WORK FOR ANGELA ALLEN IN THIS DETAILING BUSINESS

4   WITHOUT TELLING YOU ABOUT HER, ABOUT IT AND LATER DISCLOSE

5   THE EMPLOYMENT TO YOU ONCE THE BUSINESS BECAME VIABLE?

6          MR. BLACKWELL:  YOUR HONOR, I'M GOING TO OBJECT

7   TO USING THE WORD "PLAUSIBLE", I THINK THAT CALLS FOR A

8   CONCLUSION THAT ONLY MR. SAYNE CAN MAKE.  I THINK THE

9   QUESTION ASKED IS, COULD BE ASKED A DIFFERENT WAY, AND I

10  OBJECT TO THE FORM OF THE QUESTION.

11          THE COURT:  WELL, LET ME TRY MY HAND AT THIS.

12  I TAKE IT YOU HAD ABSOLUTELY NO KNOWLEDGE DURING THIS

13  PERIOD OF TIME THAT PERFECTION AUTO DETAILING EVEN

14  EXISTED; IS THAT CORRECT?

15          THE WITNESS:  THAT'S CORRECT, I HAD NO

16  KNOWLEDGE.

17          THE COURT:  MR. SAYNE NEVER REPORTED ANY

18  ASSOCIATION WITH THIS YOUNG LADY IN THAT BUSINESS OR ANY

19  OTHER BUSINESS; CORRECT?

20          THE WITNESS:  THAT'S TRUE.

21          THE COURT:  DID HE EVER REPORT ANY INCOME FROM

22  THAT BUSINESS?

23          THE WITNESS:  NO, YOUR HONOR.

24          THE COURT:  DID HE EVER REPORT ANY EXPENDITURE

25  TO OPEN THAT BUSINESS?

1          THE WITNESS:  NO, YOUR HONOR.

2          THE COURT:  SO THERE WAS ABSOLUTELY NO

3     DISCLOSURE WHATSOEVER RELATING TO THAT BUSINESS?

4          THE WITNESS:  THAT'S CORRECT.

5          THE COURT:  OKAY.

6          MS. SMITH:  IF I MAY, YOUR HONOR, JUST READING

7     FROM THE DEFENDANT'S SENTENCING MEMORANDUM, FOOTNOTE 1 ON

8     PAGE 7, THE PLAN WAS FOR THE DEFENDANT TO WORK FOR ALLEN

9     AND DISCLOSE THE EMPLOYMENT TO THE PROBATION OFFICE ONCE

10    THE BUSINESS BECAME VIABLE; BUT THAT HAD BEEN --

11         THE COURT:  I NOTED THAT, AND I ALSO NOTED THAT

12    HE TOLD THE PROBATION OFFICER THAT HE OWNED AND OPERATED

13    THE BUSINESS, SO I UNDERSTAND YOUR POINT.

14         MS. SMITH:  THANK YOU.  THE POINT IS MADE.

15    THANK YOU, YOUR HONOR.

16    Q.   DID MR. SAYNE EVER INDICATE TO YOU DURING THE TIME

17    YOU HAD HIM UNDER SUPERVISION THAT HE WAS DEPRESSED AFTER

18    ANOTHER PERSONAL AND BUSINESS FAILURE AND LOSING HIS

19    GRANDMOTHER'S MONEY?

20    A.   NO, MA'AM.

21    Q.   DID MR. SAYNE EVER DISPLAY ANY SYMPTOMS ASSOCIATED

22    WITH CLINICAL DEPRESSION?

23         MR. BLACKWELL:  YOUR HONOR, I'M GOING TO OBJECT

24    TO THIS.  I THINK WE FINALLY REACHED A POINT THAT THIS

25    MIGHT BE OUTSIDE MR. THORNTON'S EXPERTISE.  IT'S CALLING

1  FOR A MEDICAL OPINION THAT I DON'T THINK HE CAN GIVE.

2          THE COURT:  I THINK HE CAN TESTIFY AS TO WHAT

3  HE OBSERVED, HE JUST CANNOT DIAGNOSE.

4  Q.    DID HE EVER DISPLAY ANY SYMPTOMS ASSOCIATED WITH

5  DEPRESSION, MR. THORNTON?

6          MR. BLACKWELL:  WELL, YOUR HONOR, AGAIN, I

7  THINK IF SHE WANTS TO ASK HIM WHAT HE SAW RATHER THAN

8  SAYING THEY WERE SYMPTOMS OF SOME TYPE OF MENTAL ILLNESS,

9  I THINK THAT'S AN APPROPRIATE QUESTION; OTHERWISE, I

10  OBJECT TO THE FORM OF THE QUESTION.

11          THE COURT:  WELL, I THINK THE SYMPTOMS

12  GENERALLY ASSOCIATED WITH DEPRESSION ARE PRETTY WELL

13  ESTABLISHED, AND IT WOULD NOT TAKE A MEDICAL PROFESSIONAL

14  TO ANSWER A QUESTION AS TO WHETHER OR NOT HE SAW ANYTHING

15  THAT HE WOULD ASSOCIATE WITH DEPRESSION, AND HE CAN ANSWER

16  TO THAT EXTENT.

17          DID YOU SEE ANYTHING BY MR. SAYNE, ANY

18  BEHAVIOR, DID HE TELL YOU ANYTHING, DID YOU OBSERVE OR

19  HEAR ANYTHING THAT YOU WOULD ASSOCIATE WITH SYMPTOMS OF

20  DEPRESSION?

21          THE WITNESS:  NO, SIR.

22          THE COURT:  DID HE EVER ASK YOU FOR ASSISTANCE

23  IN GETTING MENTAL HEALTH TREATMENT FOR DEPRESSION?

24          THE WITNESS:  NO, YOUR HONOR.

25  Q.    HAD MR. SAYNE DISCLOSED HIS DEPRESSION OR ABUSE OF

1  DRUGS, WHAT WOULD HAVE BEEN YOUR RESPONSE?

2  A.    IT WOULD HAVE BEEN SIMILAR REGARDING THE SUBSTANCE

3  ABUSE SCENARIO.  IF HE HAD DISCLOSED ANY MENTAL HEALTH

4  NEEDS TO THE PROBATION OFFICE, HE WOULD HAVE BEEN REFERRED

5  FOR AN ASSESSMENT.  AN ASSESSMENT WOULD HAVE BEEN REVIEWED

6  WITH THE PROVIDER, MR. SAYNE; AND IF NECESSARY, TREATMENT

7  WOULD HAVE BEEN WARRANTED.

8  Q.    DID YOU RUN A CREDIT BUREAU CHECK OR SOME SORT OF

9  CHECK TO DETERMINE IF MR. SAYNE HAD BORROWED ANY MONEY OR

10 STARTED ANY BUSINESSES WHILE HE WAS UNDER YOUR

11 SUPERVISION?

12 A.    YES, MA'AM.  THOSE, THE CREDIT BUREAUS ARE REQUESTED

13 ABOUT THE SAME TIME THAT THE PERSONAL FINANCIAL STATEMENT

14 IS REQUIRED TO BE COMPLETED.  WE USE THOSE IN CONJUNCTION

15 WITH ONE ANOTHER TO -- IN MR. SAYNE'S CASE HE HAD A

16 CONDITION OF NO NEW CREDIT, AND THAT WAS THE PURPOSE OF

17 THE PROBATION OFFICE REQUESTING THE CREDIT BUREAUS, THE

18 TWO THAT WE RAN.

19 Q.    SO YOU -- BOTH THOSE REPORTS CAME BACK AND SAID,

20 REPORTED NEGATIVE; IS THAT CORRECT?

21 A.    NO NEW ACCOUNTS.

22 Q.    NO NEW ACCOUNTS.  AND I'M GOING TO ASK YOU, WE'RE

23 JUST GOING TO GO THROUGH A FEW OF THE EXHIBITS HERE THAT

24 WE'VE ALREADY TABBED IN EXHIBIT 2.  ON THE VERY FIRST ONE,

25 THE VERY FIRST PAGE, THE HIGHLIGHTED PART, WAS THIS ALL

1  WRITTEN IN BY MR. SAYNE OR WAS THIS WRITTEN BY YOU AND

2  AFFIRMED BY HIM?

3  A.    THAT?

4  Q.    THESE TWO YELLOW PARTS RIGHT HERE.  I DON'T KNOW IF

5  YOU CAN SEE THE YELLOW LINE.

6  A.    THAT IS MR. SAYNE'S HANDWRITING.

7  Q.    SO HE DISCLOSED THAT HE WAS GIVEN $615 BY HIS

8  GRANDMOTHER ON JANUARY 28?

9  A.    FOR THE REPAIR OF THE VEHICLE.

10  Q.    OKAY.  THANK YOU.  LET'S GO TO THE NEXT TAB, WHICH

11  IS THE REPORT FOR JUNE OF 08.  I NOTICE THERE'S QUESTIONS

12  THERE, DID YOU CHANGE JOBS, WERE YOU TERMINATED; AND IF

13  YOU CHANGED JOBS OR TERMINATED, AND HE PUT IN, NO, NO AND

14  NOT APPLICABLE; AND DOWN AT THE BOTTOM IT LISTS ALL

15  EXPENDITURES OVER $500, WOULD THIS HAVE INCLUDED ANY

16  EXPENDITURES FOR THIS BUSINESS, PERFECTION AUTO

17  DETAILING?

18  A.    YES, THAT WOULD HAVE BEEN A PLACE, PARDON ME, THAT

19  HE WOULD HAVE THE OPPORTUNITY TO PROVIDE THAT INFORMATION.

20        ANOTHER CONDITION OF HIS SUPERVISION IS THAT

21  HE'S REQUIRED TO DISCLOSE TO THE PROBATION OFFICE ANY

22  CHANGE IN RESIDENCE OR EMPLOYMENT.  I BELIEVE THE

23  CONDITION READS WITHIN 10 DAYS OF THE EVENT.  THE

24  PROBATION OFFICE WAS NEVER ADVISED OR NOTIFIED.

25  Q.    THANK YOU.  IF YOU'LL GO TO THE NEXT TABBED SHEET --

1  WELL, I TELL YOU WHAT, WE'LL JUST STOP RIGHT THERE AND

2  WE'LL LOOK AT SOME OF THESE EARNING STATEMENTS.  DID YOU

3  DETERMINE THAT MR. SAYNE FABRICATED ALL 23 OF THESE

4  EARNING STATEMENTS AT A LATER TIME?

5  A.    AT A LATER TIME, YES, MA'AM.  I HAVE A LETTER SIGNED

6  BY DAVID WALTERS.  IF I COULD, I'D --

7  Q.    CERTAINLY.

8        MR. BLACKWELL:  YOUR HONOR, I HAVEN'T SEEN THAT

9  LETTER, AT LEAST THAT I KNOW OF.

10       THE COURT:  ALL RIGHT.  LET MR. BLACKWELL SEE

11 THE LETTER.

12 Q.    THE NEXT TAB IS PART OF HIS NET WORTH STATEMENT, HIS

13 PERIODIC NET WORTH STATEMENT; AND IT SAYS BUSINESS

14 HOLDINGS, DOWN HERE, AND I BELIEVE THE DATE ON THIS

15 STATEMENT IS SEPTEMBER 22, 2008, AS INDICATED AT THE

16 BOTTOM OF THE PAGE.  IS THAT MR. SAYNE'S SIGNATURE AND

17 HANDWRITING AGAIN OR IS THAT YOURS AND THEN HE JUST

18 AFFIRMED IT?

19 A.    THAT IS MR. SAYNE'S INITIALS, AS WELL AS THAT

20 PARTICULAR DATE.

21 Q.    AND WOULD IT HAVE BEEN APPROPRIATE FOR HIM TO

22 DISCLOSE THIS PERFECTION AUTO DETAILING THERE?

23 A.    THAT SPACE IS SPECIFICALLY PROVIDED FOR ANY TYPE OF

24 BUSINESS HOLDINGS OR PARTNERSHIPS.

25 Q.    JUST ONE PAGE OVER, IT SAYS, TRANSFER OF ASSETS.

1   CAN YOU READ THAT OUT LOUD, TRANSFER OF ASSETS, PAREN

2   SOMETHING, CAN YOU READ IT OUT LOUD?

3   A.    THERE IN PARENTHESES?

4   Q.    YES, SIR.

5   A.    INCLUDE ANY ASSETS YOU HAVE TRANSFERRED OR SOLD

6   SINCE THE DATE OF YOUR ARREST WITH A COST OR MARKET VALUE

7   OF MORE THAN $500.  ALSO LIST ANY ASSETS THAT SOMEONE

8   ELSE --

9   Q.    IS HOLDING ON YOUR BEHALF?

10  A.    IS HOLDING ON YOUR BEHALF, YES, MA'AM.

11  Q.    SO IN FACT IF MS. ALLEN WAS HOLDING THIS BUSINESS IN

12  MR. SAYNE'S NAME, AS IS IN THE SENTENCING MEMORANDUM,

13  WOULD IT BE PROPER TO LIST THAT IN THAT?

14  A.    YES, SIR.

15  Q.    LET'S GO TO THE NEXT PAGE OF THAT JULY MONTHLY CASH

16  FLOW STATEMENT OF JULY 22 OF 08, WAS HE ASKED TO DISCLOSE

17  GIFTS FROM FAMILY AND GIFTS FROM OTHERS?

18  A.    YES.

19  Q.    AND HE PUT NA; IS THAT TRUE?

20  A.    NOT APPLICABLE, YES, MA'AM.

21  Q.    HE DID EXPOSE HIS GRANDMOTHER'S SOCIAL SECURITY

22  INCOME; DIDN'T HE, INCOME OF OTHERS IN-HOUSE?

23  A.    YES; WITH THE ASTERISKS, YES.

24  Q.    IS THERE ALSO A PLACE ON EACH MONTHLY REPORT FOR THE

25  PROBATIONER OR THE SUPERVISEE TO DISCLOSE HIS POSSESSION

1    OR USE OF ILLEGAL DRUGS?

2    A.    YES, MA'AM.  IT'S ON THE SECOND PAGE.

3    Q.    AND IS THIS ONE DATED AUGUST 1, 2008, WAS THE, HOW

4    IT APPEARS HERE?

5    A.    I CAN'T SEE THE BOTTOM THERE BY HIS SIGNATURE LINE,

6    IF YOU WOULD SLIDE THAT UP JUST A LITTLE.

7    Q.    SURE.  CAN YOU SEE THAT RIGHT THERE, DID YOU POSSESS

8    OR USE ANY ILLEGAL DRUG?

9    A.    CORRECT, AND HE'S MARKED NO; AND THEN ADDRESSING ANY

10   TYPE OF DRUG, HE'S MARKED NA OR WRITTEN IN NA.

11   Q.    SO FOR ALL 11 MONTHLY REPORTS HE NEVER DISCLOSED ANY

12   DRUG USAGE OR CERTAINLY DRUG ABUSE; DID HE?

13   A.    THAT'S CORRECT.

14   Q.    SAME FOR THE NEXT MONTH, SEPTEMBER 12, 2008?

15   A.    IF YOU'LL GIVE ME JUST A MOMENT TO GET --

16   Q.    YES, SIR.

17   A.    FLIP TO THESE HARD COPIES.

18   Q.    THE ONE DATED SEPTEMBER 12.

19   A.    YES, MA'AM.

20   Q.    THE ONE DATED OCTOBER 1.

21   A.    REGARDING THE DRUG USE QUESTION?

22   Q.    THAT'S CORRECT.

23   A.    IS MARKED NO.

24   Q.    NOVEMBER 14?

25   A.    AGAIN, A REPLY OF NO.

1   Q.   AND DECEMBER 3 OF 08?

2   A.   THE SAME.

3   Q.   THE SAME THERE.  AND I GUESS WAS HIS LAST OR SECOND

4   TO LAST ONE THAT HE GAVE TO YOU, JANUARY 2 OF 2009?

5   A.   HE MARKED NO.

6   Q.   AND, AGAIN, THE LAST NET WORTH STATEMENT THAT HE

7   GAVE TO YOU ON JANUARY 15, 2009, DID HE DISCLOSE THIS

8   BUSINESS OR ITS FAILURE OR ANY DEBTS OR ANYTHING HAVING TO

9   DO WITH THIS BUSINESS THAT HE STARTED?

10  A.   HE DID NOT.

11  Q.   AND HE FAILED TO DISCLOSE ANY GIFTS EITHER; DID

12  HE?

13  A.   THAT WOULD BE ON THE LAST TAB, I BELIEVE.

14  Q.   YES, SIR?

15  A.   THAT'S CORRECT, IT'S MARKED NA.

16  Q.   AND THAT'S DATED JANUARY?

17  A.   YES, DATED JANUARY 15, 2009.

18          MS. SMITH:  THANK YOU.  I HAVE NO FURTHER

19  QUESTIONS OF THE PROBATION OFFICER, YOUR HONOR.

20          THANK YOU, OFFICER THORNTON.

21          THE COURT:  ALL RIGHT.  MR. BLACKWELL, ANY

22  QUESTIONS?

23                  CROSS EXAMINATION

24                  BY MR. BLACKWELL:

25  Q.   HI, MR. THORNTON.

1    A.    GOOD AFTERNOON.

2    Q.    KIND OF FUNNY BEING ON THESE SIDES; ISN'T IT?  LET

3    ME JUST ASK YOU A COUPLE OF QUESTIONS.  WHILE YOU WERE

4    TESTIFYING ABOUT EVERYTHING THAT MR. SAYNE HAD DONE, I

5    WENT BACK AND LOOKED AT THE INFORMATION, AND YOU WOULD

6    AGREE WITH ME THAT EVERYTHING YOU'VE TESTIFIED ABOUT, WHAT

7    HE TOLD YOU, WHAT HE DIDN'T TELL YOU, WHAT HE SUPPLIED

8    YOU, WHAT HE SHOULD HAVE SUPPLIED YOU, ALL THAT IS

9    CONTAINED IN COUNT 1, AND HE PLED GUILTY TO THAT; DIDN'T

10   HE?

11   A.    THAT'S MY UNDERSTANDING.

12   Q.    AND WHAT YOU'RE DOING TODAY IS SIMPLY GIVING THE

13   COURT SOME BACKGROUND AS TO SOME OF THE DETAILS INVOLVED

14   IN WHAT MR. SAYNE DID WHILE HE WAS ON SUPERVISION WITH

15   YOU?

16   A.    PARTICULARLY WITH SUPERVISION REPORTING FORMS AND

17   EARNING STATEMENTS.

18   Q.    OKAY.  LET ME ASK YOU A COUPLE OF QUESTIONS KIND OF

19   IN GENERAL FIRST.  YOU SAID THAT INITIALLY WHEN HE CAME

20   INTO SUPERVISION, IT'S THE PRACTICE OF THE PROBATION

21   OFFICE TO DO A DRUG SCREEN ON AN INDIVIDUAL?

22   A.    IF DRUG SCREENS WERE ORDERED.  IF THE COURT FOUND

23   THAT AN OFFENDER DID NOT HAVE A, AT THE TIME OF SENTENCING

24   OR BASED ON THE PRIOR HISTORY NO SUBSTANCE ABUSE WAS

25   INDICATED AND THE COURT DID NOT REQUIRE SUBSTANCE ABUSE

1    TESTING, THE PROBATION OFFICE ORDINARILY WOULD NOT SCREEN

2    AN INDIVIDUAL AT THE FIRST MEETING OF PROBATION OR ON

3    SUPERVISED RELEASE.

4             MR. BLACKWELL:  YOUR HONOR, IF I COULD HAVE

5    JUST A MINUTE.

6             THE COURT:  YOU MAY.

7    A.   HE HAD A SPECIAL CONDITION NUMBER 4, IF THAT'S WHAT

8    YOU'RE LOOKING FOR.

9    Q.   WELL, YOU WOULD AGREE WITH ME THAT THE SPECIAL

10   CONDITIONS COME ABOUT AS A RESULT OF A PRESENCE REPORT

11   AND THE INVESTIGATION THE PROBATION OFFICE DOES?

12   A.   I WOULD AGREE WITH YOU.

13   Q.   AND WHEN MR. SAYNE CAME INTO YOUR SUPERVISION, I

14   WOULD ASSUME THAT YOU WENT BACK AND REVIEWED THE

15   PRESENCE REPORT IN THE EARLIER FEDERAL CASE?

16   A.   YES.

17   Q.   AND YOU WERE AWARE THAT IN THAT PRESENCE REPORT

18   THERE WAS A FAIRLY SUBSTANTIAL HISTORY OF SUBSTANCE ABUSE

19   THAT MR. SAYNE HAD?

20   A.   IF YOU'LL GIVE ME A MOMENT, I'LL REFRESH MY

21   MEMORY.

22   Q.   WELL, IF I CAN HELP A LITTLE BIT, I'VE GOT IT HERE

23   AND I CAN PUT IT ON THE SCREEN.  IT SAYS, I BELIEVE, IN

24   PARAGRAPH 57, ACCORDING TO DEFENDANT SAYNE, HE FIRST

25   CONSUMED ALCOHOL AT THE AGE OF 19 AND REPORTED THAT WHEN

1   NOT INCARCERATED CONSUMES ALCOHOL TWO TO THREE TIMES PER

2   WEEK.  DEFENDANT SAYNE STATED THAT HE EXPERIMENTED WITH

3   MARIJUANA AT THE AGE OF 19 OR 20 AND FIRST USED COCAINE

4   DURING 1998.  HE REPORTED THAT HE USED COCAINE REGULARLY

5   ON WEEKENDS FROM APPROXIMATELY 1998 THROUGH 2000.  HE ALSO

6   STATED THAT HE HAD PREVIOUSLY USED METHAMPHETAMINE,

7   VALIUM, XANAX AND ECSTASY.  HE DENIES ANY ALCOHOL OR DRUG

8   TREATMENT.  ACCORDING TO THE UNITED STATES PRETRIAL

9   SERVICES OFFICER, THE DEFENDANT SUBMITTED TO A URINE

10  SCREEN AT THE TIME OF HIS INTERVIEW WITH NEGATIVE RESULTS.

11  SO YOU WOULD AGREE WITH ME THAT WHEN HE WAS SENTENCED IN

12  THIS COURT BACK IN 2003 THAT MR. SAYNE HAD A SUBSTANCE, A

13  SERIOUS SUBSTANCE ABUSE PROBLEM; WOULDN'T YOU?

14  A.   FIVE YEARS BEFORE I BECAME ACQUAINTED WITH MR.

15  SAYNE, YES, SIR, I WOULD AGREE WITH THAT.

16  Q.   RIGHT.  AND IT'S BECAUSE OF THAT SUBSTANCE ABUSE

17  PROBLEM THAT THE SPECIAL CONDITIONS IN HIS CASE REQUIRED

18  SOME SUBSTANCE ABUSE TESTING?

19  A.   I WOULD AGREE WERE THAT STATEMENT, YES, SIR.

20  Q.   AND THE FIRST DRUG SCREEN HE WAS GIVEN WAS GIVEN

21  WHEN?

22  A.   JANUARY 8, AT OUR INITIAL MEETING, OF 2008.

23  Q.   AND CAN YOU GIVE ME A SENSE THEN OF ON WHAT BASIS

24  SUBSEQUENT DRUG SCREENS WERE TAKEN FROM MR. SAYNE?

25  A.   SPECIFICALLY ARE YOU ASKING NUMBERS OR FREQUENCY?

1  Q.   WELL, FIRST NUMBERS, JUST GIVE ME A BALL PARK NUMBER

2  OF HOW THE DRUG SCREENS WERE DONE FROM THE TIME MR. SAYNE

3  CAME INTO CUSTODY UNTIL THEY STOPPED BEING DONE.

4         MS. SMITH:  I THINK SUPERVISION, NOT CUSTODY.

5  Q.   I'M SORRY, SUPERVISION.

6  A.   NINE.

7  Q.   OKAY, AND THE NINE THAT WERE DONE WERE DONE BETWEEN

8  JANUARY OF 2008 AND JULY 17 OF 2008?

9  A.   THAT'S CORRECT.

10  Q.   AND I WOULD TAKE IT THAT ON THOSE OCCASIONS,

11  OBVIOUSLY, MR. SAYNE EITHER CAME TO YOUR OFFICE OR YOU

12  WENT TO HIM AND THOSE DRUG SCREENS WERE OBSERVED?

13  A.   MR. SAYNE WAS REFERRED ON THE CODE-A-PHONE AND WOULD

14  HAVE BEEN REQUIRED TO REPORT WHEN HIS COLOR CAME UP.

15  Q.   ALL RIGHT.  DURING, DURING THAT SAME TIME HOW OFTEN

16  DID YOU SEE MR. SAYNE FACE-TO-FACE BETWEEN JANUARY OF 2008

17  AND JULY 17 OF 2008?

18  A.   ARE YOU ASKING APPROXIMATELY?

19  Q.   YES, SIR.  I DON'T WANT YOU TO GO BACK THROUGH YOUR

20  RECORDS AND ADD THEM ALL UP, JUST GIVE ME A SENSE OF HOW

21  FREQUENTLY.

22  A.   AT LEAST TWO, POSSIBLY THREE TIMES FROM JANUARY TO

23  JULY.

24  Q.   NOW, IS THAT TWO OR THREE TIMES A MONTH OR TWO OR

25  THREE TIMES TOTAL?

1   A.    THE TOTAL.

2   Q.    AND DURING THOSE TWO OR THREE TIMES TOTAL HOW MUCH

3   TIME WOULD YOU SPEND WITH HIM?

4   A.    WITH MR. SAYNE?

5   Q.    RIGHT.

6   A.    IN MR. SAYNE'S CASE, PROBABLY NO MORE THAN TEN

7   MINUTES AT THE RESIDENCE.

8   Q.    SO WE'RE TALKING PROBABLY 30 MINUTES OR SO BETWEEN

9   JANUARY OF 2008 AND JULY OF 2008 THAT YOU SPENT

10  FACE-TO-FACE WITH HIM?

11  A.    IN THE FIELD AT HIS HOME.

12  Q.    OKAY.

13  A.    CORRECT.

14  Q.    AND YOU WOULD AGREE WITH ME THAT PEOPLE WHO SUFFER

15  FROM DEPRESSION, THAT'S NOT ALWAYS EASILY RECOGNIZABLE; IS

16  IT?

17  A.    YOU WANT ME TO AGREE WITH YOU?

18  Q.    YES, SIR.  WELL, YOU DON'T HAVE TO; BUT IF YOU WOULD

19  AGREE WITH ME A LOT OF PEOPLE THAT SUFFER FROM DEPRESSION,

20  THAT'S NOT EASILY RECOGNIZABLE BY OTHERS?

21  A.    IN MR. SAYNE'S CASE I HAD NO INDICATION THAT HE WAS

22  SUFFERING FROM DEPRESSION.  HE HAD A GOOD MOOD, SAID

23  EVERYTHING WAS GOING WELL.  HIS GRANDMOTHER WAS TYPICALLY

24  HOME DURING MY VISITS, AND SHE EXPRESSED THE SAME

25  FEELINGS.

1  Q.    WELL, OF COURSE, DURING, IT WAS DURING THIS TIME,

2  BASED ON YOUR TESTIMONY, FROM MARCH OF 2008 UNTIL JANUARY

3  OF 2009, THAT HE WAS ACTIVELY INVOLVED IN THIS SCHEME TO

4  KEEP YOU FROM KNOWING THAT HE HAD THIS OTHER BUSINESS;

5  ISN'T THAT CORRECT?

6  A.    ASK YOUR QUESTION AGAIN, PLEASE.

7  Q.    DURING, IT WAS DURING THIS SAME TIME, BETWEEN MARCH

8  3 OF 2008 AND JANUARY 20 OF 2009 AS CHARGED IN COUNT 1,

9  THAT HE WAS ACTIVELY INVOLVED IN THIS SCHEME YOU'VE

10  TESTIFIED ABOUT IN KEEPING INFORMATION FROM YOU; WASN'T

11  HE?

12  A.    YOU'RE ASKING WAS HE ACTIVELY INVOLVED IN A SCHEME,

13  YES, HE WAS.

14  Q.    AND IT WAS IN THE SCHEME THAT HE WAS KEEPING

15  INFORMATION FROM YOU; WASN'T IT?

16  A.    AS WELL AS OTHER THINGS.

17  Q.    OKAY.  AS WELL AS HIS ATTITUDE AND AS WELL AS HIS

18  BEHAVIOR IN FRONT OF YOU; WOULDN'T YOU AGREE?

19  A.    IT'S POSSIBLE.

20  Q.    OKAY.  NOW, YOU SAID THE LAST TIME THAT, THE LAST

21  DRUG SCREEN THAT YOU GAVE WAS ON JULY 17 OF 2008.

22  A.    MR. SAYNE, THAT WAS MR. SAYNE'S LAST SCREEN.

23  Q.    OKAY, AND IF YOU WOULD, TELL ME AGAIN, BECAUSE I

24  DON'T UNDERSTAND WHAT WAS THE REASON AT THAT POINT THAT

25  YOU MADE A DETERMINATION THAT NO ADDITIONAL DRUG SCREENS

1   WERE NEEDED?

2   A.    PROBATION OFFICE USES A PHASE SYSTEM WITH OFFENDERS

3   WHO ARE ORDERED TO PARTICIPATE IN DRUG TESTING OR

4   SUBSTANCE ABUSE TREATMENT.  MR. SAYNE WAS PLACED IN PHASE

5   3, WHICH IS THE LOWEST.  THAT TYPICALLY IS FOR A PERIOD OF

6   SIX MONTHS.  HE WAS GIVEN A COLOR THAT REQUIRED TESTING ON

7   A MONTHLY, AT LEAST A MONTHLY BASIS.  SEE, IN APRIL HE WAS

8   REQUIRED TO TEST TWICE, IN JULY HE WAS REQUIRED TO TEST

9   TWICE, SO IT WAS A COLOR THAT CAME UP AT LEAST ONCE AND

10  POSSIBLY TWO TIMES A MONTH.

11  Q.    OKAY.

12  A.    WITH ALL OF HIS SCREENS RESULTING WITH NEGATIVE

13  RESULTS, THERE WAS NO INDICATION TO THE PROBATION OFFICE

14  AT THAT TIME THAT MR. SAYNE WAS IN NEED OF FURTHER

15  TESTING, SO HE WAS TERMINATED FROM THE CODE-A-PHONE.

16  Q.    ALL RIGHT, SO FROM JULY 17 OF 2008 UNTIL THE DAY OF

17  HIS ARREST IN 2009, HE WAS NOT TESTED AS A RESULT OF BEING

18  ON SUPERVISION WITH THE PROBATION OFFICE?

19  A.    HE WAS SUBJECT TO BEING TESTED.

20  Q.    RIGHT.

21  A.    THE CONDITION DIDN'T GO AWAY.  HE WAS JUST NOT

22  REQUIRED TO REPORT FOR A CODE-A-PHONE.

23  Q.    SO HE WAS NOT TESTED AFTER JULY 17 OF 2008 UNTIL HE

24  WAS ARRESTED IN JANUARY OF 2009?

25  A.    THAT'S CORRECT.

1    Q.   ALL RIGHT.  NOW, ARE YOU FAMILIAR, HAVE YOU SINCE

2    LEARNED ABOUT PERFECTION AUTO DETAILING?

3    A.   ALL THAT I KNOW ABOUT PERFECTION AUTO DETAILING IS

4    IN THE PRESENTENCE REPORT AND IN YOUR SENTENCING

5    MEMORANDUM.

6    Q.   OKAY.  ASSUMING THE PRESENTENCE REPORT AND MY

7    SENTENCING MEMORANDUM ARE CORRECT AND THAT PERFECTION AUTO

8    DETAILING BEGAN IN AUGUST OR SEPTEMBER OF 2008, CAN YOU

9    TELL ME FROM JULY 17 OF 2008 UNTIL HE WAS ARRESTED HOW

10   MANY TIMES YOU MET WITH MR. SAYNE FACE-TO-FACE?

11   A.   I'LL HAVE TO LOOK THROUGH MY FILE.

12   Q.   WELL, AGAIN, CAN YOU GIVE ME A BALL PARK?

13   A.   PROBABLY ONCE EVERY THREE MONTHS.

14   Q.   OKAY, SO DURING THAT TIME FRAME YOU MIGHT HAVE MET

15   WITH HIM TWICE BETWEEN, BETWEEN JULY, BETWEEN AUGUST OR

16   SEPTEMBER OF 2008 AND WHEN HE WAS ARRESTED IN JANUARY OF

17   2009?

18   A.   YES.

19   Q.   NOW, IN READING THE PRESENTENCE REPORT AND MY

20   SENTENCING MEMORANDUM, IF THE BUSINESS HAD OPENED AND IT

21   HAD FAILED, YOU DON'T KNOW OR HAVE ANY IDEA WHETHER MR.

22   SAYNE AT THAT POINT RESORTED BACK TO USING VALIUM OR SOME

23   OTHER ILLEGAL SUBSTANCES; DO YOU?

24   A.   I HAVE NO IDEA.

25   Q.   AND THERE WASN'T ANY NEED ON YOUR PART BASED ON WHAT

1  YOU KNEW AT THE TIME TO RESTART ANY OF THE DRUG TESTING

2  PROCEDURES THAT HAD BEEN IN PLACE BEFORE?

3  A.    BASED ON THE INFORMATION KNOWN AT THE TIME, THAT'S

4  CORRECT.

5  Q.    WHEN WAS THE LAST TIME YOU SAW MR. SAYNE BEFORE HE

6  WAS ARRESTED?

7  A.    WELL, I WAS HERE IN THE BUILDING THE DAY THAT HE WAS

8  ARRESTED.  HOLD ON JUST A MOMENT.

9  Q.    I MEAN, THAT'S THE DATE I'D KIND OF LIKE TO KNOW,

10 AND I HOPE IT DOESN'T TAKE LONG TO FIND IT.

11 A.    I ATTEMPTED A VISIT NOVEMBER 18 AND MET WITH

12 MS. ELLIS.  MR. SAYNE WAS NOT HOME THAT DAY.  THAT I

13 PERSONALLY MET WITH MR. SAYNE?

14 Q.    YES, SIR, THAT YOU SAW HIM FACE-TO-FACE.

15 A.    WELL, HERE'S JULY 8, EXCUSE ME, JULY 9, 2008.  LET

16 ME GO FORWARD AND MAKE SURE I'VE GOT THEM ALL.  IT LOOKS

17 LIKE JULY 9, 2008 WAS THE LAST FACE-TO-FACE WITH THREE

18 SUBSEQUENT ATTEMPTS.

19 Q.    OKAY, SO THE LAST TIME YOU SAW HIM THEN WAS JULY 9

20 OF 2008 AND THEN UNTIL HE WAS ARRESTED IN JANUARY OF

21 2009?

22 A.    CORRECT.

23 Q.    AND, YOU KNOW, YOU WOULD AGREE WITH ME THAT BETWEEN

24 JULY OF 2008 AND JANUARY OF 2009 YOU DON'T KNOW WHAT HIS

25 MENTAL STATE OR MENTAL CONDITION WAS?

1   A.    WELL, I CAN CONCLUDE THAT HE WAS FUNCTIONING WELL

2   ENOUGH TO PREPARE HIS MONTHLY REPORTING FORM AND SUBMIT

3   THOSE ON TIME WITHIN A DAY OR TWO.  HE WAS --

4   Q.    WELL, WAS HE -- I'M SORRY, GO AHEAD.

5   A.    HE WAS ABLE TO PREPARE THE PERSONAL FINANCIAL

6   STATEMENT AND BRING IT TO THE COURTHOUSE ON JANUARY 20 PER

7   MY INSTRUCTIONS AND RETURN PHONE CALLS WHEN I CALLED

8   DURING THOSE, FROM JULY OF 08 UNTIL JANUARY 09.

9   Q.    WELL, I UNDERSTOOD YOUR TESTIMONY ON DIRECT THAT

10  BASED ON YOUR OBSERVATIONS OF MR. SAYNE, YOU BELIEVED THAT

11  HE WAS NOT DEPRESSED.  YOU WOULD AGREE WITH ME THAT HAVING

12  NO OBSERVATIONS OF MR. SAYNE BETWEEN JANUARY OF 2008 AND

13  JANUARY OF 2009 YOU COULDN'T REACH THAT SAME CONCLUSION;

14  COULD YOU?

15  A.    THAT HE WAS NOT DEPRESSED?

16  Q.    YOU COULDN'T REACH THAT CONCLUSION BECAUSE YOU

17  DIDN'T SEE MR. SAYNE; DID YOU?

18  A.    DURING THAT PERIOD OF TIME FROM JULY TO JANUARY, NO.

19  Q.    NOW, WHAT LENGTH OF TIME DOES IT TAKE FOR VALIUM TO

20  GET THROUGH A PERSON'S SYSTEM SO IT WON'T BE DETECTABLE IN

21  A DRUG SCREEN?

22  A.    GOODNESS, I'VE GOT SO MANY NUMBERS AND KNOW SO MANY

23  DAYS, I WANT TO SAY 3 TO 7 DAYS.

24  Q.    IT'S A FAIRLY SHORT PERIOD OF TIME; ISN'T IT?

25  A.    YES.

1        MR. BLACKWELL:  YOUR HONOR, THAT'S ALL.

2        THE COURT:  ANYTHING ELSE, MS. SMITH?

3        MS. SMITH:  I DO, YOUR HONOR.

4                 REDIRECT EXAMINATION

5                 BY MS. SMITH:

6   Q.    HOW MANY ATTEMPTS DID YOU MAKE TO, TO CONDUCT A HOME

7   VISIT OF MR. SAYNE THERE WITH HIS GRANDMOTHER?

8   A.    LET ME COUNT THEM AGAIN.  I BELIEVE I COUNTED THREE,

9   BUT -- THERE WERE THREE ATTEMPTS.

10  Q.    DID YOU TALK WITH HIS GRANDMOTHER EACH TIME?

11  A.    YES, MA'AM.

12  Q.    AND DID SHE REPORT THAT HE WAS DOING WELL,

13  SUCCESSFUL ON PROBATION, ON SUPERVISION?

14  A.    MS. ELLIS, ON AUGUST 5, 2008, MS. ELLIS ADVISED THAT

15  HER GRANDSON WAS DOING WELL AND WAS WORKING IN KNOXVILLE

16  THAT PARTICULAR DAY.  SEPTEMBER 23, 2008, HOME CONTACT

17  MADE.  SHE ADVISED THAT GRANDSON WAS DOING WELL AND

18  WORKING IN OAK RIDGE.  SHE STATED HE CONTINUES TO BE

19  RESPONSIBLE.  IS THAT TWO OR THREE THAT I JUST DISCUSSED?

20  Q.    TWO.

21  A.    OKAY.  NOVEMBER 18, 2008, HOME CONTACT MADE.  SHE

22  STATED THAT GRANDSON WAS WORKING IN KNOXVILLE.  PO ASKED

23  IF HE IS RESPONSIBLE AND DEPENDABLE AROUND THE HOUSE, AND

24  SHE ADVISED YES.

25  Q.    DID YOU TALK WITH HIM ON THE TELEPHONE DURING THIS

1    PERIOD OF TIME FROM JULY OF 08 TO JANUARY OF 09?

2    A.   YES, MA'AM, MOSTLY REGARDING PERSONAL FINANCIAL

3    STATEMENTS AND HIS RESTITUTION PAYMENTS.

4    Q.   OKAY, AND AT ANY TIME HAD MR. SAYNE CALLED YOU, YOU

5    WOULD HAVE TAKEN HIS PHONE CALL; IS THAT CORRECT?

6    A.   OR RETURNED HIS CALL, YES.

7    Q.   OR RETURNED HIS CALL, THANK YOU.  AND YOU HAVE NO

8    RECORD OF HIM REACHING OUT TO YOU WITH ANY COMPLAINTS OF

9    DEPRESSION OR DRUG USE OR ANYTHING LIKE THAT?

10   A.   NO, MA'AM.

11            MS. SMITH:  THANK YOU.  I HAVE NO FURTHER

12   QUESTIONS, YOUR HONOR.

13            THE COURT:  ANYTHING ELSE, MR. BLACKWELL?

14            MR. BLACKWELL:  JUST ONE QUESTION.

15                  RECROSS EXAMINATION

16                  BY MR. BLACKWELL:

17   Q.   MR. THORNTON, THE COUPLE OF VISITS THAT YOU

18   MENTIONED TO MS. ELLIS' HOUSE, THOSE WERE POP-IN VISITS?

19   A.   UNANNOUNCED.

20            MR. BLACKWELL:  THAT'S ALL.

21                  EXAMINATION

22                  BY THE COURT:

23   Q.   OFFICER THORNTON, LET ME MAKE SURE I UNDERSTAND THIS

24   ISSUE OF DRUG TESTING.  BETWEEN JULY OF 08 AND JANUARY 20

25   OF 2009 THERE WERE NO DRUG TESTS; IS THAT CORRECT?

1    A.    THAT'S CORRECT.

2    Q.    WAS HE DRUG TESTED AT THE TIME HE WAS ARRESTED IN

3    JANUARY OF 2009?

4    A.    NO, SIR.

5              THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

6    THANK YOU VERY MUCH.

7              MS. SMITH:  I HAVE NO FURTHER EVIDENCE, YOUR

8    HONOR.

9              THE COURT:  AND I MAY HAVE MISSPOKEN, I THINK I

10   SAID THESE MONTHLY SUPERVISION REPORTS AND ATTACHED

11   DOCUMENTS WERE EXHIBIT 2, THEY'RE ACTUALLY EXHIBIT 3.  THE

12   302'S THAT MR. BLACKWELL WANTED FILED ARE NUMBER 2.

13             MS. SMITH:  WE'VE GOT A COPY OF THOSE TWO, YOUR

14   HONOR, IF WE COULD STAPLE THOSE TOGETHER, THIS WOULD BE

15   EXHIBIT 2.

16             THE COURT:  ALL RIGHT.  IF YOU'D PROVIDE THOSE

17   TO THE CLERK, PLEASE.

18             AND THAT IS YOUR LAST WITNESS, MS. SMITH?

19             MS. SMITH:  THAT'S CORRECT, YOUR HONOR.

20             THE COURT:  MR. BLACKWELL, DO YOU WISH TO CALL

21   ANY WITNESSES?

22             MR. BLACKWELL:  NO, YOUR HONOR.

23             THE COURT:  DO EITHER OF YOU WANT TO BE HEARD

24   IN ARGUMENT ON THE GOVERNMENT'S OBJECTION THAT HAS BEEN

25   FILED?

1    MS. SMITH:  I THINK IT QUALIFIES, YOUR HONOR,

2  UNDER THE, UNDER THE LAW, AND I ATTACHED TO MY SENTENCING

3  MEMORANDUM SOME SUPPORTING CASE LAW, VERY SIMILAR SCHEMES,

4  SAME LEVEL OF SOPHISTICATION, IF YOU WILL.  I THINK IT

5  SHOULD APPLY.  I DON'T -- ANY WAY THAT YOU LOOK AT IT, IT

6  IS A SOPHISTICATED SCHEME.  I'M NOT SAYING THAT IT

7  WASN'T -- THAT YOU HAD TO BE A SUPER GENIUS TO DO IT, BUT

8  I THINK HE HAD TO GO THROUGH SEVERAL LEVELS OF OVERT

9  ACTIONS, AND I THINK IT'S IMPORTANT TO UNDERSTAND THAT

10  THESE TWO OFFENSES GO TOGETHER.  HE CONCEALED FROM OFFICER

11  THORNTON THIS BUSINESS BECAUSE THIS BUSINESS GAVE HIM THE

12  CARD READERS AND THE MODEM AND THE, THE INTERNET HOOK-UP

13  WITH THE CREDIT CARD PROCESSORS, SO HE COMPLETELY

14  CONCEALED FROM OFFICER THORNTON ANY ASSOCIATION WITH THIS

15  BUSINESS, WHILE AT THE SAME TIME HE WAS CONDUCTING A VERY

16  INTENTIONAL AND MANIPULATIVE SCHEME; AND I THINK THAT THE

17  FACT THAT HE HAD IT IN THE FRONT SEAT OF HIS TRUCK WHEN HE

18  CAME FOR THE VISIT ON JANUARY 20, 2009, DEMONSTRATES THAT

19  IT WAS FAIRLY IMPORTANT TO HIM.  HE HAD IT RIGHT THERE IN

20  THE BED, IN THE FRONT SEAT OF HIS TRUCK, AND ON HIS

21  COMPUTER ALONG WITH THE FABRICATED EARNING STATEMENTS WAS

22  ALL THE INFORMATION FOR THE SCHEME AS WELL.  BUT, AGAIN,

23  YOUR HONOR, I WOULD RELY ON THE LAW THAT I CITED IN EITHER

24  MY OBJECTION OR THE SENTENCING MEMORANDUM, WHICH I THINK

25  SPEAKS FOR ITSELF.  THANK YOU.

1           THE COURT:  ALL RIGHT.  THANK YOU, MS. SMITH.

2           MR. BLACKWELL.

3           MR. BLACKWELL:  YOUR HONOR, THE SOPHISTICATED

4    MEANS, OBVIOUSLY, IS SET OUT IN 2B1.19C, AND IT ADDS TWO

5    LEVELS.

6           A COUPLE OF THINGS.  FIRST, YOUR HONOR, IN

7    READING THE SENTENCING GUIDELINES, AND PARTICULARLY NOTE 8

8    TO THAT SECTION, WHAT IT TALKS ABOUT IS THAT THE

9    "SOPHISTICATED MEANS" MEANS IT'S ESPECIALLY COMPLEX OR

10   ESPECIALLY INTRICATE OFFENSE CONDUCT IN REFERENCE TO THE

11   EXECUTION OR CONCEALMENT OF AN OFFENSE.  AND IF THE COURT

12   LOOKS AT 2B1.1 AND LOOKS AT NOTE 8 TO THAT, IT GIVES SOME

13   GUIDANCE, I BELIEVE, ON EXACTLY WHAT THAT MEANS.  AND WHAT

14   THE NOTE SAYS IS THAT SOPHISTICATED MEANS MEANS ESPECIALLY

15   COMPLEX OR ESPECIALLY INTRICATE OFFENSE CONDUCT PERTAINING

16   TO THE EXECUTION OR CONCEALMENT OF AN OFFENSE.  THEN IT

17   GIVES US AN EXAMPLE, AND I UNDERSTAND IT'S NOT AN ALL-

18   INCLUSIVE EXAMPLE, IN A TELEMARKETING SCHEME, LOCATING THE

19   MAIN OFFICE OF THE SCHEME IN ONE JURISDICTION BUT LOCATING

20   SOLICITING OPERATIONS IN ANOTHER JURISDICTION ORDINARILY

21   INDICATES SOPHISTICATED CONDUCT.  CONDUCT SUCH AS HIDING

22   ASSETS OR TRANSACTIONS OR BOTH THROUGH THE USE OF

23   FICTITIOUS ENTRIES, CORPORATE SHELLS OR OFF-SHORE

24   FINANCIAL ACCOUNTS ALSO ORDINARILY INDICATES SOPHISTICATED

25   MEANS.

1    I WOULD POINT OUT TO THE COURT THAT I TOOK A

2  LOOK AT THE THREE CASES THAT MS. SMITH PROVIDED, AND, YOUR

3  HONOR, IN THE MASTERS CASE, AND IN ALL THREE OF THESE

4  CASES -- NONE OF THESE ARE REPORTED CASES, THEY ARE SIXTH

5  CIRCUIT CASES; BUT IN MASTERS THERE WERE A SERIES OF

6  CRIMINAL ACTIONS BY THE DEFENDANT.  THE COURT DESCRIBED

7  THE SCHEME AS A MULTI-PRONGED CROSS JURISDICTIONAL SCHEME

8  WHERE THE DEFENDANT OBTAINED CREDIT CARDS WITH FALSE

9  NAMES, AND IT INVOLVED A LARGE SCALE IDENTITY THEFT

10  OPERATION.  I'M SURE THE COURT HAS READ A FACTUAL, THE

11  FACTUAL SUMMARY OF THE MASTERS CASE, BUT I THINK IT'S

12  INTERESTING IN THAT THE CASE BASICALLY INVOLVED THE

13  DEFENDANT USING INFORMATION FROM REFERENCE MATERIALS TO

14  OBTAIN THE VICTIM'S BIRTH CERTIFICATE AND A CREDIT REPORT.

15  HE USED THOSE DOCUMENTS THEN AND OBTAINED MULTIPLE CREDIT

16  CARDS UNDER FALSE NAMES AND PROCEEDED TO DEFRAUD THE

17  SOCIAL SECURITY ADMINISTRATION BY GETTING OVER $46,000 IN

18  BENEFITS WHICH HE THEN SENT TO A BANK ACCOUNT ESTABLISHED

19  UNDER A FALSE NAME.  CLEARLY, YOUR HONOR, THAT IS A SCHEME

20  THAT I THINK FITS THE DEFINITION OF SOPHISTICATED MEANS.

21    THE ERWIN CASE, THE SECOND CASE THAT MS. SMITH

22  CITED TO THE COURT, INVOLVES A DEFENDANT WHO WAS THE

23  MANAGER OF A SECURITIES FIRM, I BELIEVE IN ST. LOUIS,

24  MISSOURI; AND BASICALLY WHAT HE DID, YOUR HONOR, IS HE

25  OBTAINED MONEY FROM CLIENT ACCOUNTS, AND THERE WERE 11

1    CLIENT ACCOUNTS INVOLVED.  AND THE CASE ITSELF SAYS THAT

2    HE CHANGED THE ADDRESSES LISTED ON THE CLIENTS' ACCOUNTS

3    SO THE DISTRIBUTION WOULD BE SENT TO HIM.  HE THEN

4    REQUESTED DISTRIBUTIONS THAT WERE NOT AUTHORIZED BY THE

5    CLIENTS AND HAD CHECKS SENT TO AN ALTERED ADDRESS.  HE

6    THEN RECEIVED THE UNAUTHORIZED ACCOUNT DISTRIBUTIONS.  HE

7    FORGED THE NAME OF THE CLIENTS ON THEM, AND THEN DEPOSITED

8    THOSE INTO A BANK ACCOUNT.  HE THEN MANIPULATED AFTER THE

9    FACT THE CLIENTS' ACCOUNTS STATEMENTS TO CONCEAL THE

10   WITHDRAWALS THAT HE MADE.

11            THE COX CASE, THE THIRD CASE --

12            THE COURT:  HOW DOES WHAT YOU JUST DESCRIBED

13   DIFFER IN ANY SIGNIFICANT DEGREE FROM WHAT MR. SAYNE DID?

14            MR. BLACKWELL:  WELL, YOUR HONOR, I THINK THE

15   BIG DIFFERENCE IS, IS THAT IN ERWIN WE HAD INVOLVED A MAN

16   WHO WAS THE MANAGER OF A SECURITIES FIRM, WHO WAS

17   OBVIOUSLY IN A FIDUCIARY RESPONSIBILITY AND A POSITION OF

18   TRUST -- MUCH MORE SO THAN MR. SAYNE WAS WITH FIRST

19   DATA -- WITH HIS CUSTOMERS, AND HE USED THE CUSTOMERS'

20   INFORMATION TO MAKE MONEY ON HIS OWN.  I THINK THAT'S WHAT

21   THE DIFFERENCE IS, YOUR HONOR.

22            AND I THINK THE SAME THING APPLIES IN THE COX

23   CASE, THE THIRD CASE THAT MS. SMITH INCLUDED.  THAT IS

24   EVEN MORE EGREGIOUS BECAUSE IN THAT CASE THE DEFENDANT

25   USED, SET UP A CHARITABLE FOUNDATION AND THEN MANIPULATED

1　MONEY THROUGH THAT CHARITABLE FOUNDATION AND TRUST

2　ACCOUNT, CAUSED DEPOSITORS TO DEPOSIT INTO THE CHARITABLE

3　FOUNDATION MAKING THEM BELIEVE THAT THE FOUNDATION WAS

4　SOMETHING THEY SHOULD CONTRIBUTE TO.  THEN HE SET UP BANK

5　ACCOUNTS SO THE MONEY WOULD BE FUNNELED INDIRECTLY

6　ULTIMATELY TO HIM, AND THEN HE DISAPPEARED FOR FOUR YEARS

7　AFTER HE ACQUIRED HIS CLIENTS' MONEY.

8　　　　　　I THINK IT'S IMPORTANT, YOUR HONOR, TO LOOK AT

9　WHAT MR. SAYNE DID IN COMPARISON TO THOSE CASES; BUT,

10　FIRST, I'D LIKE TO POINT OUT SOMETHING MS. SMITH BROUGHT

11　UP, AND THAT IS WHAT SHE SAID WAS LOOKING AT THE SCHEME

12　AND LOOKING AT THE PROBATION VIOLATION TOGETHER.  WHAT THE

13　COURT HAS TO DO, I THINK, IS LOOK AT THE PROBATION

14　VIOLATION ITSELF.  COUNT 1 CHARGES THAT THAT OCCURRED

15　BETWEEN MARCH 3 OF 2008 AND JANUARY 20 OF 2009.  THAT'S

16　THE DATE, OF COURSE, THAT MR. SAYNE WAS ARRESTED; AND AS I

17　UNDERSTOOD THE TESTIMONY FROM MR. THORNTON, IT INVOLVED

18　THE SUBMISSION OF FALSE MONTHLY REPORTS AND THE

19　INFORMATION TO CONCEAL THE OPERATION OF PERFECTION AUTO

20　DETAILING.

21　　　　　　IF THE COURT LOOKING AT THE SECOND COUNT IN THE

22　INDICTMENT, THAT'S THE COUNT INVOLVING THE SCHEME

23　INVOLVING FIRST DATA, IT BEGAN ON DECEMBER 3 OF 2008, SO

24　IT BEGAN TOWARD THE END OF THE SCHEME WITH THE PROBATION

25　OFFICE AND ONLY INVOLVED THE JANUARY 2010 {SIC} FALSE

1    INFORMATION THAT WAS PROVIDED TO MR. THORNTON.  MY POINT

2    IS, YOUR HONOR, YOU CAN'T LAY THEM ON TOP OF EACH OTHER

3    AND SAY THEY OCCURRED AT THE SAME TIME OR ONE WAS THE

4    TOTAL CONCEALMENT OF THE OTHER.

5              I THINK THE OTHER THING THE COURT HAS TO LOOK

6    AT IS MR. SAYNE'S SCHEME; AND, AGAIN, YOUR HONOR, HE HAS

7    PLED GUILTY.  HE HAS ADMITTED HIS RESPONSIBILITY.  HE

8    ADMITS DOING WHAT MR. THORNTON SAID HE DID.  HE ADMITS

9    WHAT AGENT SCOWN SAID HE DID; AND IF YOUR HONOR WOULD

10   REMEMBER THE TESTIMONY AND THE PRESENTENCE REPORT, MR.

11   SAYNE LEGALLY OBTAINED THE FIRST DATA TERMINAL.  HE

12   LEGALLY OBTAINED THE PERFECTION AUTO DETAILING I.D.

13   BASICALLY WHAT HE DID, AND I SET OUT A VERY SIMPLE EXAMPLE

14   IN THE SENTENCING MEMORANDUM, HE WOULD SIMPLY TAKE THE

15   FIRST DATA NUMBER PERFECTION HAD RECEIVED, AND HE WOULD GO

16   UP ONE NUMBER; AND IF THAT HIT IN ANOTHER MERCHANT, THEN

17   YOU HAD A SERIES OF DEBIT AND CREDIT TRANSACTIONS, AND

18   THAT MONEY WAS THEN SENT TO MR. SAYNE'S ACCOUNT.  THAT'S

19   SIMPLY WHAT HE DID.  WHAT HE DID, YOUR HONOR, IS THE CARDS

20   THAT WERE USED WAS SIMPLY THE STORAGE MECHANISM FOR THE

21   MONEY HE STOLE TO GO INTO; AND ALL OF THOSE CARDS, YOUR

22   HONOR, AS MR. SCOWN TESTIFIED, WERE IN HIS OWN NAME.  HE

23   DIDN'T CONCEAL THE FACT THAT THE MONEY WAS GOING TO HIM.

24   THEY WERE REASONABLY TRACEABLE TO HIM.

25              THE COURT:  THE PRESENTENCE REPORT INDICATES

1  SOME OF THEM WERE NOT IN HIS NAME.

2       MR. BLACKWELL:  THEY WERE IN HIS NAME OR

3  PERFECTION AUTO DETAIL.

4       THE COURT:  OR HIS GRANDMOTHER.

5       MR. BLACKWELL:  OR HIS GRANDMOTHER, BUT THEY

6  WERE TRACEABLE DIRECTLY BACK TO HIM.

7       AS THE COURT KNOWS, IN 2003, HIS GRANDMOTHER'S

8  NAME CAME UP IN THE 2003 CASE TOO, AND AGENT SCOWN

9  TESTIFIED THAT IT WOULD HAVE BEEN EASILY TRACEABLE BACK TO

10  MR. SAYNE.  I HAVE SUGGESTED TO YOUR HONOR, AND MAY ARGUE

11  LATER WHAT I THINK THE MOTIVATION FOR WHAT MR. SAYNE DID

12  WAS, BUT CLEARLY THIS IS NOT CONCEALMENT; AND THE

13  PROBATION OFFICE CONSIDERED THIS SAME INFORMATION, YOUR

14  HONOR, AND DID NOT RECOMMEND THIS ENHANCEMENT IN THE

15  PRESENTENCE REPORT, ALTHOUGH ULTIMATELY, YOUR HONOR, IT'S

16  THE GOVERNMENT'S RESPONSIBILITY TO DO THAT AND YOUR HONOR

17  TO MAKE THAT DETERMINATION.

18       I SUGGEST TO THE COURT THAT UNDER THE FACTS AND

19  CIRCUMSTANCES AS YOU'VE HEARD TODAY, THAT IT'S NOT

20  APPROPRIATE IN THIS CASE.

21       THE COURT:  ALL RIGHT, MR. BLACKWELL.  THE

22  GOVERNMENT OBJECTS TO THE CALCULATION OF THE GUIDELINE

23  RANGE IN THE PRESENTENCE REPORT, ARGUES THAT MR. SAYNE'S

24  OFFENSE LEVEL SHOULD BE INCREASED BY TWO LEVELS.  BASED ON

25  THE ENHANCEMENT PROVIDED FOR IN SECTION 2B1.19C WHICH

PROVIDES FOR THAT ENHANCEMENT IF THE OFFENSE INVOLVED
SOPHISTICATED MEANS. THE COMMENTARY TO THE GUIDELINES
DEFINES SOPHISTICATED MEANS AS ESPECIALLY COMPLEX OR
ESPECIALLY INTRICATE OFFENSE CONDUCT PERTAINING TO THE
EXECUTION OR CONCEALMENT OF AN OFFENSE. FOR EXAMPLE, IN A
TELEMARKETING SCHEME LOCATING THE MAIN OFFICE OF THE
SCHEME IN ONE JURISDICTION BUT LOCATING SOLICITING
OPERATIONS IN ANOTHER JURISDICTION ORDINARILY INDICATES
SOPHISTICATED MEANS. CONDUCT SUCH AS HIDING ASSETS OR
TRANSACTIONS OR BOTH THROUGH THE USE OF FICTITIOUS OFFICE
SHELLS OR OFF-SHORE FINANCIAL ACCOUNTS ALSO ORDINARILY
INDICATES SOPHISTICATED MEANS.

AS IS OFTEN THE CASE WITH THE GUIDELINES,
COMMENTARY IS NOT PARTICULARLY HELPFUL, EXCEPT TO THE
EXTENT THAT IT DOES INDICATE THAT SOPHISTICATED MEANS
INCLUDES NOT ONLY CONDUCT RELATED TO THE EXECUTION OF THE
OFFENSE ITSELF, BUT ALSO TO THE CONCEALMENT OF THE
OFFENSE. THERE IS NOT A GREAT NUMBER OF, OR THE COURT HAS
NOT FOUND A GREAT NUMBER OF REPORTED OR UNREPORTED CASES
WHICH EXPLAIN THE CRITERIA FOR THE APPLICATION OF THE
ENHANCEMENT. THE COURT HAS NOT FOUND, NOR HAS THE
GOVERNMENT POINTED TO A CASE THAT IS FACTUALLY ON ALL
FOURS WITH THE PRESENT CASE; HOWEVER, THE CASE LAW DOES
GIVE THE COURT SOME GUIDANCE IN HOW TO APPLY THE
ENHANCEMENT, AND IT IS CLEAR NOT ONLY FROM CASES IN OTHER

1  CIRCUITS, BUT FROM CASES IN THE SIXTH CIRCUIT AS WELL,

2  THAT THE TEST HERE IS NOT WHETHER OR NOT ANY SPECIFIC PART

3  OF THE SCHEME IS SOPHISTICATED, BUT RATHER WHETHER THE

4  SCHEME AS A WHOLE IS SOPHISTICATED OR COMPLEX OR

5  INTRICATE.  AND THE CASE LAW MAKES CLEAR THAT IT IS NOT AN

6  EXAMINATION OF EACH OF THE INDIVIDUAL PARTS OF THE SCHEME

7  WHICH IS DETERMINATIVE, BUT RATHER THE OVERALL SCOPE OF

8  THE SCHEME.

9          THE SCHEME HERE IS APPARENTLY ONE THAT HAD NOT

10  BEEN USED BEFORE.  INTERESTINGLY, WHEN I READ THE NAME

11  ASSIGNED TO THIS SCHEME IN THE PRESENTENCE REPORT, I

12  WRONGLY ASSUMED THAT THIS WAS A WELL KNOWN SCHEME THAT MR.

13  SAYNE HAD ADOPTED.  THAT, HOWEVER, IS NOT THE CASE.  THIS

14  IS A SCHEME THAT HE CONCEIVED AND EXECUTED; THAT AS FAR AS

15  THE FBI AGENT IN THIS CASE KNOWS WAS NOT USED BY ANY OTHER

16  PERPETRATOR.  WHILE NOT ENTIRELY ANALOGOUS TO A TELE-

17  MARKETING SCHEME AS REFERENCED IN THE COMMENTARY, IT DOES

18  HAVE SOME SIMILARITIES.  MR. SAYNE, MR. SAYNE'S SCHEME

19  INVOLVED AT LEAST TWO SEPARATE JURISDICTIONS, THAT BEING

20  HAVING LOCATED PRECISION DETAILING IN THE EASTERN DISTRICT

21  OF TENNESSEE AND THE EFFECTIVE VICTIM BEING LOCATED IN THE

22  STATE OF FLORIDA.

23          MORE IMPORTANTLY, HOWEVER, IS THAT THIS SCHEME

24  WAS AND DOES REPRESENT AN INTENTIONAL MANIPULATION BY MR.

25  SAYNE OF COMPUTER DATA AND COMPUTER SYSTEMS.  THE SCHEME

1  INVOLVED MORE THAN 100 TRANSACTIONS INVOLVING

2  APPROXIMATELY 45 EMULATED VENDORS.  THE SCHEME WAS CARRIED

3  OUT OVER A SIX WEEK PERIOD AND INVOLVED MORE THAN $100,000

4  IN TRANSACTIONS.  IT SEEMS TO ME, HOWEVER, THAT THE REAL

5  KEY TO WHETHER OR NOT THE ENHANCEMENT APPLIES IS FOUND IN

6  THE MANNER IN WHICH MR. SAYNE CONCEALED HIS CRIMINAL

7  CONDUCT, AND THAT HAS TO DO WITH THE FACT THAT THESE

8  ACCOUNTS HAD TO BE ZEROED OUT WITHIN ANY GIVEN 24 HOUR

9  PERIOD.  IN OTHER WORDS, THERE HAD TO BE A CORRESPONDING

10  CREDIT FOR ANY DEBIT WITHIN A 24 HOUR PERIOD.  THAT MEANS

11  THAT MR. SAYNE HAD TO MONITOR THESE ACCOUNTS CAREFULLY.

12  HE HAD TO MANIPULATE THE DATA TO ASSURE THAT THERE WAS IN

13  FACT A CORRESPONDING CREDIT, AND ALL OF THAT WAS CRITICAL

14  TO AVOIDING DETECTION BY MR. SAYNE.

15        BASED ON THE PREPONDERANCE OF THE EVIDENCE

16  STANDARD THAT IS APPLIED IN DETERMINING THESE OBJECTIONS,

17  OR THIS OBJECTION, I FIND BY A PREPONDERANCE OF THE

18  EVIDENCE THAT THE GOVERNMENT HAS ESTABLISHED THAT THE

19  OFFENSE INVOLVED SOPHISTICATED MEANS, AS I HAVE JUST

20  DESCRIBED.

21        IN ADDITION TO THAT -- AND I AT FIRST THOUGHT

22  THIS HAD NO SIGNIFICANCE TO THE ISSUE BEFORE THE COURT,

23  BUT IN ADDITION TO THAT IS THE ARGUMENT MADE BY THE

24  GOVERNMENT THAT THERE IS IN FACT A RELATIONSHIP BETWEEN

25  THE WIRE FRAUD SCHEME AND THE MONTHLY, THE FALSE MONTHLY

1  REPORTS SUBMITTED TO THE PROBATION OFFICER.  MR. BLACKWELL

2  WAS CORRECT, THAT THERE IS NOT AN EXACT OVERLAP WITH

3  RESPECT TO THE TIME INVOLVED; HOWEVER, AS I UNDERSTAND THE

4  GOVERNMENT'S POINT, IT IS THAT THE FILING, OR CONTINUED

5  FILING OF FALSE MONTHLY REPORTS WAS ALSO CRITICAL TO MR.

6  SAYNE'S EFFORT TO AVOID DETECTION OF THE MAIL FRAUD

7  SCHEME.  AND TO THE EXTENT THAT HE FALSELY ANSWERED

8  QUESTIONS ON THE MONTHLY REPORTS OR THAT HE GAVE FALSE

9  INFORMATION ON THOSE MONTHLY REPORTS, THE GOVERNMENT IS

10 CORRECT, IT IS SIMPLY ONE MORE PIECE OF THE PUZZLE THAT

11 WAS CREATED BY MR. SAYNE.

12      IN SUM, THIS WAS A MULTI-PART, MULTI-

13 JURISDICTION, INTENTIONAL MANIPULATION OF DATA AND SYSTEMS

14 WHICH REQUIRED A CONSIDERABLE AMOUNT OF EXPERTISE AND

15 WHICH REQUIRED CONSIDERABLE EFFORTS TO CONCEAL, AND UNDER

16 THE FACTS AND CIRCUMSTANCES OF THIS CASE, I FIND THAT THE

17 ENHANCEMENT APPLIES.  THE GOVERNMENT'S OBJECTION IS

18 SUSTAINED.  THAT RESULTS IN AN OFFENSE LEVEL OF, OR BASE

19 OFFENSE LEVEL OF 7 AND A SIX LEVEL ENHANCEMENT PURSUANT TO

20 SECTION 2B 1.1B1D BASED ON THE AMOUNT OF LOSS, THOSE TWO

21 CALCULATIONS ARE NOT OBJECTED TO, AND ALSO A TWO LEVEL

22 ENHANCEMENT UNDER SECTION 2B1.19C, RESULTING IN AN

23 ADJUSTED OFFENSE LEVEL OF 15.  WITH A TWO LEVEL REDUCTION

24 FOR ACCEPTANCE OF RESPONSIBILITY, THAT RESULTS IN A TOTAL

25 OFFENSE LEVEL OF 13.  WITH A CRIMINAL HISTORY CATEGORY OF

1   6, THAT RESULTS IN AN ADVISORY GUIDELINE SENTENCING RANGE

2   OF 33 TO 41 MONTHS.  AND THAT IS THE ADVISORY RANGE THE

3   COURT WILL APPLY IN THE CASE.

4           AND, COUNSEL, BEFORE WE GO FURTHER, LET'S TAKE

5   ABOUT A 5 MINUTE RECESS, AND THEN WE'LL CONTINUE.

6       (RECESS AT 3:40 P.M., UNTIL 3:50 P.M.)

7           THE COURT:  ALL RIGHT.  MS. SMITH, WHAT IS THE

8   GOVERNMENT'S POSITION HERE WITH RESPECT TO THE CURRENT

9   INDICTMENT, CURRENT CASE?

10          MS. SMITH:  I HAVE NOT CHANGED OUR POSITION

11  SINCE THE SENTENCING MEMORANDUM, YOUR HONOR, AND I THOUGHT

12  I ASKED THE COURT TO VARY UPWARDLY.

13          THE COURT:  YOU DID.

14          MS. SMITH:  AND I REALLY HAVE VERY LITTLE

15  ARGUMENT TO PRESENT; BUT WHATEVER IS IN THE SENTENCING

16  MEMORANDUM IS WHAT WE PROPOSE, AND, OF COURSE, WE CONCUR

17  WITH THE PROBATION OFFICER'S RECOMMENDATION AS TO THE

18  PROBATION VIOLATION AS WELL.

19          THE COURT:  ALL RIGHT.

20          ALL RIGHT, MR. BLACKWELL, ON BEHALF OF MR.

21  SAYNE.

22          MS. SMITH:  IS THIS MY ONLY OPPORTUNITY FOR

23  ARGUMENT, YOUR HONOR, BY THE WAY, OR DO I GET --

24          THE COURT:  WHAT I THOUGHT I WOULD DO, I'LL GO

25  AHEAD AND IMPOSE SENTENCE ON THE CASE NUMBER 09-CR-96 AND

1  THEN WE'LL TAKE UP THE SUPERVISED RELEASE REVOCATION.  I

2  ASSUME THERE'S GOING TO BE A STIPULATION ON THAT ONE.

3          MS. SMITH:  OKAY.  IN THAT INSTANCE, YOUR

4  HONOR, I PREPARED A TWO PAGE ORAL ARGUMENT, AND THEN THE

5  MORE I LOOKED AT IT, THE MORE I REALIZED THAT IT WAS JUST,

6  IT WAS JUST WAY TOO MUCH.

7          I THINK IN THIS INSTANCE IF WE JUST LOOK AT THE

8  NUMBERS, IT'S SOMEWHAT DEPRESSING FOR A PERSON OF MR.

9  SAYNE'S RELATIVE YOUTH, HE'S ONLY 33 YEARS OLD, HE NOW HAS

10  3 FEDERAL FELONY CONVICTIONS, I BELIEVE IT'S 9 STATE

11  FELONY CONVICTIONS, 8 STATE MISDEMEANOR CONVICTIONS AND A

12  TOTAL OF CRIMINAL HISTORY POINTS 26, WHICH IS DOUBLE WHAT

13  YOU NEED TO GET INTO THE VERY TOP CATEGORY.

14          AS TO CONVICTION FROM THIS CASE THAT WE'RE

15  DEALING WITH TODAY, HE SUBMITTED 11 FALSE MONTHLY REPORTS,

16  2 FALSE NET WORTH STATEMENTS, 23 FABRICATED EARNING

17  STATEMENTS, ENGAGED IN MORE THAN 100 FRAUDULENT CREDIT

18  CARD TRANSACTIONS, MANIPULATED MORE THAN $300,000 IN

19  FRAUDULENT TRANSACTIONS AND VICTIMIZED 45 VENDORS WHOSE

20  NAMES WERE STOLEN.  FOR ALL THE REASONS THAT ARE SET FORTH

21  IN OUR SENTENCING MEMORANDUM, I WOULD ASK THE COURT TO

22  MAXIMIZE HIS IMPRISONMENT AND MINIMIZE HIS SUPERVISION,

23  WHICH I KNOW MUST BE, MUST BE ORDERED PURSUANT TO THE LAW;

24  BUT HE WILL NOT SUCCEED ON SUPERVISION, AND WE'RE JUST

25  SETTING HIM UP FOR MORE FAILURE.

1    AND I GUESS FINALLY IN CLOSING, YOUR HONOR, I

2    GUESS THE THING THAT REALLY DISTURBS ME MOST OF ALL IS

3    THAT THE UNITED STATES PROBATION OFFICE IS SO DIFFERENT

4    FROM WHAT THE STATES CAN OFFER.  THE RESOURCES THAT

5    OFFICER THORNTON COULD HAVE GIVEN MR. SAYNE, DRUG

6    TREATMENT, PSYCHO -- PSYCHOLOGICAL TREATMENT, EMOTIONAL

7    TREATMENT, ANY SORT OF THING, AND HE BASICALLY SNUBBED HIS

8    NOSE AT ALL OF THOSE FROM DAY ONE.  THERE'S NO QUESTION

9    THAT HE'S A VERY INTELLIGENT MAN.  THERE'S NO QUESTION

10   THAT HE ABSOLUTELY HAS NO GUILT ABOUT ANY OF THESE THINGS;

11   AND HE TOOK RESOURCES AWAY, NOT JUST FROM OFFICER

12   THORNTON, BUT FROM OTHER PEOPLE WHO WERE ON SUPERVISION

13   WHO DO IN FACT WANT TO REHABILITATE THEMSELVES, AND I DO

14   NOT UNDERSTAND THAT.  I DON'T THINK HE CAN EXPLAIN THAT

15   EITHER.  AND FOR ALL THOSE REASONS, YOUR HONOR, WE WOULD

16   ASK THE COURT TO MAXIMIZE THE TERM OF IMPRISONMENT AND TO

17   MINIMIZE THE TERM OF SUPERVISED RELEASE.  THANK YOU.

18        THE COURT:  ARE YOU SUGGESTING A VARIANCE ABOVE

19   THE TOP END OF THE GUIDELINES?

20        MS. SMITH:  I BELIEVE I SUGGESTED 70 MONTHS ON

21   THE 2010, OR 2009 CONVICTION BASED ON UPWARD FOUR LEVELS,

22   AND THEN I ASKED FOR A LITTLE BIT MORE.  I BELIEVE IT CAME

23   OUT TO 63 AT THE TOP IF, EVEN IF YOU WENT UP FOUR LEVELS,

24   YOUR HONOR.  OF COURSE, WE'LL LEAVE IT AT THE COURT'S

25   DISCRETION.  I ASKED ON PAGE 10 FOR THE COURT TO DEPART

UPWARDLY FOUR LEVELS TO AN OFFENSE LEVEL OF 17, WHICH

YIELDS AN ADVISORY RANGE OF 51 TO 63, AND THEN I ASKED FOR

70, YOUR HONOR.

MR. BLACKWELL: YOUR HONOR, IF I COULD START

WITH THE LAST THING. OBVIOUSLY IT'S OUR POSITION THAT A

FOUR LEVEL INCREASE UNDER 4A1.3 IS, IS EXTREME. I WOULD

AGREE WITH MS. SMITH THAT THE NUMBER OF CRIMINAL HISTORY

POINTS THAT MR. SAYNE HAS FOR A MAN HIS AGE IS OBVIOUSLY

MORE THAN IT SHOULD BE AND EXCEEDS THAT FOR A CRIMINAL

HISTORY CATEGORY OF 6; BUT 4A1.3, YOUR HONOR, TELLS US NOT

TO LOOK AT THE NUMBERS NECESSARILY, BUT INSTEAD TO LOOK AT

THE NATURE OF THE CONVICTIONS; AND I WOULD SUGGEST TO THE

COURT THAT A FAIR AMOUNT, A LITTLE OVER A DOZEN OF HIS

CRIMINAL HISTORY POINTS IN THE BEGINNING PRIOR TO HIS 2003

CONVICTION AND GUILTY PLEA IN THIS COURT, HAD TO DO WITH

PETTY THEFT AND WORTHLESS CHECK CHARGES. THEY WERE ALL

MISDEMEANOR CHARGES, YOUR HONOR.

OBVIOUSLY THE 2003 CONVICTION IS DIFFERENT.

THAT ADDED A NUMBER OF POINTS TO HIS CRIMINAL HISTORY; BUT

I THINK IF THE COURT LOOKS AFTER THE 2003 CONVICTION, YOU

WILL SEE THAT A NUMBER OF THE STATE CHARGES, PREDOMINANTLY

THE STATE CHARGES THAT WERE MISDEMEANORS, I BELIEVE THERE

MAY HAVE BEEN A STATE FELONY THERE, BUT ALL OF THOSE

CHARGES, YOUR HONOR, WERE RESOLVED BY GUILTY PLEAS, AND

BASICALLY ALL THE SENTENCES WERE RUN CONCURRENTLY TO THE

2003 FEDERAL SENTENCE.  IN FACT, AS THE COURT KNOWS FROM

THE PRESENTENCE REPORT, WHEN MR. SAYNE WAS RELEASED ON

SUPERVISION, HE HAD NO OTHER ACTIVE STATE TIME TO SERVE,

AND I WOULD SIMPLY SUGGEST THAT LOOKING AT THE CRIMINAL

HISTORY POINTS GIVES THE COURT A DISTORTION AS TO THE

NATURE OF THE CONVICTIONS BEFORE THE CONVICTION IN THIS

CASE THAT MR. SAYNE HAS.

OBVIOUSLY, YOUR HONOR, IF THE COURT DECIDES

THAT A THREE LEVEL OR A FOUR LEVEL INCREASE IS GOING TO BE

CONSIDERED AS A RESULT OF HIS CRIMINAL HISTORY UNDER

4A1.3, I WOULD SUGGEST TO THE COURT THAT UNDER 3E1.1B

EITHER A THREE LEVEL OR FOUR LEVEL WOULD GIVE MR. SAYNE AN

OFFENSE LEVEL OF 16 OR 17, WHICH WOULD ALLOW HIM TO

RECEIVE A ONE LEVEL REDUCTION, THE EXTRA ACCEPTANCE OF

RESPONSIBILITY.

AS THE COURT KNOWS, HE STARTED COOPERATING

SHORTLY AFTER HE WAS ARRESTED; AND I WAS APPOINTED TO

REPRESENT HIM, THAT'S WHAT HE TOLD ME HE WANTED TO DO.

EVEN THOUGH HE WAS INDICTED LATER IN THE YEAR, WE WORKED

WITH THE GOVERNMENT ON BASICALLY 90 PERCENT OF THE FACTUAL

BASIS THAT YOUR HONOR HAS TO SUPPORT HIS GUILTY PLEA IN

THIS CASE.

I'M NOT GOING TO REPEAT ANYTHING, YOUR HONOR,

THAT I SAID IN MY SENTENCING MEMORANDUM, BUT WHAT I WOULD

LIKE TO DO IS EMPHASIZE WHAT I BELIEVE THE GOVERNMENT DID

NOT SAY IN THEIRS THAT THEY SHOULD HAVE SAID, AND I THINK

THAT'S IMPORTANT BECAUSE I THINK THE GOVERNMENT PAINTS TOO

ONE-SIDED A PICTURE.  AND I UNDERSTAND, YOUR HONOR, THAT

HAD THIS BEEN 2003, THAT'S REALLY ALL THE COURT COULD

CONSIDER BECAUSE WHEN MR. SAYNE WAS SENTENCED BACK IN

2003, THE GUIDELINES WERE MANDATORY.  BACK THEN THIS COURT

COULD NOT HAVE CONSIDERED ANY FAMILY CIRCUMSTANCES OR

SITUATION, COULD NOT HAVE CONSIDERED ANY PSYCHOLOGICAL

ISSUES THAT MR. SAYNE MIGHT HAVE HAD.  AND I WOULD REMIND

THE COURT BACK IN 2003 THAT THE MR. SAYNE THAT WAS

SENTENCED IN THAT COURT, HIS CONDUCT THEN IS MATERIALLY

DIFFERENT THAN HIS CONDUCT SINCE HE WAS ARRESTED IN THIS

COURT.

            ONE THING, YOUR HONOR, I CAN'T GO BACK AND

CHANGE WHAT ROBERT SAYNE DID.  HE, HE PLED GUILTY.  WE

HAVE ACKNOWLEDGED FROM THE VERY BEGINNING THAT HE

COMMITTED THE CRIME IN COUNT 1 AND HE COMMITTED THE CRIME

IN COUNT 2; BUT BACK IN 2003, YOUR HONOR, THE ROBERT SAYNE

THAT WAS SENTENCED BY YOUR HONOR BACK THEN DID NOT RECEIVE

ANY ACCEPTANCE OF RESPONSIBILITY.  HE GOT A TWO LEVEL

ENHANCEMENT BECAUSE OF OBSTRUCTION OF JUSTICE BECAUSE HE

ATTEMPTED TO WITHDRAW HIS GUILTY PLEA, AND YOU AT THE TIME

FOUND THAT HE HAD GIVEN FALSE TESTIMONY.  HE HAD A

VIOLATION OF HIS PRETRIAL RELEASE BACK THEN.  HE HAD A

CRIMINAL HISTORY OF 5 BACK IN 2003 BASED ON 12 POINTS; AND

1  AS THE PRESENTENCE REPORT REFLECTS, HE HAD AN ESCALATING

2  DRUG ABUSE PROBLEM THAT EXISTED BACK THEN.

3      AGAIN, YOUR HONOR, I'M NOT GOING TO TRY TO

4  EXPLAIN BECAUSE IT CAN'T BE EXPLAINED WHAT HE DID THAT

5  FORMED THE BASIS FOR COUNTS 1 AND 2 OF THIS INDICTMENT.

6  HE HAS ADMITTED DOING THE CONDUCT THAT HE WAS CHARGED WITH

7  IN A FAIRLY DETAILED FACTUAL BASIS IN THE PLEA AGREEMENT.

8  WHAT THE GOVERNMENT DOESN'T TALK ABOUT THOUGH IN THEIR

9  SENTENCING MEMORANDUM OR TODAY IS HIS CONDUCT AFTER HE WAS

10  ARRESTED, AND I SIMPLY AND VERY BRIEFLY WOULD LIKE TO GO

11  THROUGH THAT.

12      ON MARCH 6, YOUR HONOR, OF 2009, AFTER I WAS

13  APPOINTED TO REPRESENT HIM, MET HIM FOR THE FIRST TIME AT

14  THE WASHINGTON COUNTY JAIL, HE TOLD ME AT THE TIME THAT HE

15  WAS GUILTY, HE WANTED TO PLEAD GUILTY.  HE FELT LIKE THERE

16  WAS SECURITY ISSUES THAT FIRST DATA OUGHT TO KNOW ABOUT,

17  HE WANTED TO SIT DOWN WITH THEM AND THE FBI AND EXPLAIN

18  WHAT HE HAD DONE AND WHAT HE HAD LEARNED ABOUT THEIR

19  SYSTEM; AND MOST IMPORTANTLY, YOUR HONOR, HE TOLD ME, AND

20  I PUT THIS IN QUOTES IN MY SENTENCING MEMORANDUM, I AM NOT

21  NORMAL.  THERE MUST BE SOMETHING WRONG WITH ME.  I'VE

22  NEVER BEEN A SUCCESS AT ANYTHING.  HE TOLD ME THAT HE WAS

23  SORRY FOR THE TROUBLE AND THE CONCERN HE HAD CAUSED HIS

24  FAMILY, PARTICULARLY HIS GREAT GRANDMOTHER WHO HAD BEEN

25  SUPPORTIVE ALL THESE YEARS.  HE TOLD ME THAT HE WANTED TO

1  MEET WITH THE FBI AND HE WANTED TO TELL THEM EVERYTHING

2  THAT HE KNEW AND HE WANTED TO ANSWER THEIR QUESTIONS.

3  　　　　　　THAT FIRST INTERVIEW OCCURRED ON MARCH 31 OF

4  2009.  IT LASTED OVER TWO HOURS.  MR. SAYNE VOLUNTEERED

5  INFORMATION.  HE ANSWERED ALL OF THE AGENT'S QUESTIONS.

6  THE AGENT TOLD ME LATER THAT HE FELT MR. SAYNE HAD BEEN

7  TRUTHFUL, THAT HE HAD BEEN COMPLETE, AND MOST IMPORTANTLY

8  THE INFORMATION THAT MR. SAYNE HAD GIVEN HIM HE BELIEVED

9  WOULD BE VERY HELPFUL TO FIRST DATA IN STRENGTHENING THEIR

10  SECURITY.

11  　　　　　　WE THEN KEPT ASKING FOR A FOLLOW-UP INTERVIEW,

12  AND THE AGENT AT THE TIME, YOUR HONOR, WAS BUSY, HE WAS

13  OUT OF THE OFFICE FOR THE NEXT COUPLE MONTHS, AND IT

14  WASN'T UNTIL JUNE 29 OF 2009 THAT WE WERE ABLE TO SET UP

15  THE SECOND INTERVIEW.  AGAIN, MR. SAYNE WAS INSISTING ON

16  THAT INTERVIEW.  WE MET AT THE U.S. ATTORNEY'S OFFICE, THE

17  FBI WAS INVOLVED; AND, AGAIN, WE WENT BACK THROUGH THE

18  DETAIL OF WHAT HAD HAPPENED, TALKED ABOUT THE SECURITY

19  WEAKNESSES THAT MR. SAYNE HAD SEEN THAT HE HAD NOT TAKEN

20  ADVANTAGE OF.  HE WANTED TO SUPPLY THAT INFORMATION.  YOUR

21  HONOR HEARD THE TESTIMONY FROM AGENT SCOWN THAT THEY

22  APPRECIATED THE INFORMATION THAT MR. SAYNE GAVE THEM, AND

23  THEY THEN REPORTED THAT INFORMATION TO FIRST DATA SO FIRST

24  DATA COULD CHANGE THEIR SECURITY PROCEDURES.

25  　　　　　　YOUR HONOR HAS READ MR. SAYNE'S OWN LETTER, I'M

1    NOT GOING TO GO BACK AND TALK ABOUT WHAT HE SAID; BUT IT

2    SEEMED TO ME, YOUR HONOR, BASED ON MY CONVERSATIONS WITH

3    HIM AND THE NUMBER OF VISITS I HAD WITH HIM, WHEN I READ

4    THAT LETTER, IT SEEMED TO ME TO BE A MAN WHO RECOGNIZED

5    HIS SHORTCOMINGS, WHO RECOGNIZED THAT HE PUT PEOPLE AT

6    RISK, WHO RECOGNIZED THAT HE HAD HURT PEOPLE AND HE WAS

7    SORRY FOR WHAT HE DID.

8             LOOK AT WHAT HE DID, YOUR HONOR, AS FAR AS

9    CORRECTIONS WERE CONCERNED AND HIS COOPERATIONS WHILE HE'S

10   BEEN IN CUSTODY.  WHEN HE WAS IN WASHINGTON COUNTY, YOUR

11   HONOR, HE WAS IN A CELL WITH A VIOLENT INMATE UP THERE,

12   AND HE WAS SMUGGLING IN DRUGS THROUGH THE KITCHEN AT THE

13   WASHINGTON COUNTY JAIL.  MR. SAYNE, THOUGH REALIZING THAT

14   IF THAT DEFENDANT FOUND OUT THAT HE WAS TELLING WHAT

15   HAPPENED, HE COULD GET IN TROUBLE, HE PASSED THAT

16   INFORMATION ON TO CORRECTIONAL OFFICIALS AT THE WASHINGTON

17   COUNTY JAIL.  AS A RESULT OF THAT, I ASKED THE MARSHALS

18   OFFICE TO MOVE MR. SAYNE FROM WASHINGTON COUNTY, TO GET

19   HIM OUT OF THERE SO THERE WOULDN'T BE ANY RETALIATION, AND

20   THE MARSHALS SERVICE DID THAT.

21            MR. SAYNE EVENTUALLY, YOUR HONOR, GOT PLACED

22   BACK IN WASHINGTON COUNTY, AND WE VERY QUICKLY HAD TO

23   MOVE, AND THE MARSHALS OFFICE AGAIN MOVED HIM WITHIN THE

24   WASHINGTON COUNTY JAIL TO GET HIM OUT OF HARM'S WAY

25   BECAUSE THAT VIOLENT DEFENDANT WAS STILL THERE.

1    HE'S BEEN IN THE CLAIBORNE COUNTY JAIL, YOUR

2  HONOR, FOR TWO DIFFERENT OCCASIONS NOW FOR SEVERAL MONTHS.

3  AS YOUR HONOR CAN TELL FROM THE SENTENCING MEMORANDUM, HE

4  HELPED THEM WITH A NUMBER OF BURGLARIES.  THERE WAS A

5  SITUATION WHERE AN INMATE ACCUSED SOME GUARDS OF PHYSICAL

6  ABUSE TO THE INMATE, MR. SAYNE VOLUNTEERED INFORMATION TO

7  GIVE INFORMATION TO THE SHERIFF'S DEPARTMENT.

8    THE COURT:  DOES THAT SUGGEST THAT HE HAS

9  REHABILITATED HIMSELF OR THAT HE'S LEARNED HOW TO PLAY THE

10  SYSTEM?

11    MR. BLACKWELL:  YOUR HONOR, IT SUGGESTS TO ME,

12  IT SUGGESTS TO ME IN GETTING TO KNOW HIM THAT IT'S SOMEONE

13  WHO IS REALIZING THAT HE HAS RESPONSIBILITIES TO OBEY THE

14  LAW THAT MAYBE HE DIDN'T HAVE BEFORE.  IT'S CONDUCT, YOUR

15  HONOR, DIFFERENT FROM THE CONDUCT HE DISPLAYED BACK IN

16  2003, AND I SUBMIT TO THE COURT THAT IT SHOWS THAT EVEN

17  THOUGH THE GOVERNMENT PAINTS HIM AS SOMEONE WHO IS TOTALLY

18  INCORRIGIBLE, WHO IS ALWAYS GOING TO VIOLATE THE LAW, THAT

19  THERE ARE TIMES, PARTICULARLY RECENT TIMES, THAT HE TRIES

20  TO DO THE RIGHT THING.

21    YOUR HONOR, IN FACT, I GOT A LETTER THAT I HAVE

22  PROVIDED THE GOVERNMENT THAT I WOULD LIKE TO PROVIDE TO

23  THE COURT AND ASK THAT IT BE INCLUDED AS AN EXHIBIT --

24    THE COURT:  ALL RIGHT.

25    MR. BLACKWELL:  -- FROM A CAPTAIN AT THE

CLAIBORNE COUNTY SHERIFF'S DEPARTMENT, AND HE VALIDATES

COOPERATION AND THE HELP THAT MR. SAYNE HAS GIVEN THEM

SINCE HE'S BEEN THERE.

AND IN ADDITION, YOUR HONOR, YOU HAVE TO

CONSIDER THIS NOW AGAINST HIS BACKGROUND; AND THE

GOVERNMENT DOESN'T TALK ANYTHING ABOUT HIS BACKGROUND,

EXCEPT TO THE POINT THAT THEY TALK ABOUT WHEN WE WERE HERE

BEFORE TALKING ABOUT GETTING HIM TREATMENT.  THEY TALK

ABOUT SOMEONE WHO STOOD IN HIS STEAD AS HIS MOTHER, AND

THEY SEEMED TO SUGGEST, YOUR HONOR, THAT THAT'S NOT

SOMETHING THAT WOULD HAVE BEEN APPROPRIATE AT THE TIME;

BUT YOUR HONOR HAS TO LOOK AT MR. SAYNE'S BACKGROUND.  THE

FACT THAT HIS MOTHER WAS ABSENT MOST OF THE TIME.  WHEN

SHE WAS AROUND, SHE WAS ABUSIVE, SHE WAS A DRUG USER, SHE

WAS A CON.  SHE GOT INVOLVED IN ECONOMIC AND FINANCIAL

CRIMES HERSELF.  HE DIDN'T HAVE A FATHER GROWING UP.  HE

HAS A CONFLICTING FAMILY BACKGROUND.  ON ONE HAND, YOUR

HONOR, HE HAS GRANDPARENTS WHO CARED FOR HIM, WHO LOVED

HIM, WHO HELPED HIM ALONG.  ON THE OTHER HAND HE HAD A

GRANDPARENT WHO DID THINGS THAT A ROLE MODEL SHOULDN'T DO

FOR A YOUNG MAN GROWING UP.

HIS CRIMINAL HISTORY, YOUR HONOR, IS, AGAIN, AS

I SAID BEFORE, PRE-2003, IT'S PETTY THEFT AND WORTHLESS

CHECKS.  POST 2003 HE GETS 13 POINTS ADDED BECAUSE OF

STATE CONVICTIONS THAT HE PLED GUILTY TO THAT WERE RUN

1    CONCURRENTLY WITH HIS FEDERAL SENTENCE IN 2003.

2              ONE THING HE TOLD ME, YOUR HONOR, WHEN I MET

3    WITH HIM WAS THAT HE WANTED A, A PSYCHOLOGICAL EVALUATION,

4    AND WE APPLIED TO THE COURT FOR THAT.  THE COURT AGREED.

5    MR. SAYNE WANTED THAT.  THAT WAS NOT AN IDEA, YOUR HONOR,

6    THAT I CAME UP.  THE COURT CONSIDERED IT, THE COURT

7    ORDERED IT.  THE EVALUATION WAS DONE BY DR. MCNISH.  IT

8    INCLUDED CLINICAL INTERVIEWS, IT INCLUDED A PSYCHOLOGICAL

9    TEST; AND THERE'S SOME THINGS I CAN AGREE WITH MS. SMITH

10   ON, I THINK THIS EVALUATION IN SOME PARTS SHOWS THAT MR.

11   SAYNE IS A SMART PERSON; THAT HE HAS A LOT OF POTENTIAL;

12   THAT HIS POTENTIAL HASN'T BEEN DIRECTED IN THE RIGHT

13   DIRECTION OVER THE YEARS.  I THINK IT'S ALSO IMPORTANT TO

14   NOTE THAT DR. MCNISH SAYS THAT MR. SAYNE TRIED DURING THE

15   EVALUATION; THAT SHE FOUND THAT HIS REPORTING WAS HONEST;

16   THAT THERE WAS NO EXAGGERATION OR FEIGNING ON HIS PART;

17   THAT IT WAS AN HONEST ATTEMPT FOR HELP.  AND, YOUR HONOR,

18   I CONTRAST THAT TO WHAT THE COURT DESCRIBED MR. SAYNE WHEN

19   HE PLED GUILTY.  WHEN WE ASKED FOR THAT EVALUATION, THE

20   GOVERNMENT SAID THAT HE WAS A PATHOLOGICAL LIAR; THAT HE

21   WAS TRYING TO CON THE COURT BY SIMPLY HAVING A

22   PSYCHOLOGICAL EVALUATION.

23             WELL, THANKFULLY DR. MCNISH BELIEVED AND SAW

24   THAT MR. SAYNE HONESTLY REPORTED AND HONESTLY PARTICIPATED

25   IN THE PROCESS.  HIS DIAGNOSES WAS TWO PERSONALITY

1   DISORDERS, AND THAT SHE SAID THAT THEY WERE BASICALLY

2   BASED ON INTENSE ABANDONMENT FEARS.  YOUR HONOR, AS A

3   RESULT OF THAT, SHE RECOMMENDED COGNITIVE BEHAVIORAL

4   THERAPY.  I DID NOTE IN THE REPORT THAT IN MAKING THAT

5   RECOMMENDATION SHE DIDN'T EXPLAIN TO THE COURT OR TO THE

6   PARTIES WHAT COGNITIVE BEHAVIORAL THERAPY WAS; AND I

7   ATTEMPTED IN THE SENTENCING MEMORANDUM, YOUR HONOR, TO

8   RESEARCH THAT, TO GET INTO IT, TO SEE WHAT IT INVOLVED AND

9   TO SEE WHAT HELPED.  ONLY MR. SAYNE IS GOING TO BE ABLE TO

10  TAKE ADVANTAGE OF THAT, BUT WE ASK THE COURT AS PART OF

11  THE SENTENCING PROCESS TO TAKE THAT INTO CONSIDERATION, TO

12  INCLUDE THAT BOTH WHILE HE IS IN CUSTODY AND WHEN HE IS

13  RELEASED ON SUPERVISED RELEASE.

14         I ALSO BELIEVE, YOUR HONOR, THAT WE HAVE

15  ESTABLISHED THAT MR. SAYNE HAS A DRUG PROBLEM; THAT WHEN

16  HIS BUSINESS FAILED, HE RESORTED BACK TO THE DRUG ABUSE

17  CONDUCT THAT HE DID BEFORE; THAT HE BEGAN USING VALIUM AND

18  AGAIN GOT OUT OF CONTROL.  NOT SAYING THAT, YOUR HONOR, AS

19  ANY KIND OF EXCUSE FOR ANYTHING, BUT IT'S PART OF HIS NEED

20  IN NEEDING HELP THAT HE NEEDS THE 500 HOUR COMPREHENSIVE

21  RESIDENTIAL DRUG TREATMENT PROGRAM.  HE HAS NOT HAD THAT

22  BEFORE, AND WE ASK THE COURT TO MAKE THAT RECOMMENDATION

23  SO HE CAN GET THAT NOW.

24         THAT'S OUR POSITION, YOUR HONOR.  OBVIOUSLY MR.

25  SAYNE WANTS TO ADDRESS THE COURT.  I'M MORE THAN HAPPY TO

1  ANSWER ANY QUESTIONS THE COURT MIGHT HAVE OF ME.

2          THE COURT:  WELL, LET ME JUST ASK ONE, MR.

3  BLACKWELL, AND I ADDRESSED IT TO AGENT SCOWN EARLIER, IS

4  THERE ANYTHING TO ESTABLISH THAT THIS BUSINESS ACTUALLY

5  EXISTED AS A, AS A LEGITIMATE BUSINESS?  WHAT IS THERE?

6  AT THIS POINT I'M, I'M WONDERING WHETHER THERE WAS EVER A

7  LEGITIMATE ATTEMPT TO OPERATE, OPEN AND OPERATE A

8  BUSINESS.

9          MR. BLACKWELL:  WELL, YOUR HONOR, I, IN MY

10  TALKS WITH MR. SAYNE AND THE DISCOVERY I WAS PROVIDED, I

11  UNDERSTAND THAT THERE WAS A BUSINESS LOCATION THAT WAS

12  LEASED.  THERE WAS A DEFINITE ADDRESS.

13          THE COURT:  IS THERE A LEASE AGREEMENT --

14          MR. BLACKWELL:  I BELIEVE THERE WAS, YOUR

15  HONOR.

16          THE COURT:  -- DIRECTING PAYMENT IS?  THERE A

17  RECORD OF PAYMENT OF THE LEASE, A RECORD OF PURCHASE OF

18  EQUIPMENT?

19          MR. BLACKWELL:  WELL, YOUR HONOR, THERE WAS

20  NEVER AN ISSUE AS TO THE LEGITIMACY OF THAT BUSINESS

21  DURING ALL THE MEETINGS THAT WE HAD WITH THE FBI OR ANY

22  INTERVIEWS THEY CONDUCTED.  AS YOUR HONOR CAN TELL FROM

23  THE FACTUAL BASIS THAT WE AGREED TO, WE AGREED THAT THE

24  BUSINESS ITSELF WAS A LEGITIMATE BUSINESS.  IT WAS A

25  BUSINESS THAT WASN'T SUCCESSFUL, THAT WENT OUT OF

1   BUSINESS, AND THAT AFTER THAT IS WHEN MR. SAYNE GOT

2   INVOLVED IN MANIPULATING THE TERMINAL THAT HE RECEIVED

3   FROM FIRST DATA.

4           THERE WAS AN AGREEMENT WITH FIRST DATA.  THEY

5   WERE THE ONES THAT PROVIDED THE TERMINAL TO HIM.  THE

6   BUSINESS JUST DID NOT TAKE OFF BECAUSE A LOCAL DEALERSHIP

7   DECIDED THAT THEY WERE GOING TO KEEP THEIR DETAILING

8   IN-HOUSE INSTEAD OF DOING THAT WITH PERFECTION AUTO

9   DETAILING.

10          THE COURT:  WELL, IS THAT THE ONLY CUSTOMER HE

11  HAD?

12          MR. BLACKWELL:  NO, SIR.  THERE WERE OTHER

13  CUSTOMERS, BUT NOT ENOUGH CUSTOMERS TO JUSTIFY CONTINUING

14  THE BUSINESS.

15          THE COURT:  WHAT DOES ONE NEED ALL THESE

16  THOUSANDS OF DOLLARS FOR TO OPEN UP A DETAILING BUSINESS?

17          MR. BLACKWELL:  WELL, YOUR HONOR, YOU'VE GOT TO

18  HAVE ADVERTISING FIRST, YOU'VE GOT TO HAVE A BUSINESS

19  LOCATION, YOU'VE GOT TO GET THE BUSINESS LICENSES, AS I

20  RECALL.  IN A DETAILING BUSINESS, IT REQUIRES CERTAIN

21  MATERIALS THAT YOU USE.  I MEAN, AGAIN, THE GOVERNMENT HAS

22  NEVER TAKEN THE POSITION, NOR AS I UNDERSTAND IT THE

23  PROBATION OFFICE IN THE PRESENTENCE REPORT, THAT THE

24  CREATION OF THIS BUSINESS WAS IN ANY WAY ILLEGITIMATE.

25  GRANTED, YOUR HONOR, THAT HE DIDN'T DISCLOSE IT TO THE

PROBATION OFFICE, WHICH HE SHOULD HAVE DONE, WHICH HE HAS

ADMITTED AND WHICH HE HAS PLED GUILTY TO.

THE COURT:  MR. BLACKWELL, THE PROBLEM I'M

HAVING HERE IS THAT, AND I'M TRYING NOT TO PREJUDGE THIS,

BUT ON PAPER THE RECORD I'VE GOT IS A RECORD OF A

DEFENDANT WHO FOR THE LAST DECADE HAS BEEN WILLING TO LIE,

CHEAT, STEAL, TAKE ADVANTAGE OF PEOPLE, SCAM PEOPLE, AND

I'M NOW BEING TOLD THAT SUDDENLY HE HAS CHANGED.  HE NOW

WANTS TO DO THE RIGHT THING.  AND WHAT I THINK I'M HEARING

IS THAT ALL THIS CAN BE EXPLAINED BY A MOTHER WHO RAN OFF

AND ABANDONED HIM AND A BUSINESS THAT FAILED.

MR. BLACKWELL:  NO, SIR.

THE COURT:  AND I KNOW THAT'S AN OVER

SIMPLIFICATION, BUT THAT'S WHAT IT SOUNDS LIKE.

MR. BLACKWELL:  WELL, AND IF THAT'S WHAT IT

SOUNDS LIKE, THAT'S NOT WHAT IT'S MEANT TO BE.  I DON'T

KNOW HOW WE ARE ABLE TO EXPLAIN WHY PEOPLE DO WHAT THEY

DO, PARTICULARLY IN SITUATIONS WHERE YOU HAVE WHITE COLLAR

CRIMES.  I AGREE WITH THE COURT THAT THIS IS SOMETHING

THAT MR. SAYNE DECIDED TO DO; BUT WHEN YOU DECIDE TO DO

SOMETHING, IT'S BASED ON EXPERIENCES AND, AND GROWTH AND

PEOPLE THAT YOU LOOK UP TO WHEN YOU DECIDE TO DO IT.

CLEARLY, YOUR HONOR, HE DID THE WRONG THINGS, AND HE HAS

ADMITTED TO EVERYONE THAT HE COMMITTED THESE CRIMES.  IF

HE CAME IN HERE, YOUR HONOR, SAYING, JUDGE, IF YOU LET ME

1   OUT OR I DON'T CARE WHY I DID IT, THAT WOULD BE ONE THING;

2   BUT HE COMES IN HERE ASKING FOR HELP.

3            I'M NOT MINIMIZING WHAT HE'S DONE, AND I'M NOT

4   ARGUING WITH THE COURT AT ALL ABOUT THE SUMMARY THAT YOU

5   JUST GAVE.  CLEARLY THOSE THINGS WERE THINGS THAT HAPPENED

6   IN THE PAST.  I'M SIMPLY SUGGESTING TO THE COURT THAT

7   THERE ARE A NUMBER OF POSITIVE THINGS THAT MR. SAYNE HAS

8   DONE SINCE HE'S BEEN IN CUSTODY SINCE JANUARY OF 2009 THAT

9   THE COURT NEEDS TO TAKE INTO CONSIDERATION.  IT WOULD BE A

10  SAD DAY, YOUR HONOR, REGARDLESS OF WHAT A PERSON'S PAST

11  HISTORY IS, IF WE DECIDE TO SIMPLY THROW AWAY A HUMAN LIFE

12  THAT MIGHT BE PRODUCTIVE.

13           THE COURT:  AND I FULLY AGREE WITH THAT, AND

14  THAT'S THE REASON I'M STRUGGLING WITH THIS A BIT BECAUSE

15  CLEARLY WHAT YOU DESCRIBE IN TERMS OF THE COOPERATION HE'S

16  GIVEN AT THE WASHINGTON COUNTY DETENTION CENTER AND AT THE

17  CLAIBORNE COUNTY JAIL, THOSE ARE POSITIVE THINGS, IF IN

18  FACT THEY REPRESENT A SINCERE DESIRE ON HIS PART TO DO THE

19  RIGHT THING, IF THEY ARE INDICATIVE OF A DEGREE OF REMORSE

20  OR ACCEPTANCE OF RESPONSIBILITY THAT SUGGESTS THAT THERE

21  IS A POTENTIAL FOR REHABILITATION HERE.

22           ON THE OTHER HAND, THERE ARE JUST LITTLE THINGS

23  THAT ARE BOTHERSOME HERE.  I AM HAVING A DIFFICULT TIME

24  UNDERSTANDING WHY ALL THOSE THOUSANDS OF DOLLARS ARE

25  NEEDED TO START A DETAILING BUSINESS.  I'M HAVING A

1   DIFFICULT TIME UNDERSTANDING THE SIGNIFICANCE OF THE

2   ARGUMENT THAT'S NOW BEING MADE THAT HE SUFFERS FROM

3   DEPRESSION WHEN HE DENIED DURING THE PSYCHOLOGICAL

4   EVALUATION THAT HE HAD ANY SYMPTOMS OF DEPRESSION.  I'M

5   HAVING A DIFFICULT TIME UNDERSTANDING WHY IT'S ARGUED IN

6   THE SENTENCING MEMORANDUM THAT IN REALITY THIS WAS A

7   BUSINESS WHERE HE WORKED FOR SOMEBODY ELSE, AND YET HE

8   TOLD THE PROBATION OFFICER HE OWNED AND OPERATED THIS

9   BUSINESS.  THOSE ARE BOTHERSOME LITTLE DETAILS.

10        MR. BLACKWELL:  WELL, YOUR HONOR, AND I

11   UNDERSTAND THAT.  IF I COULD ADDRESS ONE OF THEM, THE

12   COURT WILL REMEMBER FROM THE TESTIMONY YOU HEARD THAT THE

13   BUSINESS ITSELF STARTED IN AUGUST AND SEPTEMBER OF 2008.

14   IT LASTED A COUPLE MONTHS, AND THAT WAS THE END OF IT IT'S

15   OUR POSITION, AS I SET OUT IN THE SENTENCING MEMORANDUM,

16   THAT THAT'S WHEN THE DEPRESSION HIT.  MR. SAYNE REALIZED

17   AGAIN THAT HE HAD BEEN A COMPLETE FAILURE, HE HADN'T BEEN

18   A SUCCESS AT ANYTHING.  THAT'S WHEN WE SUGGEST TO THE

19   COURT THAT THE DEPRESSION STARTED AGAIN, AND HE STARTED

20   ABUSING VALIUM AT THE TIME.

21        THE COURT:  BUT THIS EVALUATION WAS DONE AFTER

22   THAT.

23        MR. BLACKWELL:  EXACTLY, YOUR HONOR; BUT THE

24   EVALUATION WAS DONE AFTER HE WENT INTO CUSTODY.  I MEAN,

25   THE EVALUATION WAS DONE BACK A COUPLE OF MONTHS AGO AFTER

HE HAD BEEN IN CUSTODY A YEAR.  HE HAS ADAPTED AS WELL AS
HE CAN ADAPT TO HIS CURRENT SITUATION.  THE BUSINESS HAD
FAILED, YOUR HONOR, BACK AT THE END OF 2008.

I MEAN, YOU KNOW, DEPRESSION, MY UNDERSTANDING
OF DEPRESSION, AND, AGAIN, I DON'T WANT TO GET INTO
SOMETHING THAT I'M NOT AN EXPERT ON, BUT DEPRESSION IN MY
EXPERIENCE WITH IT IS NOT SOMETHING THAT IS AN OBVIOUS
CONSTANT.  IT'S SOMETHING THAT COMES AND GOES WITH THE
CHANGE OF CIRCUMSTANCES; AND IT'S NOT SO MUCH THE
DEPRESSION THAT WE'RE CONCERNED ABOUT, I'M MORE CONCERNED
ABOUT THE DRUG ABUSE AND THE ADDICTIVE BEHAVIOR.

AND I AGREE WITH DR. MCNISH THAT THAT CREATES
CERTAIN PERSONALITY DEFICIENCIES AND PERSONALITY TRAITS.
I MEAN, SHE SAYS, AND I THINK IT WAS EVEN DIFFICULT FOR
HER IN THE PSYCHOLOGICAL EVALUATION TO REALLY PUT HER
FINGER ON THE ANSWER TO THE QUESTION YOUR HONOR JUST
ASKED, AND THAT'S THE WHY QUESTION, WHY DID MR. SAYNE DO
ALL OF THIS OVER THE LAST TEN YEARS OR SO?  AND THE ONLY
THING THAT I GLEANED FROM WHAT SHE SAID IS IT IS A
CIRCUMSTANCE, A SERIES OF CIRCUMSTANCES AND A SERIES OF
BEHAVIORS ON HIS PART THAT AREN'T EASILY DEFINABLE INTO
ONE SINGLE FACTOR.  THAT YOU HAVE TO TAKE INTO
CONSIDERATION HIS BACKGROUND AND EVERYTHING ELSE AND HIS
CURRENT SITUATION.

I KNOW THE COURT IS IN A DIFFICULT POSITION IN

TRYING TO DECIDE WHETHER THIS IS IT OR WHETHER IF THE
COURT SHOWS MERCY AND MR. SAYNE GETS BACK OUT IF IT'S
GOING TO HAPPEN AGAIN.  I CAN ONLY SUGGEST TO THE COURT
THAT WE HAVE TRIED AS -- MR. SAYNE HAS TRIED AS BEST HE
CAN TO SHOW A DIFFERENCE IN HIS BEHAVIOR FROM LAST TIME
AND A DIFFERENCE IN HIS BEHAVIOR BY EVERYTHING HE'S DONE
SINCE HE'S BEEN IN ARREST.

YOUR HONOR, I'M NOT GOING TO TAKE ANY CREDIT
FOR THAT.  I SIMPLY SPENT A LOT OF TIME WITH HIM, AND HE
TOLD ME FROM THE VERY BEGINNING THAT THIS WAS SOMETHING HE
WANTED TO DO; THAT HE DOESN'T WANT TO BE PART OF THIS
REVOLVING DOOR AND CONTINUE TO GET OUT, DISAPPOINT PEOPLE,
DISAPPOINT HIMSELF, DISAPPOINT YOUR HONOR AND END UP BACK
IN JAIL AGAIN.  HE WANTS TO BE PRODUCTIVE, AND THANKFULLY
HE'S STILL YOUNG ENOUGH TO DO THAT.

YOU KNOW, I DON'T ENVY YOUR HONOR IN TRYING TO
RESOLVE THESE ISSUES.  WE ARE SIMPLY HERE ASKING FOR HELP;
AND I BELIEVE, YOUR HONOR, THAT THE APPROPRIATE THERAPY
AND COUNSELING THAT CAN START WITH THE BUREAU OF PRISONS,
THE HELP THAT HE'S GOING TO GET IN UNDERSTANDING THE DRUG
AND ADDICTION PROBLEM THAT HE HAS, YOUR HONOR, IS
SOMETHING THAT HE NEEDS HELP FOR, AND WE WOULD ASK THE
COURT TO RECOMMEND THE 500 HOUR COMPREHENSIVE DRUG
TREATMENT PROGRAM.

LASTLY, YOUR HONOR, AND THIS GOES WITHOUT

SAYING, IS THAT ANY SENTENCE YOUR HONOR IMPOSES OBVIOUSLY

IN THIS CASE IS GOING TO BE CONSECUTIVE TO THE SENTENCE

YOU IMPOSE ON THE PROBATION REVOCATION, AND THAT'S JUST

SOMETHING WE'RE NOT GOING TO CONTEST.  OBVIOUSLY HE'S IN

VIOLATION OF HIS SUPERVISED RELEASE AND THERE HAS TO BE A

CONSECUTIVE SENTENCE UNDER THE LAW.

THE COURT:  ALL RIGHT.

ALL RIGHT.  MS. SMITH, DO YOU WANT TO BE HEARD

AGAIN?

MS. SMITH:  WELL, I JUST WANTED TO CLARIFY THE

RECORD.  THERE WAS NO PLEA AGREEMENT IN THIS CASE.

MR. BLACKWELL REFERRED TO A PLEA AGREEMENT.  HE DECLINED

TO SIGN THE PLEA AGREEMENT, EVEN THOUGH I TRIED VERY HARD

TO CRAFT ONE THAT HE WOULD AGREE TO SIGN.  THERE WERE TWO

STATEMENTS OF FACTS HE HAD ABOUT RETAINING HIS RIGHTS, SO

I'M NOT SURE ABOUT THAT THIRD POINT IN ANY EVENT ON THAT

ISSUE.

AND THEN, SECONDLY, YOU KNOW, DR. MCNISH HAD NO

PROBLEMS WHATSOEVER FINDING THAT HIS SCORE SUGGESTS A LOW

CAPACITY FOR CHANGE, THAT'S PAGE 4.  WHILE THE CLINICAL

PROFILE APPEARS TO BE VALID, IT MAY REFLECT SOME

EXAGGERATION OF SYMPTOMS, THAT'S AT PAGE 4 AS WELL.  PAGE

7, SHE, SHE SAYS, YES, HE'S ANTISOCIAL, DEMONSTRATED

FAILURE TO CONFORM TO SOCIAL NORMS WITH RESPECT TO LAWFUL

BEHAVIORS, REPEATED LYING OR CONNING OTHERS FOR PERSONAL

1  PROFIT OR PLEASURE, IMPULSIVITY OR FAILURE TO PLAN AHEAD,

2  CONSISTENT IRRESPONSIBILITY, ET CETERA, ET CETERA. AND

3  FINALLY, I THINK SHE, ON THE BOTTOM OF PAGE 7, IT APPEARS

4  THAT MR. SAYNE DEVELOPED A SENSE OF ENTITLEMENT. AND I

5  THINK SHE'S CORRECT, I DON'T THINK SHE STRUGGLED AT ALL.

6          YOUR HONOR, THANK YOU.

7          THE COURT: MR. SAYNE, COME UP TO THE PODIUM

8  WITH YOUR ATTORNEY, PLEASE.

9          MR. SAYNE, THERE'S BEEN A PRESENTENCE REPORT

10 PREPARED IN THIS CASE. HAVE YOU RECEIVED AND REVIEWED

11 WITH YOUR ATTORNEY A COPY OF THIS PRESENTENCE REPORT?

12         THE DEFENDANT: YES, YOUR HONOR.

13         THE COURT: IS THERE ANYTHING YOU WISH TO SAY

14 TO THE COURT THIS AFTERNOON BEFORE SENTENCE IS IMPOSED.

15         THE DEFENDANT: JUST THAT ENOUGH IS ENOUGH.

16         THE COURT: I'M SORRY.

17         THE DEFENDANT: I'M SORRY --

18         THE COURT: MR. BLACKWELL, YOU MIGHT PULL THE

19 MICROPHONE UP JUST A LITTLE BIT OR RAISE THE PODIUM.

20         MR. BLACKWELL: WELL, YOUR HONOR, I --

21         MS. SMITH: I'M SORRY. I SHOULD HAVE DONE

22 IT.

23         THE DEFENDANT: YOUR HONOR, ENOUGH IS ENOUGH.

24 I MEAN, I DON'T HAVE ANY KIND OF EXCUSE. I DON'T, I DON'T

25 EVEN KNOW COMPLETELY THE REASON WHY I'M HERE RIGHT NOW. I

AM EXTREMELY SORRY THAT I CAUSED ALL THIS TROUBLE. I HOPE
THAT, YOU KNOW, YOU'LL GET ME THE HELP. I THINK ONE THING
THAT IS TALKED ABOUT THAT WAS MAYBE A LITTLE BIT
MISUNDERSTOOD, I WAS UNDER A LITTLE MORE STRESS THAN JUST
STRAIGHT OUT DEPRESSION. NO EXCUSE, STILL YET, BUT I
JUST -- I DON'T KNOW. BUT I WANT HELP. I WANT TO STOP
THIS STUFF. I DON'T WANT TO BE HERE. I DON'T WANT TO
DISAPPOINT MY FAMILY, HURT MY FAMILY. I MEAN, I'M SURE MY
SISTER AND FRIENDS BACK THERE ARE CRYING RIGHT NOW. YOU
KNOW, I'VE HURT THEM. I'VE HURT EVERYONE. I JUST ASK YOU
THAT GET ME HELP AND HELP ME TO SOLVE THIS. I DON'T WANT
TO DO THIS ANYMORE.

THE COURT: DO YOU WANT TO ADDRESS ANY OF THESE
QUESTIONS THAT I'VE RAISED ABOUT THIS BUSINESS?

THE DEFENDANT: I WILL, YOUR HONOR, YES.

THE COURT: WELL, I'M LISTENING.

THE DEFENDANT: THE BUSINESS WAS A LEGITIMATE
BUSINESS. THE MONTHS WEREN'T EXACTLY RIGHT. IT OPENED
AROUND AUGUST, IT CLOSED IN NOVEMBER. IT'S -- I DID TRY
TO MAKE A GO OF IT.

THE COURT: WHAT DID YOU USE ALL THESE
THOUSANDS OF DOLLARS FOR?

THE DEFENDANT: A LOT OF IT WAS WASTED.

THE COURT: WHAT DID YOU USE IT FOR? MR.
BLACKWELL SUGGESTED IT WENT TO LEASE PAYMENTS AND BUSINESS

1  LICENSES AND ADVERTISING.  DID YOU RUN SOME ADVERTISING?

2          THE DEFENDANT:  YES.

3          THE COURT:  WHERE.

4          THE DEFENDANT:  OAK RIDGE.  OAK RIDGER, I

5  BELIEVE IS THE NAME OF THE NEWSPAPER.

6          THE COURT:  HOW MUCH DID THAT COST YOU.

7          THE DEFENDANT:  FIVE OR $600 FOR A MONTH'S AD.

8          THE COURT:  AND WHAT DID YOUR BUSINESS LICENSE

9  COST, 30, $40?

10          THE DEFENDANT:  ALMOST NOTHING.

11          THE COURT:  ALMOST NOTHING, RIGHT.  I'M AWARE

12  OF WHAT THEY COST.  AND WHAT WAS YOUR MONTHLY LEASE ON THE

13  BUILDING?

14          THE DEFENDANT:  $1,000.

15          THE COURT:  AND THAT ACCOUNTS FOR A COUPLE

16  THOUSAND DOLLARS OF THE THOUSANDS YOU GOT FROM YOUR

17  GRANDMOTHER.  WHERE DID THE REST OF IT GO?

18          THE DEFENDANT:  FIVE THOUSAND WENT INTO THE

19  BUILDING FOR REPAIRS.  AGAIN, A LOT OF IT WAS WASTED.  I'M

20  NOT GOING TO TRY TO SIT HERE AND SAY I SPENT EVERY NICKEL

21  ON THE BUSINESS, I DIDN'T.  PART OF IT WAS JUST ME BLOWING

22  IT.  A LOT OF IT DID GO FOR THE BUSINESS, A LOT OF IT WENT

23  FOR THE CHEMICALS, FOR THE TOTAL EMPLOYEES, THE EQUIPMENT

24  TO DO IT WITH, BUT I BLEW QUITE A BIT OF IT.

25          THE COURT:  MR. SAYNE, I REALIZE THAT FROM

WHERE YOU'RE STANDING THIS DOESN'T SOUND TERRIBLY

INCREDIBLE AT ALL, BUT WHAT YOU'RE ASKING ME TO DO IS TO

GET YOU HELP TO STOP YOU DOING SOMETHING THAT YOU DON'T

KNOW THE REASON WHY YOU'RE DOING IT AND TELLING ME THAT

IT'S RELATED TO STRESS, AND I WOULD SUGGEST TO YOU THAT

MOST OF THE STRESS WAS CREATED BY EFFORTS TO KEEP FROM

BEING DETECTED.  I'M GOING TO TELL YOU WHY YOU ARE HERE,

YOU ARE HERE BECAUSE YOU CHOSE TO TAKE SOMETHING THAT DID

NOT BELONG TO YOU.  THAT DIDN'T HAPPEN BECAUSE YOUR MOTHER

ABANDONED YOU OR BECAUSE YOUR GRANDFATHER WAS A

MOONSHINER.

THE DEFENDANT:  NO, SIR.

THE COURT:  OR BECAUSE YOU HAD A DIFFICULT

CHILDHOOD.  IT DIDN'T HAPPEN FOR ANY OF THOSE REASONS.  IT

HAPPENED BECAUSE ROBERT SAYNE MADE A CONSCIOUS CHOICE TO

DO WHAT HE DID.

THE DEFENDANT:  YOU'RE RIGHT.

THE COURT:  SO WHY AM I HEARING ALL THESE

EXCUSES?

THE DEFENDANT:  I DON'T --

THE COURT:  WHAT'S WRONG WITH SAYING I CHOSE TO

DO IT, I KNEW IT WAS WRONG, I KNEW I WAS TAKING SOMETHING

THAT DIDN'T BELONG TO ME.  YOU ARE AN INTELLIGENT YOUNG

MAN, MR. SAYNE.  IT TOOK AN INTELLIGENT PERSON TO COME UP

WITH THIS SCHEME AND TO EXECUTE THIS SCHEME.  WHY IS IT

THAT YOU DON'T CHOOSE TO PUT YOUR TALENTS TO USE IN
PRODUCTIVE PURSUITS AS OPPOSED TO CRIMINAL PURSUITS?  WHAT
MAKES IT SO HARD FOR YOU TO MAKE THAT CHOICE?

THE DEFENDANT:  THERE IS NO EXCUSE.  I'M NOT
TRYING TO LAY BLAME ON ANYONE.

THE COURT:  YOU'RE ASKING ME TO GET YOU HELP.

THE DEFENDANT:  YES.

THE COURT AND YOU NEED TO UNDERSTAND THAT IT
STARTS WITH YOU.  YOU NEED TO UNDERSTAND THAT YOU'VE MADE
CONSCIOUS CHOICES HERE.  I SENT YOU TO PRISON ONCE BEFORE,
AND LESS THAN 30 DAYS, OR MAYBE JUST A FEW MORE THAN 30
DAYS, ROUGHLY 30 DAYS AFTER YOUR RELEASE FROM CONFINEMENT,
YOU PROVIDE A MONTHLY REPORT WITH THE PROBATION OFFICER
THAT'S FALSE.  NOW, ONE CONCLUSION I CAN DRAW FROM THAT IS
THAT YOU DIDN'T LEARN ANYTHING EXCEPT HOW TO WORK THE
SYSTEM.

IN YOUR LETTER AND IN EVERYTHING ELSE I'M
HEARING HERE, THE MESSAGE IS I WANT TO DO THE RIGHT THING,
BUT I JUST CAN'T.  I CAN'T DO THE RIGHT THING.  I MAKE A
MESS OUT OF THINGS.  I'M A FAILURE.  I DIG MY HOLE DEEPER
BY DOING SOMETHING WRONG OR ILLEGAL.  IT WOULD BE A VERY
SIMPLE MATTER, MR. SAYNE, IF THERE WERE SIMPLY SOME MENTAL
DEFECT THAT I COULD GET YOU TREATMENT FOR THAT SOME DOCTOR
COULD CURE.  NO DOCTOR CAN CURE THIS UNTIL YOU FIRST
UNDERSTAND THAT SOCIETY'S RULES ARE THERE FOR A REASON.

1       I MENTIONED A COUPLE OF LITTLE THINGS HERE THAT
2   WERE TROUBLING JUST A MINUTE AGO.  THE WHOLE ISSUE ABOUT
3   THE OWNERSHIP OF THIS BUSINESS IS TROUBLING.  IF I HAD TO
4   FIND TODAY BY A PREPONDERANCE OF THE EVIDENCE THAT THERE
5   EVER WAS SUCH A BUSINESS THAT EXISTED FOR ANY PURPOSE
6   OTHER THAN SCAMMING THIS COMPANY, I DON'T THINK I COULD
7   MAKE THAT FINDING.  ON THE ONE HAND, I'M BEING TOLD THAT
8   YOU'RE DEPRESSED, AND IN FACT YOU TOLD THE PROBATION
9   OFFICER THAT YOU WERE SUFFERING FROM STRESS, ANXIETY AND
10  DEPRESSION DUE TO YOUR CURRENT CIRCUMSTANCES; AND YET WHEN
11  YOU GO FOR A PSYCHOLOGICAL EVALUATION AND THE EXAMINER
12  ASKS YOU ABOUT DEPRESSION, YOU DENY SYMPTOMS OF
13  DEPRESSION.
14      HERE'S THE PROBLEM THAT YOU HAVE CREATED, MR.
15  SAYNE, AS I INDICATED TO MR. BLACKWELL, WHAT YOU HAVE DONE
16  HERE IS CREATE A TEN YEAR RECORD OF LYING, CHEATING,
17  STEALING, CONNING PEOPLE, TAKING THINGS THAT DON'T BELONG
18  TO YOU; AND IT IS NOT THE NUMBER OF CONVICTIONS THAT YOU
19  SUSTAINED THAT IS TROUBLING TO ME, IT IS THE TYPE OF
20  CONVICTIONS BECAUSE EVERY ONE OF THEM HAVE INVOLVED
21  DECEPTION AND TAKING FROM OTHER PEOPLE THINGS THAT DO NOT
22  BELONG TO YOU.  NOW, THAT'S THE RECORD YOU HAVE CREATED
23  FOR THE LAST TEN YEARS, AND YET I'M ASKED TO BELIEVE THAT
24  NOW IN THE PROCESS YOU HAVE FINALLY COME TO THE REALI-
25  ZATION THAT YOU HAVE BEEN MAKING THE WRONG DECISIONS AND

1    THAT YOU NEED HELP SO THAT YOU WON'T MAKE THOSE BAD

2    DECISIONS IN THE FUTURE.  YOU UNDERSTAND HOW HARD IT IS

3    FOR ME TO ACCEPT THAT EXPLANATION?

4              THE DEFENDANT:  YES, YOUR HONOR, I CAN SEE

5    THAT.

6              THE COURT:  I WANT TO ACCEPT IT BECAUSE I

7    PREFER NOT TO PUT PEOPLE IN JAIL TO PROTECT THE PUBLIC,

8    I'D PREFER THAT WE DEAL WITH THE CAUSES TO THE EXTENT WE

9    CAN; BUT YOU CANNOT CHALK UP TO DEPRESSION OR BAD UP-

10   BRINGING OR DRUG ABUSE ALL THESE DECISIONS THAT YOU'VE

11   MADE OVER THE LAST DECADE.

12             THE DEFENDANT:  IT WAS NEVER --

13             THE COURT:  WHEN YOU WRITE A WORTHLESS CHECK,

14   YOU'RE TAKING FROM SOMEBODY SOMETHING THAT DOESN'T BELONG

15   TO YOU.  WHEN YOU COMMIT WIRE FRAUD, YOU ARE TAKING FROM

16   SOMEBODY OR SOME ENTITY SOMETHING THAT DOES NOT BELONG TO

17   YOU.

18             MR. BLACKWELL:  YOUR HONOR, IF I COULD SAY, AND

19   THE COURT KNOWS THIS FROM THE PRESENTENCE REPORT, THAT MR.

20   SAYNE HAS NEVER DENIED DOING WHAT HE DID, WHETHER IT BE IN

21   FEDERAL COURT OR WHETHER IT BE IN STATE COURT.  HE'S TAKEN

22   RESPONSIBILITY FOR THAT.  THE QUESTION HE'S ASKED TO ME IS

23   WHY DO I DO IT?  WHY DO I MAKE THE DECISION NOT TO USE THE

24   FACULTIES THAT I HAVE AND THE ABILITY THAT I HAVE TO MAKE

25   THE RIGHT DECISIONS?  HE'S NEVER TRIED TO HIDE BEHIND NOT

1    BEING RESPONSIBLE FOR THE ACTS HE'S COMMITTED.  IT'S --

2              THE COURT:  I UNDERSTAND THAT, MR. BLACKWELL;

3    BUT THERE ARE TWO POSSIBLE EXPLANATIONS FOR WHY MR. SAYNE

4    DOES WHAT HE DOES.  ONE IS THAT THERE TRULY IS SOMETHING

5    WRONG WITH HIM.

6              MR. BLACKWELL:  YES, SIR.

7              THE COURT:  THE OTHER IS THAT HE'S CHOSEN TO DO

8    IT.

9              MR. BLACKWELL:  YES, SIR.

10             THE COURT:  IT'S JUST ABSOLUTE DISREGARD FOR

11   OTHER PEOPLE'S RIGHTS, AND THAT'S PRETTY CLOSE TO WHAT

12   DR., OR TO WHAT DR. MCNISH SAYS HERE.  SHE DESCRIBES HIM

13   AS HAVING AN ANTISOCIAL PERSONALITY DISORDER.  HE HAS

14   DEMONSTRATED FAILURE TO CONFORM TO SOCIAL NORMS WITH

15   RESPECT TO LAWFUL BEHAVIORS, REPEATED LYING OR CONNING

16   OTHERS FOR PERSONAL PROFIT OR PLEASURE, IMPULSIVITY OR

17   FAILURE TO PLAN AHEAD, A SENSE OF ENTITLEMENT; AND SHE

18   EVEN NOTES THAT HIS REQUEST FOR THE PSYCHOLOGICAL ITSELF

19   APPEARS TO BE SELF SERVING, A BENEFIT ONLY TO HIM.

20             MR. BLACKWELL:  WELL, OF COURSE, HE'S THE ONE

21   THAT'S GOING TO BENEFIT OR NOT BENEFIT FROM THE EVALUA-

22   TION; BUT WE DON'T DISAGREE WITH WHAT THE COURT JUST SAID,

23   BUT, AGAIN, THE CORE QUESTION IS WHY HAS HE MADE THE

24   DECISIONS IN THE PAST TO DO WHAT HE DID.  WE'RE NOT TRYING

25   TO EXCUSE ANYTHING.  HE'S TAKEN FULL RESPONSIBILITY.  HE

WANTS TO UNDERSTAND THE WHY, SO IF THERE IS AN OPPORTUNITY

WITH TREATMENT AND THERAPY TO CHANGE, THAT'S WHAT HE WANTS

TO DO, HE WANTS TO CHANGE.

THE COURT: THAT'S A PRETTY HARD SALE, MR.

BLACKWELL, THAT'S MY POINT. IT'S PRETTY HARD TO SELL THAT

HE NOW WANTS TO CHANGE AFTER THIS TEN YEAR HISTORY OF ALL

THAT'S GONE ON HERE.

MR. BLACKWELL: YOUR HONOR, I'M NOT TRYING TO

SELL ANYTHING. WHAT I'M SIMPLY TRYING TO DO IS SUGGEST TO

THE COURT THAT, AS I SAID EARLIER, WE DON'T SIMPLY THROW A

HUMAN BEING AWAY, WE TRY TO HELP THAT HUMAN BEING, WE TRY

TO PUT THAT PERSON IN THE BEST POSITION WE CAN. ALL I'M

TRYING TO DO WITH THE COURT IS GIVE YOU AS MUCH

INFORMATION TO HIS BACKGROUND SO THAT IF THERE IS AN

UNDERSTANDING AS TO WHY HE COMMITTED THE CRIMES THAT HE

DID, ONCE WE GET TO THAT POINT, THEN AS DR. MCNISH SAYS,

THERE IS THE POSSIBILITY FOR TREATMENT. THERE IS THE

POSSIBILITY WITH COGNITIVE THERAPY BEHAVIOR THAT MR. SAYNE

CAN UNDERSTAND THE WHY AT SOME POINT AND RESIST DOING IF,

IF AN URGE COMES UP.

IT'S ALMOST LIKE AN ADDICTION, YOUR HONOR,

WHETHER IT BE A DRUG ADDICTION OR AN ADDICTION TO ANYTHING

ELSE IS; AND THAT'S WHAT A PERSONALITY DISORDER LIKE THIS

IS. WE ARE SIMPLY TRYING TO ANSWER THAT CORE QUESTION AND

DETERMINE WHETHER HIS LIFE IS SALVAGEABLE WITH COGNITIVE

1    THERAPY TREATMENT.

2            THE COURT:  MR. SAYNE, HERE'S THE DEBATE I'M

3    HAVING RIGHT NOW, I'VE BEEN SITTING HERE TRYING TO

4    FORMULATE THE RECOMMENDATION THAT I WOULD SEND TO THE

5    BUREAU OF PRISONS, I'M GOING TO RECOMMEND TO THE BUREAU OF

6    PRISONS THAT YOU RECEIVE HELP FOR SOME UNSPECIFIED PROBLEM

7    THAT CAUSES YOU TO DO WHAT YOU'VE DONE, AND I'M BEING

8    ASKED TO TRUST THE BUREAU OF PRISONS TO PROVIDE THAT

9    UNSPECIFIED HELP SO THAT YOU WILL NO LONGER BE A MENACE TO

10   SOCIETY WHEN YOU'RE RELEASED.

11           THE FIRST THING YOU SAID TO ME WAS YOU DON'T

12   UNDERSTAND THE REASON WHY YOU'RE HERE.  I DON'T BELIEVE

13   THAT FOR ONE MINUTE.  I AM RESISTING THE URGE AT THE

14   MOMENT, MR. SAYNE, TO COME TO THE CONCLUSION THAT THE ONLY

15   WAY I CAN PROTECT OTHERS AND THEIR PROPERTY FROM YOU IS TO

16   PUT YOU IN JAIL FOR THE MAXIMUM AMOUNT OF TIME THAT THE

17   LAW REQUIRES ME TO DO, OR ALLOWS ME TO DO.  YOU SIMPLY

18   CANNOT TAKE FROM OTHERS WHAT DOES NOT BELONG TO YOU,

19   PERIOD, PURE AND SIMPLE, END OF DISCUSSION, AND I SIMPLY

20   DO NOT BELIEVE THAT THE REASON YOU HAVE BEEN TAKING FROM

21   OTHERS FOR THE LAST DECADE IS BECAUSE SOMETHING IS WRONG

22   WITH YOU.  THERE IS NO EVIDENCE IN THIS RECORD THAT YOU

23   ARE MENTALLY INCOMPETENT TO THE POINT THAT YOU DO NOT HAVE

24   RESPONSIBILITY FOR YOUR OWN ACTIONS.  THE RESPONSIBILITY

25   FOR WHAT'S HAPPENED HERE LIES WITH YOU AND YOU ALONE.  YOU

1  HAVE VICTIMIZED EVERYBODY THAT YOU HAVE COME IN CONTACT

2  WITH, INCLUDING YOUR GRANDMOTHER, AND I THINK I SAID THIS

3  AT THE LAST SENTENCING HEARING -- YOU STOLE FROM HER THEN

4  TOO; DIDN'T YOU?

5          THE DEFENDANT:  IN EFFECT, YEAH.

6          THE COURT:  IN EFFECT?  WHAT DO YOU MEAN IN

7  EFFECT?  YOU STOLE FROM HER, TOOK SOMETHING THAT DIDN'T

8  BELONG TO YOU; DIDN'T YOU?

9          THE DEFENDANT:  YES.

10         THE COURT:  MR. SAYNE THAT'S PART OF THE

11 PROBLEM HERE.  YOU NEED TO FACE UP TO WHAT YOU'VE BEEN

12 DOING.  DON'T SAY IN EFFECT THIS OR THAT OR I MIGHT HAVE

13 DONE THIS OR THAT OR MAYBE I DID THAT, JUST FACE UP TO THE

14 FACT THAT YOU HAVE BEEN STEALING FROM EVERYBODY YOU'VE

15 COME IN CONTACT WITH.

16         THE QUESTION IS, AS I SAID JUST A MINUTE AGO,

17 DO I HAVE TO PUT YOU IN FEDERAL PRISON FOR 25 YEARS IN

18 ORDER TO STOP THAT?  I MUST SAY THAT I AM SURPRISED AT

19 WHAT I'VE HEARD FROM YOU, NOT WHAT I'VE HEARD FROM YOUR

20 LAWYER, BUT WHAT I'VE HEARD FROM YOU TODAY.  I DON'T KNOW

21 WHY I'M HERE, I NEED HELP.

22         I AM RELUCTANT TO IMPOSE SENTENCE THIS

23 AFTERNOON.  WHAT I'M INCLINED TO DO HERE, MR. SAYNE, IS TO

24 POSTPONE THE IMPOSITION OF SENTENCING SO THAT I CAN TAKE

25 SOME TIME TO CONSIDER THIS IN A MORE DETACHED FASHION.  I

1   DO NOT WANT TO THROW AWAY A LIFE, AS MR. BLACKWELL SAID.

2   I WOULD MUCH PREFER TO IMPOSE A SENTENCE THAT WILL SERVE

3   NOT ONLY THE PUBLIC'S NEEDS, BUT YOURS AS WELL. I WOULD

4   MUCH PREFER TO IMPOSE A SENTENCE THAT GIVES ME SOME SENSE

5   OF HOPE THAT AFTER YOU SERVE THIS PRISON SENTENCE, THAT

6   THINGS WOULD IN FACT BE DIFFERENT, THAT YOU WOULD PUT YOUR

7   OBVIOUS TALENT TO MORE PRODUCTIVE USE. THAT'S WHAT I'D

8   LIKE TO DO; BUT IF I CAN'T DO THAT, THEN THE ONLY OPTION

9   I'VE GOT IS TO IMPOSE A SENTENCE THAT PROTECTS THE PUBLIC

10  FROM YOU. AND I REALLY DON'T WANT TO DO THAT, MR. SAYNE.

11  AND I KNOW THAT WHEN I PUT A MATTER OFF IT INCONVENIENCES

12  EVERYBODY INVOLVED, AND I APOLOGIZE FOR THAT.

13          WE HAVE SPECIALLY SET SOME CASES FOR WEDNESDAY,

14  APRIL 28TH. COUNSEL, ARE YOU AVAILABLE THEN?

15          MS. SMITH: YES, YOUR HONOR, I AM.

16          MR. BLACKWELL: YOUR HONOR, IS THAT IN THE

17  MORNING OR AFTERNOON?

18          THE COURT: WE CAN DO IT EITHER ONE.

19          MR. BLACKWELL: IF THE COURT COULD DO IT IN THE

20  AFTERNOON, THAT WOULD BE FINE. I'VE GOT A MATTER IN

21  KNOXVILLE AT 9:00 IN THE MORNING.

22          THE COURT: ALL RIGHT. MR. SAYNE, I'M GOING TO

23  RESET THIS MATTER FOR THE IMPOSITION OF SENTENCE AT 1:30

24  P.M. ON WEDNESDAY, APRIL 28, AND I WILL IMPOSE SENTENCE AT

25  THAT TIME. I'M GOING TO REVIEW AGAIN THE MATERIALS THAT

1   HAVE BEEN PROVIDED TO ME, THINK ABOUT WHAT I'VE HEARD AND

2   SEEN TODAY; AND I WOULD SUGGEST TO YOU, MR. SAYNE, THAT

3   YOUR TIME COULD BE PRODUCTIVELY SPENT NOT LOOKING FOR SOME

4   UNDETERMINED ILLNESS OR DEFECT THAT CAUSES YOU TO MAKE THE

5   CHOICES YOU MAKE, BUT TO A DETACHED CONSIDERATION OF WHAT

6   IT IS ABOUT YOU, NOT WHAT IT IS ABOUT SOMEBODY ELSE, BUT

7   WHAT IT IS ABOUT YOU THAT MAKES IT DIFFICULT FOR YOU TO

8   FOLLOW THE RULES; AND THINK BACK TO WHEN THAT FIRST REPORT

9   WAS DUE AFTER YOU WERE RELEASED FROM PRISON AND ASK

10   YOURSELF WHAT IT IS THAT CAUSED YOU TO CHOOSE TO START

11   FABRICATING EARNING STATEMENTS AND FALSIFYING MONTHLY

12   REPORTS.  I AM CONVINCED OF ONE THING, IT WAS NOT A MENTAL

13   ILLNESS THAT CAUSED YOU TO DO THAT.

14         COUNSEL, I APOLOGIZE FOR THE INCONVENIENCE, BUT

15   I'LL IMPOSE SENTENCE ON THE 28TH.

16         MR. BLACKWELL:  YOUR HONOR, IF THE COURT WOULD

17   ALLOW ME TO FILE IN THE RECORD THE LETTER FROM THE CAPTAIN

18   OF THE CLAIBORNE COUNTY SHERIFF'S OFFICE.

19         THE COURT:  YOU MAY.

20         MS. SMITH, JUST FOR FUTURE REFERENCE, THERE WAS

21   A REASON WHY I WAS ASKING THE QUESTIONS ABOUT YOUR

22   RECOMMENDATION, IT WAS NOT THAT I HAD NOT READ YOUR

23   SENTENCING MEMORANDUM, IT WAS THE PROCEDURAL POSTURE HERE

24   BECAUSE I WAS TRYING TO DETERMINE WHETHER OR NOT YOU WERE,

25   IN EFFECT, SEEKING AN UPWARD DEPARTURE OR WHETHER YOU WERE

1    SEEKING A VARIANCE.  AND I KNOW THAT EVEN THE APPEALS

2    COURTS HAVE USED THOSE TERMS SOMEWHAT INTERCHANGEABLY, BUT

3    IT APPEARS TO ME THAT WHAT YOU'RE ASKING FOR IS, FIRST OF

4    ALL, A DEPARTURE FROM THE GUIDELINE RANGE THAT OTHERWISE

5    APPLIES, IN OTHER WORDS A GUIDELINES DEPARTURE UNDER

6    CHAPTER 4 OF THE GUIDELINES.

7                    MS. SMITH:  RIGHT.

8                    THE COURT:  AND THEN YOU'RE ASKING FOR A

9    VARIANCE IN ADDITION TO THAT.

10                   MS. SMITH:  THAT'S CORRECT, YOUR HONOR, FOUR

11   LEVELS PLUS AN ADDITIONAL SIX MONTHS OR SEVEN MONTHS,

12   THAT'S CORRECT.

13                   MR. BLACKWELL:  AND, YOUR HONOR, THAT WAS THE

14   WAY I UNDERSTOOD IT TOO.

15                   THE COURT:  AND THAT'S JUST -- I'VE NOT SEEN IT

16   RAISED IN QUITE THAT FASHION, BUT I UNDERSTAND WHAT YOU'RE

17   ASKING HERE.

18                   ALL RIGHT.  WE'LL COME BACK ON THE 28TH OF

19   APRIL THEN.

20        (PROCEEDINGS ARE ADJOURNED AT 4:50 P.M.)

21   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

22   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23

24

25   KAREN J. BRADLEY/S                    3/22/11
     SIGNATURE OF COURT REPORTER               DATE

1                         INDEX

2
                          DIRECT   CROSS   REDIRECT
3
WITNESSES ON BEHALF
4  OF THE GOVERNMENT:
   DREW SCOWN                 5       15        27
5  BY THE COURT              28
   DAN THORNTON              29      46, 58      57
6  BY THE COURT              58

7

8                        EXHIBITS

9
                               MARKED    ADMITTED
10
   GOVERNMENT'S:
11 1   POWER POINT                        15
   3   MONTHLY REPORTS                    35
12
   DEFENDANT'S:
13 2  FBI 302'S                           59

14

15

16

17

18

19

20

21

22

23

24

25